# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RANBAXY LABORATORIES, LTD. and RANBAXY, INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>SYLVIA MATHEWS BURWELL,<br>in her official capacity as<br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES, *et al.*,<br><br>    Defendants. | No. 1:14-cv-01923-BAH |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION
## FOR A TEMPORARY RESTRAINING ORDER

# Contents

INTRODUCTION ................................................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND ...................................................... 5

   A.  New Drug Applications And Abbreviated New Drug Applications ............................. 5

     1.  Patent Certifications and 180-Day Exclusivity ..................................................... 7

     2.  Tentative and Final ANDA Approval .................................................................... 8

     3.  Forfeiture of 180-Day Exclusivity ......................................................................... 9

FACTUAL BACKGROUND ............................................................................................. 10

   A.  Ranbaxy's Compliance History at the Paonta Sahib and Dewas Facilities ................. 10

     1.  Inspections and Regulatory Actions .................................................................... 10

     2.  The Complaint and Consent Decree ................................................................... 13

     3.  Events Subsequent To Entry of The Decree ......................................................... 17

   B.  Ranbaxy's ANDA for Esomeprazole ........................................................................ 17

   C.  Ranbaxy's ANDA for Valganciclovir ...................................................................... 19

   D.  FDA's Review and Correction of Its Error ............................................................... 20

ARGUMENT ..................................................................................................................... 23

   A.  Ranbaxy Is Not Likely To Succeed On The Merits .................................................. 24

     1.  Ranbaxy's Claims Regarding Esomeprazole Are Unripe and Lack Final Agency
Action .......................................................................................................................... 24

     2.  FDA's Actions Pass Muster Under *Chevron* and the APA ....................................... 26

     3.  Tentative Approval Requires a Showing of CGMP Compliance ............................. 28

     4.  The Rescinded Tentative Approval Letters Were Issued In Error ............................ 34

     5.  FDA Is Authorized, and Obligated, To Correct An Error ...................................... 36

       i. ........... Congress Has Not Limited FDA's Authority To Rescind an Erroneously-Issued
Tentative Approval Letter ............................................................................................. 37

       ii.  FDA Acted In a Timely Fashion In Light Of The Circumstances ........................... 38

       iii.  Ranbaxy's Alleged "Reliance Interests" Do Not Preclude FDA Action ................... 40

     6.  FDA's Interpretation of the Forfeiture Trigger is Reasonable ................................ 43

   B.  Ranbaxy Has Not Shown That It Will Suffer Irreparable Injury In The Absence Of
Immediate Injunctive Relief ........................................................................................ 47

   C.  The Balance Of Harms And The Public Interest Weigh Against The Entry Of
Immediate Injunctive Relief ........................................................................................ 53

CONCLUSION .................................................................................................................. 53

## Cases

*Actavis Elizabeth LLC v. FDA*, 689 F. Supp. 2d 174 (D.D.C.) .................................................... 35

*AFL-CIO v. Excelsior Foundry Co.*, 56 F.3d 844 (7th Cir. 1995).............................................. 38

*Albertson v. FCC*, 182 F.2d 397 (D.C. Cir. 1950)...................................................................... 36

*American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984) ................................................ 37

*American Therapeutics, Inc. v. Sullivan*, 755 F. Supp. 1 (D.D.C. 1990).................................. 37

*Astellas Pharma US, Inc., v. FDA*, 642 F. Supp. 2d 10 (D.D.C. 2009)..................................... 23

*Barnhart v. Walton*, 535 U.S. 212 (2002)................................................................................... 27

*Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236 (D.D.C. 2002) .................................. passim

*Bond v. United States*, 134 S. Ct. 2077 (2014) ......................................................................... 44

*Camp v. Pitts*, 411 U.S. 138 (1973) ........................................................................................... 26

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ....................... 27

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................... 26

*Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1012 (D.C. Cir. 1999).............................................. 27

*Confederated Tribes of Warm Springs Reservation of Oregon v. United States*, 177 Ct. Cl. 184
(1966)....................................................................................................................................... 41

*ConocoPhillips Co. v. EPA*, 612 F.3d 822 (5th Cir. 2010)......................................................... 38

*Cooley v. United States*, 324 F.3d 1297 (Fed. Cir. 2003) .......................................................... 38

*Deal v. United States*, 508 U.S. 129 (1993)............................................................................... 45

*Dun & Bradstreet Corp. v. USPS*, 946 F.2d 189 (2d Cir. 1991) ............................................... 38

*Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314 (Ct. Int'l Trade 2002)................. 39, 40

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ........................................................... 26

*Haggar Co. v. Helvering*, 308 U.S. 389 (1940)......................................................................... 45

*Hall v. Johnson*, 599 F. Supp. 2d 1 (D.D.C. 2009)................................................................... 23

*Hi-Tech Pharmacal Co., Inc. v. U.S. Food and Drug Admin.*, 587 F. Supp. 2d 1 (D.D.C. 2008) 9,
44

*Howard Sober Inc. v. I.C.C.*, 628 F.2d 36 (1980)...................................................................... 36

*Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81 (D.C. Cir. 2014) .................................. 36, 37

*Last Best Beef, LLC v. Dudas*, 506 F.3d 333 (4th Cir. 2007) ................................................... 36

*Lewis v. Dep't of Labor*, 368 F. App'x 20 (11th Cir. 2010) ...................................................... 38

*Mazaleski v. Truesdell*, 562 F.2d 701 (D.C. Cir. 1977)............................................................ 38

*McAllister v. United States*, 3 Cl. Ct. 394 (1983) ..................................................................... 40

*Motor Vehicle Mfrs. Ass'n, Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)........... 27

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998)............................................... 8

*Mpoy v. Fenty*, 674 F. Supp. 2d 163, 165 (D.D.C. 2009)......................................................... 23

*Munaf v. Geren*, 553 U.S. 674, 128 S. Ct. 2207, 2219 (2008).......................................... 23, 24

*Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299 (D.D.C. 2012) ............................................... 47

*Mylan Pharm. Indus. v. Crawford*, 410 F.3d 51 (D.C. Cir. 2005)............................................. 8

*Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30 (D.D.C. 2000) .......................................... 24

*Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122 (D.C. Cir. 1995) ............................ 27

*Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006)................................... 28

*Prieto v. United States*, 655 F. Supp. 1187 (D.D.C. 1987)........................................................ 41

*Ranbaxy Labs. Ltd. v. FDA*, 307 F. Supp. 2d 19 (D.D.C. 2004) ....................................... 8, 31, 41

iii

*Rathbun v. United States*, 355 U.S. 107 (1957) .......................................................................... 45
*Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194 (D.S.D. 2000) ........................................ 41
*Sanofi-Aventis U.S. LLC v. FDA*, 842 F. Supp. 2d 195 (D.D.C. 2012) ...................................... 30
*Saqr v. Holder*, 580 F.3d 414 (6th Cir. 2009) ............................................................................. 38
*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) ........................................... 26, 30
*Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 43 (D.C. Cir. 2005) .................................. 43
*Teva v. Leavitt*, 548 F.3d 103 (D.C. Cir. 2008) .......................................................................... 46
*Tri-Bio Labs., Inc. v. United States*, 836 F.2d 135 (3d Cir. 1987) .............................................. 6
*United States Gas Improvement Co. v. Callery Properties*, 382 U.S. 223 (1965) ...................... 36
*United States v. Bank of America*, 922 F. Supp. 2d 1 (D.D.C. 2013) ........................................ 42
*United States v. Mead Corp.*, 533 U.S. 218 (2001) ..................................................................... 28
*United States v. Microsoft Corporation*, 147 F.3d 935 (D.C. Cir. 1998) ................................... 42
*United States v. Raynor*, 302 U.S. 540 (1938) ............................................................................ 31
*United States v. W. Elec. Co.*, 894 F.2d 1387 (D.C. Cir. 1990) .................................................. 42
*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ............................................................................. 23, 24

**Statutes**

21 U.S.C. § 331 ............................................................................................................................... 8
21 U.S.C. § 351 ......................................................................................................................... 8, 15
21 U.S.C. § 355 ...................................................................................................................... passim
35 U.S.C. § 156 ............................................................................................................................... 6
35 U.S.C. § 271 ........................................................................................................................... 6, 9
35 U.S.C. § 282 ............................................................................................................................... 6
5 U.S.C. § 706(2)(A) ..................................................................................................................... 28

**Other Authorities**

Approved Drug Products with Therapeutic Equivalence Evaluations .......................................... 6
GDUFA Commitment Letter:  Generic Drug User Fee Program Performance Goals and
    Procedures (July 2012) ........................................................................................................... 36
H.R. Rep. No. 98-857 ..................................................................................................................... 7
Public Law 108-173, Stat. 2066 (Dec. 8, 2003) .......................................................................... 11

**Regulations**

21 C.F.R. § 10.85 ......................................................................................................................... 39
21 C.F.R. § 314.105 ................................................................................................................ 10, 34
21 C.F.R. § 314.107 ................................................................................................................ 10, 41
21 C.F.R. § 314.127 ............................................................................................................... 7, 8, 11
21 C.F.R. § 314.53 .......................................................................................................................... 6
21 C.F.R. § 314.94 ...................................................................................................................... 7, 8
54 Fed. Reg. 28,872, 28,893 (July 10, 1989) .............................................................................. 34
57 Fed. Reg. 17,950, 17,967 (Apr. 28, 1992) .............................................................................. 35
59 Fed. Reg. 50,338, 50,351-52 (Oct. 3, 1994) ........................................................................... 35

# INTRODUCTION

The United States Food and Drug Administration ("FDA"), like all federal agencies, is not immune to making errors. When errors happen, the agency should endeavor to correct them. The public should hope for, and expect, nothing less. Here, FDA made an error – a tentative, non-final error subject to further review – but an error.

Ranbaxy Laboratories, Ltd. and Ranbaxy, Inc. ("Ranbaxy")—a company (1) with an almost decade-long history of pervasive manufacturing compliance and data integrity problems at its manufacturing facilities; (2) that voluntarily entered into a Consent Decree imposing "the most onerous set of restrictions ever written" in order to avoid litigation about its compliance problems; (3) that (in its own words) "previously agreed to pay some $500 million to resolve related criminal and civil charges arising from its past submission of certain false statements to the government and prior failure to operate certain of its Indian manufacturing facilities in compliance with FDA's required Good Manufacturing Practice[ ] [requirements]"; (4) that (again, in its own words) acknowledged the need to "determine whether the company may have made other false statements to FDA in connection with its pending generic drug applications"; (5) that, even while apparently on its best behavior after entering into the Consent Decree, continued to have manufacturing compliance problems so serious that FDA was forced to extend the Consent Decree's provisions to two additional facilities—thinks that FDA should not be allowed to correct its error, because letting this error persist would permit Ranbaxy to generate "hundreds of millions of dollars in first-year net sales for the company."

By 2012, Ranbaxy had received three Warning Letters related to manufacturing compliance problems at two of its Indian facilities, and FDA had invoked its Application Integrity Policy after determining that the company submitted untrue statements of material fact

1

to the agency in applications containing data from one of those facilities.  As a result of those regulatory actions, the company was unable to obtain approval for certain of its generic drug products, because FDA's review of those applications was suspended until the data in them had been adequately verified.  After years of unsatisfactory efforts to remedy its compliance problems, Ranbaxy voluntarily entered into the Consent Decree with FDA in order to avoid litigation.  The parties indeed "bargained exhaustively" over the terms of the Consent Decree, and the terms of the Consent Decree reflect with precision everything to which the parties agreed.

The Consent Decree, however, does not anywhere reflect that FDA agreed Ranbaxy possessed inalterable, vested rights to 180-day marketing exclusivity for any of its drug products.  Indeed, FDA's longstanding policy has been not to determine *any* applicant's eligibility for exclusivity with respect to a given drug product until *some* applicant is close to approval.  The Consent Decree merely provided that Ranbaxy would be conclusively *prohibited* from asserting any claim to exclusivity, and thus preventing other generic drug manufacturers from bringing lower-cost alternatives to market, if it could not satisfy certain conditions with respect to specified applications.

Several years after entry of the Consent Decree, two other sponsors were approaching an approval decision for their applications to market generic valganciclovir – a product for which, as the first applicant, Ranbaxy potentially held a blocking exclusivity.  In evaluating the arguments that they (and others, in a citizen petition that was docketed and to which interested parties including Ranbaxy could, and did, comment) made regarding Ranbaxy's eligibility for exclusivity, FDA looked back at the history of Ranbaxy's application.  During that review, FDA realized it had incorrectly issued a "tentative approval" letter to Ranbaxy six years earlier, in

2

2008, despite the fact that Ranbaxy proposed to manufacture the drug product at a facility that at the time had not demonstrated compliance with the current good manufacturing practice ("CGMP") requirements for drugs.

FDA has long interpreted the applicable statute to provide that an application is not eligible for tentative approval unless it meets all of the substantive requirements for final approval, but cannot obtain final approval *only* because of an unexpired exclusivity or a stay. The tentative approval letter for Ranbaxy's valganciclovir application appeared to be in conflict with that position, and FDA promptly undertook a review to determine whether any other applications had similarly received tentative approval letters despite referencing a manufacturing facility that, at the time of the letter, could not demonstrate CGMP compliance adequate to support approval.

Following this review, FDA determined that the tentative approval letters it had issued in 2008 for Ranbaxy's valganciclovir and esomeprazole applications had been issued in error. FDA was faced with a choice – it could let the error stand, and embrace an inconsistent application of its statutory requirements, or it could fix the error, and reaffirm the interpretation that it has applied for more than twenty years. FDA opted to do the right thing, and correct its error. The only party aggrieved by this decision was Ranbaxy, which lost the possibility of capitalizing on an exclusivity to which it was never legitimately entitled.[1] The beneficiaries are the two other applicants whose products were approved, and the American public, which gained access to lower-cost generic drug products sooner than it otherwise would have – the objective that Congress has advanced in enacting the generic drug laws.

---

[1] To be clear, Ranbaxy may still obtain approval for each of these applications. The agency has determined only that, with regard to one of them, Ranbaxy cannot prevent other applicants from marketing their products.

Ranbaxy, armed with innuendo and suggestions of improper motive, now challenges FDA's action, and asks this Court to order immediate and extraordinary relief.  But Ranbaxy's picture of an agency lying in wait, looking for an opportunity to claw back its precious exclusivities cannot be reconciled with the fact that FDA, in addition to investing enormous agency resources in reviewing Ranbaxy's efforts to demonstrate the legitimacy of its applications, has *twice* appeared in federal court to assert positions that had the effect of *protecting* Ranbaxy's right to benefit from other extremely valuable 180-day exclusivities, while Ranbaxy itself elected *not* to pursue the pathway provided by the Consent Decree to potentially market one of only five similarly situated applications.

For more than twenty years, FDA has openly interpreted the Federal Food, Drug, and Cosmetic Act to require a generic drug application to meet all of the substantive requirements for approval – including a demonstration of CGMP compliance – before it can receive tentative approval.  That interpretation is embodied in FDA's regulations, it is shared by the generic drug industry, and it has been applied to Ranbaxy.  The 2008 tentative approval letters wrongly did not apply that requirement, and they were issued in error.  Ranbaxy argues that the FDA is powerless to correct its error, but courts have long recognized that an agency possesses the inherent authority to correct its own error as long as Congress has not provided otherwise, and it is done in a manner that is timely considering the circumstances.  Both conditions are satisfied here, and Ranbaxy's protest that FDA cannot fix its errors because Ranbaxy relied on them is not compelling.

One consequence of FDA correcting its error was its determination that Ranbaxy forfeited its eligibility for exclusivity for valganciclovir.  Ranbaxy also challenges this determination, but its position rests on the absurd suggestion that a mere "act of notice" is

sufficient to preserve a claim to exclusivity, even where the notice is not grounded in a legitimate basis and, by logical progression, even where the notice itself is not valid. The Court should decline Ranbaxy's invitation to ignore reality. Ranbaxy not only is unlikely to prevail on the merits, it also fails to establish that it will suffer irreparable harm absent preliminary relief. Nor has Ranbaxy demonstrated that the balance of equities tips in its favor or that its position is in the public interest. The Court should deny Ranbaxy's motion.

## STATUTORY AND REGULATORY BACKGROUND

### A. New Drug Applications And Abbreviated New Drug Applications

Under the Federal Food, Drug, and Cosmetic Act ("FDCA"), pharmaceutical companies seeking to market the initial version of a drug product (also known as the "innovator" or "pioneer" drug) must first obtain FDA approval by filing a new drug application ("NDA") containing extensive scientific data demonstrating the safety and effectiveness of the drug product. 21 U.S.C. § 355(a), (b). An NDA applicant must also submit information on any patent that claims the drug, or a method of using the drug, for which a claim of patent infringement could reasonably be asserted against an unauthorized party. 21 U.S.C. § 355(b)(1), (c)(2). FDA publishes the patent information it receives in "Approved Drug Products with Therapeutic Equivalence Evaluations" (the "Orange Book"), *available at* http://www.fda.gov/cder/ob/. *See also* 21 C.F.R. § 314.53(e).

The Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Amendments"), codified at 21 U.S.C. § 355 and 35 U.S.C. §§ 156, 271, and 282, permits manufacturers to submit abbreviated new drug applications ("ANDAs") requesting approval of generic versions of approved drug products. 21 U.S.C. § 355(j). The Hatch-Waxman Amendments were intended to balance encouraging innovation in the development of

5

new drugs with accelerating the availability to consumers of lower cost alternatives to such

drugs.  *See* H.R. Rep. No. 98-857 (Part I), 98th Cong., 2d Sess. at 14-15 (1984), *reprinted in*

1984 U.S.C.C.A.N. 2647-48; *see also, e.g.*, *Tri-Bio Labs., Inc. v. United States*, 836 F.2d 135,

139 (3d Cir. 1987).

ANDA applicants need not submit clinical data to demonstrate the safety and efficacy of

the generic product, as is necessary with an NDA.  *See* 21 U.S.C. § 355(j).  Rather, an ANDA

demonstrates that it is the same as the previously-approved innovator drug in several respects

and that it can reliably manufacture the drug product and relies on FDA's previous findings that

the product approved under the NDA is safe and effective.  The FDCA sets forth in detail the

information an ANDA must contain.  *See* 21 U.S.C. § 355(j)(2)(A).

Among other information, an ANDA must contain information showing compliance with

CGMP requirements, which reflect the FDCA's provision that a drug is deemed adulterated, and

thus prohibited from traveling in interstate commerce, if

> the methods used in, or the facilities or controls used for, its
> manufacture, processing, packing, or holding do not conform to or
> are not operated or administered in conformity with current good
> manufacturing practice to assure that such drug meets the
> requirements of this Act as to safety and has the identity and
> strength, and meets the quality and purity characteristics, which it
> purports or is represented to possess.

21 U.S.C. §§ 331, 351(a)(2)(B); *see also* 21 C.F.R. Parts 210 and 211 (CGMP requirements for

drugs).  An ANDA is required to contain "the items specified in clauses (B) through (F) of

subsection (b)(1)."  21 U.S.C. § 355(j)(2)(A)(vi).  The referenced clauses include "a full

description of the methods used in, and the facilities and controls used for, the manufacture,

processing, and packing of such drug."  21 U.S.C. § 355(b)(1)(D); *see also* 21 C.F.R.

§ 314.94(a)(9)(i).  FDA may not approve an ANDA if it finds that "the methods used in, or the

facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity." 21 U.S.C. § 355(j)(4)(A); *see also* 21 C.F.R. § 314.127(a)(1).

### 1. Patent Certifications and 180-Day Exclusivity

The timing for approval of ANDAs depends, in part, on statutory patent protections afforded to the innovator drug.  Among other things, an ANDA must contain one of four specified certifications for each patent that "claims the listed drug" or claims "a use for such listed drug for which the applicant is seeking approval."  21 U.S.C. § 355(j)(2)(A)(vii).

This certification must state one of the following:

(I)  that such patent information has not been filed,
(II) that such patent has expired,
(III)  . . . the date on which such patent will expire, or
(IV)  that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.

21 U.S.C. § 355(j)(2)(A)(vii).  The certifications relevant to this case were made pursuant to paragraph IV, which applies if an applicant wishes to challenge the validity of a patent listed by the innovator, or to claim that the patent would not be infringed by the product covered by the ANDA.  *See* 21 U.S.C.  § 355(j)(2)(A)(vii)(IV).  The applicant must provide notice of its paragraph IV certification to the NDA holder and the patent owner explaining the factual and legal basis for the applicant's opinion that the patent is invalid or not infringed.  21 U.S.C. § 355(j)(2)(B).

The filing of a paragraph IV certification "for a drug claimed in a patent or the use of which is claimed in a patent" is an act of infringement.  35 U.S.C. § 271(e)(2)(A).  This enables the NDA holder and patent owner to sue the ANDA applicant.  If such a suit is brought within 45 days after the date notice of the certification was received by the patent owner or NDA holder,

FDA must stay approval of the ANDA for 30 months from that date (commonly referred to as the "30-month stay"), unless a final court decision is reached earlier in the patent case or the court orders a longer or shorter period.  21 U.S.C. § 355(j)(5)(B)(iii).  If no action is brought within the 45-day period, FDA may approve an ANDA with a paragraph IV certification effective immediately, provided that other conditions for approval have been met.  21 U.S.C. § 355(j)(5)(B)(iii); 21 C.F.R. § 314.107(f)(2).

The statute also provides an incentive and reward to generic drug manufacturers that expose themselves to the risk of patent litigation.  It does so by granting, in certain circumstances, a 180-day period of marketing exclusivity *vis-a-vis* other paragraph IV ANDA applicants to the manufacturer who is first to file a substantially complete ANDA containing a paragraph IV certification.  21 U.S.C. § 355(j)(5)(B)(iv); *see Mylan Pharm. Indus. v. Crawford*, 410 F.3d 51, 52-53 (D.C. Cir. 2005); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1064 (D.C. Cir. 1998).

### 2.  Tentative and Final ANDA Approval

FDA grants "tentative approval" to an ANDA that meets the substantive requirements for approval, but "cannot receive effective approval because" of a 30-month stay, some form of exclusivity, or existing patents.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA); *see generally Barr Labs., Inc. v. Thompson*, 238 F. Supp. 2d 236, 245-50 (D.D.C. 2002).  An application with a tentative approval is not finally approved – and the drug may not be legally marketed – until the agency issues a final approval letter.  21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(BB); 21 C.F.R. § 314.105(d); 21 C.F.R. § 314.107(b)(3)(v).  *See also Ranbaxy Labs. Ltd. v. FDA*, 307 F. Supp. 2d 15, 19 (D.D.C. 2004) ("Approvals do not become effective by operation of law because the FDA has an ongoing health and safety responsibility to perform.").

8

Under FDA's longstanding regulations, FDA will generally send the applicant a tentative approval letter "if none of the reasons in § 314.127 for refusing to approve the abbreviated new drug application applies." 21 C.F.R. § 314.105(d). The reasons in § 314.127 include CGMP non-compliance; in fact, the first reason given for refusing to approve an application is a failure to demonstrate that "[t]he methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug product are [ ]adequate to ensure and preserve its identity, strength, quality, and purity." 21 C.F.R. § 314.127(a)(1).

### 3. Forfeiture of 180-Day Exclusivity

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "MMA")[2] amended the FDCA, in part, by adding provisions that describe sets of conditions under which an ANDA applicant previously eligible for 180-day exclusivity could lose that eligibility. *See* 21 U.S.C. § 355(j)(5)(D). "Congress enacted the forfeiture provisions to 'ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition.'" 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer) (*quoted in Hi-Tech Pharmacal Co., Inc. v. U.S. Food and Drug Admin.*, 587 F. Supp. 2d 1, 4 (D.D.C. 2008)). As amended, the FDCA provides that a 180-day exclusivity period described in 21 U.S.C. § 355(j)(5)(B)(iv) "shall be forfeited by a first applicant if a forfeiture event occurs with respect to that first applicant." 21 U.S.C. § 355(j)(5)(D)(ii). The forfeiture events are (1) the failure to market; (2) the withdrawal of an application; (3) an amendment of a certification; (4) the failure to obtain tentative approval; (5) an agreement with another applicant, the listed drug application holder, or a patent owner; and (6) the expiration of patents to which the applicant certified. 21 U.S.C. § 355(j)(5)(D)(i).

---

[2] Public Law 108-173, Stat. 2066 (Dec. 8, 2003).

The failure to obtain tentative approval forfeiture provision, the only forfeiture provision relevant in this case, states that a first applicant will forfeit exclusivity if it fails to obtain tentative approval of its application within 30 months after the date it filed its application:

> (IV) FAILURE TO OBTAIN TENTATIVE APPROVAL. – The first applicant fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

21 U.S.C. § 355(j)(5)(D)(i)(IV).

## FACTUAL BACKGROUND

### A. Ranbaxy's Compliance History at the Paonta Sahib and Dewas Facilities

Ranbaxy's compliance problems at the company's Paonta Sahib and Dewas facilities date back at least to 2006 and continue today.

#### 1. Inspections and Regulatory Actions

In February 2006, FDA inspected Ranbaxy's Paonta Sahib, India manufacturing facility. FDA's investigators observed significant deviations from CGMP in the manufacture of drug products at the Paonta Sahib facility and, at the conclusion of the inspection, issued a Form FDA 483 documenting those observations. Ranbaxy subsequently submitted numerous written responses to the Form FDA 483, but those responses did not adequately address FDA's concerns. On June 15, 2006, FDA issued a Warning Letter to Ranbaxy stating that, based on the violations observed during FDA's February 2006 inspection at Paonta Sahib and taking into account Ranbaxy's written responses, the finished drug products manufactured at Paonta Sahib were adulterated under 21 U.S.C. § 351(a)(2)(B) because they were manufactured in violation of CGMP. The Warning Letter also stated that, "[u]ntil FDA has confirmed correction of the deficiencies observed during the most recent inspection and compliance with CGMP, this office

will recommend withholding approval of any new applications listing your Paonta Sahib facility as the manufacturer of finished pharmaceutical drug products."

In March 2008, FDA inspected Ranbaxy's Paonta Sahib Batamandi (Unit II) manufacturing facility. FDA's investigators again observed significant deviations from CGMP in the manufacture of drug products at that facility and, at the conclusion of the inspection, issued a Form FDA 483 documenting those observations. Ranbaxy subsequently submitted written responses to the Form FDA 483, but those responses did not adequately address FDA's concerns. On September 16, 2008, FDA issued a Warning Letter to Ranbaxy stating that, based on the violations observed during FDA's March 2008 inspection at Paonta Sahib and taking into account Ranbaxy's written responses, the finished drug products manufactured at Paonta Sahib were adulterated under section 501(a)(2)(B) of the FDCA, 21 U.S.C. § 351(a)(2)(B), because they were manufactured in violation of CGMP. The Warning Letter reminded Ranbaxy of the earlier June 2006 Warning Letter and reiterated that, "[u]ntil FDA has confirmed correction of the deficiencies and compliance with CGMP, this office will continue to recommend disapproval of any new applications listing the Paonta Sahib facility as the manufacturing location for finished pharmaceutical drug products."

FDA inspected Ranbaxy's Dewas, India manufacturing facility in January-February 2008.[3] FDA's investigators observed significant deviations from CGMP in the manufacture of sterile and non-sterile finished drug products and in the manufacture and control of active pharmaceutical ingredients ("APIs") and, at the conclusion of the inspection, issued a Form FDA 483 documenting those observations. Ranbaxy subsequently submitted a written response to the

---

[3] FDA previously had inspected the Dewas facility in February-March 2006. FDA investigators documented deviations from CGMP at the conclusion of that inspection, but a Warning Letter did not result.

11

Form FDA 483, but that response did not adequately address FDA's concerns. On September 16, 2008, FDA issued a Warning Letter to Ranbaxy stating that, based on the violations observed during FDA's January-February 2008 inspection at Dewas and taking into account Ranbaxy's written response, the sterile and non-sterile finished drug products and APIs manufactured at Dewas were adulterated under section 501(a)(2)(B) of the FDCA, 21 U.S.C. § 351(a)(2)(B), because they were manufactured in violation of CGMP. The Warning Letter stated that, "[u]ntil all corrections have been completed and FDA can confirm your firm's compliance with CGMP, this office will recommend disapproval of any new applications or supplements listing your firm as a manufacturing location of finished dosage forms and [APIs]."

In addition to the specific CGMP deviations observed at Paonta Sahib and Dewas, FDA also became concerned about the integrity of the data that Ranbaxy was submitting in its drug applications and supplements. On February 25, 2009, FDA sent a letter to Ranbaxy stating that the agency had "determined that [Ranbaxy] submitted untrue statements of material fact in abbreviated and new drug applications filed with the Agency" from Ranbaxy's Paonta Sahib facility. In that letter, FDA cited findings that "indicate a pattern and practice of submitting untrue statements of material fact and other wrongful conduct, which raise significant questions regarding the reliability of the data and information contained in applications" containing data developed at Paonta Sahib, and invoked its Application Integrity Policy ("AIP"), requiring Ranbaxy to assess the validity of the data and information in all its applications containing data from Paonta Sahib. Under the AIP, until the validity assessment of all of these applications was complete, FDA did "not intend ordinarily to conduct or to continue its normal substantive scientific review" of any pending or new application or supplement containing data developed at Paonta Sahib.

12

Ranbaxy has known since February 2006 that FDA did not consider the Paonta Sahib facility to be operating in conformance with CGMP; it knew in June 2006 that FDA would recommend withholding approval of any application listing Paonta Sahib as the manufacturing site for finished drug products; it knew in September 2008 that FDA would recommend disapproving any new applications or supplements listing Dewas as the manufacturing site for finished dosage forms or APIs; and, as of February 2009, it knew that FDA did not intend to substantively review *any* new or pending application containing data developed at Paonta Sahib until the company had completed a satisfactory validity assessment of *all* applications containing data developed at Paonta Sahib.

### 2. The Complaint and Consent Decree

On January 25, 2012, the United States filed a Complaint for Permanent Injunction ("Complaint") against Ranbaxy and three of the company's officers. The Complaint alleged, *inter alia*, that the defendants: (1) manufactured and distributed at and from Paonta Sahib, Dewas, and one other facility drugs that were not manufactured in conformance with CGMP and thus were adulterated; (2) manufactured and distributed three prescription drugs that lacked required approval; (3) failed to file required Field Alert Reports for distributed drug products that did not meet their approved specifications, and did not file Annual Reports for certain approved drug products within the required time frame; and (4) submitted numerous untrue statements of material fact in submissions to FDA from the Paonta Sahib and Dewas facilities. The Complaint requested, *inter alia*, that the Court enjoin the defendants from manufacturing and distributing drug products at and from Paonta Sahib and Dewas until FDA had determined that the facilities were operated in compliance with CGMP, and that FDA be authorized to withhold review of

13

applications and other submissions in connection with the Paonta Sahib and Dewas facilities until defendants had resolved all data integrity issues in a manner acceptable to FDA.

On January 25, 2012, the parties also filed, and on January 26, 2012, the court entered, a Consent Decree of Permanent Injunction ("Decree"). The Decree set forth in detail the steps Ranbaxy would need to take to resolve its CGMP problems at the Paonta Sahib and Dewas facilities to FDA's satisfaction before resuming normal operations at the affected facilities.

The Decree also set forth a multi-pronged approach for resolving FDA's concerns regarding the integrity of data in Ranbaxy's applications. Generally speaking, the Decree broadly defines most applications containing data generated or developed at Paonta Sahib and Dewas as "Affected Applications," Decree ¶ VII.G, and requires Ranbaxy to retain an expert to develop and conduct internal reviews at each facility to determine the scope and extent of untrue statements and data irregularities at each facility, Decree ¶¶ XVII.A-C. Based on the results of those internal reviews, Ranbaxy and its expert then must (in consultation with FDA) develop plans for auditing all Affected Applications from each facility, execute those audits, submit and implement a Corrective Action Operating Plan, and report to FDA the actions that it has taken. Decree ¶¶ XVII.D-L. FDA may conduct its own Validity Assessment of each Affected Application to determine whether each Affected Application contains an untrue statement and/or a pattern or practice of data irregularities affecting approval. Decree ¶¶ XVII.M-N.

Significantly, for Affected Applications containing data generated or developed at Dewas, the Decree permits FDA to resume or begin reviewing an Affected Application as soon as Ranbaxy has fully and satisfactorily completed the requirements of Paragraph XVII for that specific Affected Application. Decree ¶ XVII. The Decree does not permit FDA to resume or begin reviewing Affected Applications containing data generated or developed at Paonta Sahib,

14

however, until Ranbaxy has fully and satisfactorily completed the requirements of Paragraph

XVII with respect to *all* Affected Applications containing data from that facility.  *Id.*  In other

words, although Ranbaxy is permitted to address the data integrity concerns for Affected

Applications containing Dewas data on an application-by-application basis, the Decree requires

that Ranbaxy fully and satisfactorily complete its data integrity requirements for *all* Affected

Applications containing Paonta Sahib data before FDA may resume or begin reviewing *any*

Affected Application containing Paonta Sahib data.

 The Decree also defines five Ranbaxy ANDAs as "Excepted Applications."  These five

ANDAs are not considered to be Affected Applications unless later deemed to be such under

other Decree provisions.  Decree ¶ VII.H.[4]  The Decree's data integrity provisions with respect to

the Excepted Applications focus on how Ranbaxy can resolve concerns about the integrity of

data in those Applications.  If Ranbaxy proves that there are no concerns about the integrity of

data in an Excepted Application, FDA will begin or resume the substantive review necessary for

approval of that Application.  The effect of these provisions, to the extent that any of the

Excepted Applications contain data from Paonta Sahib, is to allow Ranbaxy the opportunity to

move forward with respect to those ANDAs before it has completed the Decree's data integrity

requirements with respect to *all* applications containing data from Paonta Sahib.  In essence, it

gives Ranbaxy the chance to move these applications to the front of its own queue for validation.

 In particular, for each Excepted Application, the Decree requires Ranbaxy to submit a

detailed written submission, with supporting data, to demonstrate that that Excepted Application

was "substantially complete" at the time it was initially filed.  Decree ¶ XIV.A.  The Decree

---

[4]  The identity of these five Excepted Applications is contained in a sealed appendix that was
filed with the Court along with the Decree.

further requires Ranbaxy and its Data Integrity Auditor to develop audit plans for and audit each Excepted Application to determine whether there is reason to question the reliability of the data therein. Decree ¶ XIV.B. Under the Decree, if, after reviewing the audit reports, FDA determines that an Excepted Application does not appear to contain untrue statements and/or a pattern or practice of data irregularities affecting approval, FDA is required to begin or resume reviewing that Excepted Application. Decree ¶ XV.

Under the Decree, if FDA determines that an Excepted Application does not appear to have been substantially complete at the time it was filed, then Ranbaxy "shall be *ineligible* for exclusivity" for that Excepted Application, and that Excepted Application is thereafter deemed to be an Affected Application and subject to the Decree's provisions for such applications. Decree ¶ XIV.A.2 (emphasis added). For Excepted Applications that FDA has determined to be substantially complete at the time they were filed, the Decree requires FDA to evaluate Ranbaxy's submissions and make its determination regarding data reliability within sixty (60) days. Decree ¶ XV. If an Excepted Application is determined to contain unreliable data, the Decree precludes Ranbaxy from asserting any claim of eligibility for exclusivity and potentially blocking additional generic competition. The Decree also imposes specific dates by which, for four of the Excepted Applications, Ranbaxy must complete its submissions pursuant to Paragraph XIV or, for one particular application, receive final approval; if Ranbaxy does not meet the Decree's specified deadline for any Excepted Application, it shall "be deemed to have relinquished *any claim* for exclusivity" for that Excepted Application. Decree ¶ XIII (emphasis added).

16

### 3.   Events Subsequent To Entry of The Decree

Although the Decree offered a path forward for Ranbaxy to address its ongoing compliance problems at the Paonta Sahib and Dewas facilities, the company's problems have continued, and even expanded, since the Decree's entry.

On May 13, 2013, a Ranbaxy subsidiary pled guilty to an Information containing seven felony charges related to drug manufacturing at Paonta Sahib and Dewas and the integrity of submissions containing data from those facilities.  The charges – all of which related to conduct predating the Decree – included one count of introducing adulterated drugs into interstate commerce, two counts of failing to file required Field Alert Reports, and three counts of making false statements in Annual Reports.

Also in 2013, after observing and documenting significant CGMP deficiencies during September and December 2012 inspections at Ranbaxy's Mohali, India manufacturing facility, FDA exercised its authority under the Decree to extend the Decree's CGMP provisions to the Mohali facility.  And earlier this year, after observing and documenting significant CGMP deficiencies during a January 2014 inspection at Ranbaxy's Toansa, India manufacturing facility, FDA exercised its authority under the Decree to extend the Decree's CGMP provisions to that facility as well.  At present, the Decree now prohibits Ranbaxy from distributing in interstate commerce drug products, including APIs, manufactured at the Paonta Sahib, Dewas, Mohali, and Toansa facilities until Ranbaxy demonstrates its CGMP compliance at those facilities.

### B.   Ranbaxy's ANDA for Esomeprazole

FDA received Ranbaxy's ANDA 077830 for Esomeprazole Magnesium Delayed-release Capsules, 20 mg and 40 mg, for review on August 5, 2005.  Ranbaxy's ANDA was submitted on the first day on which an ANDA containing a paragraph IV certification was received by the

17

agency for these products. In its ANDA, Ranbaxy identified the Paonta Sahib facility as one of

the facilities in which the company's Esomeprazole Magnesium Delayed-release Capsule

products would be manufactured.

By letter dated February 5, 2008, FDA informed Ranbaxy that ANDA 077830 was

tentatively approved. The letter stated, "This determination is based upon information available

to the agency at this time, (i.e., information in your ANDA and the status of current good

manufacturing practices (cGMPs) of the facilities used in the manufacturing and testing of the

drug product)." At the time this letter issued, however, the Paonta Sahib facility remained the

subject of the June 15, 2006 Warning Letter based on CGMP violations. FDA's instructions to

its staff at that time dictated that "[n]o application should be recommended for approval if the

applicant is found in a state of non-compliance with the CGMP regulations." *See* FDA

Compliance Program Guidance Manual Program 7346.832 (New Drug Evaluation: Pre-

Approval Inspections), Part V at 35 (Aug. 15, 1994) ("CPGM 7346.832").

As will be explained in more detail below, FDA has long interpreted the statute to mean

that an application is eligible for tentative approval only when it meets all of the substantive

requirements for final approval – including CGMP compliance – but cannot receive final

approval due to patent or exclusivity issues. Accordingly, because this application did not

demonstrate the CGMP compliance required for approval, FDA erred in issuing a tentative

approval letter for this ANDA.

Several years later, FDA received and reviewed Ranbaxy's submissions for esomeprazole

pursuant to Paragraphs XIV and XV of the Decree. After evaluating these submissions, FDA on

November 4, 2014, informed Ranbaxy that the agency had determined that the ANDA did not

appear to contain any untrue statements of material fact or a pattern or practice of data

irregularities affecting approval.  In accordance with Paragraph XV of the Decree, and as stated in the November 4, 2014 letter, FDA has resumed reviewing ANDA 077830.[5]

### C. Ranbaxy's ANDA for Valganciclovir

FDA received Ranbaxy's ANDA 078078 for Valganciclovir Hydrochloride Tablets USP, 450 mg, for review on December 27, 2005.  It was the first ANDA containing a Paragraph IV certification received by the agency for this product.  In its ANDA, Ranbaxy identified the Dewas facility as the drug substance manufacturer for Valganciclovir API and the Paonta Sahib facility as the finished dosage form manufacturer for its Valganciclovir Hydrochloride Tablet drug product.

By letter dated June 20, 2008, FDA informed Ranbaxy that ANDA 078078 was tentatively approved.  The letter stated, "This determination is based upon information available to the agency at this time, (i.e., information in your ANDA and the status of current good manufacturing practices (cGMPs) of the facilities used in the manufacturing and testing of the drug product)."  At the time of this letter, however, the Paonta Sahib facility remained the subject of the June 15, 2006 Warning Letter based on CGMP violations; the Paonta Sahib Batamandi facility had been the subject of a March 2008 inspection that found significant deviations from CGMP and that resulted in the September 16, 2008 Warning Letter; and the Dewas facility had been the subject of a January-February 2008 inspection that found significant deviations from CGMP and resulted in the September 16, 2008 Warning Letter.  As noted, FDA has long interpreted the statute to mean that an application is eligible for tentative approval only when it meets all of the substantive requirements for final approval – including CGMP

---

[5] Nothing in the Consent Decree required FDA to re-evaluate the propriety of the previously-issued tentative approval letter in order to make a determination regarding the ANDA's substantial completeness or data integrity, and the agency did not do so as part of that effort.

compliance – but cannot receive final approval due to patent or exclusivity issues. Accordingly, because this application did not demonstrate the CGMP compliance required for approval, FDA erred in issuing a tentative approval letter for this ANDA.

Several years later, FDA received and reviewed Ranbaxy's submissions for valganciclovir pursuant to Paragraphs XIV and XV of the Decree. After evaluating these submissions, FDA on August 10, 2012, informed Ranbaxy that the agency had determined that the ANDA did not appear to contain any untrue statements of material fact or a pattern or practice of data irregularities affecting approval. FDA then resumed reviewing ANDA 078078.[6]

### D. FDA's Review and Correction of Its Error

In a letter dated February 17, 2014, Endo Pharmaceuticals Inc. ("Endo"), the sponsor of ANDA 200790 for valganciclovir tablets, asked FDA to "confirm that it will not delay the final approval of Endo's ANDA because of any exclusivity period associated with Ranbaxy['s] . . . ANDA No. 078078 for valganciclovir tablets." Endo informed the agency that it believed it would be ready to market its valganciclovir tablet product in August 2014, and made numerous arguments as to why Ranbaxy was not eligible for, or had forfeited any eligibility for, 180-day exclusivity for valganciclovir tablets. In a citizen petition filed on May 5, 2014, on behalf of an unnamed generic drug manufacturer, a law firm made similar arguments regarding Ranbaxy's lack or forfeiture of any eligibility for exclusivity for a broader set of ANDAs that included the

---

[6] Nothing in the Consent Decree required FDA to re-evaluate the propriety of the previously-issued tentative approval letter in order to make a determination regarding the ANDA's substantial completeness or data integrity, and the agency did not do so as part of that effort.

valganciclovir and esomeprazole ANDAs. Several comments were submitted to the citizen petition docket by interested parties, including one comment by Ranbaxy.[7]

Endo continued to contact FDA to ask whether its ANDA would be granted full approval by August 2014. In July 2014, as Endo's ANDA appeared to be approaching an action, the agency began to prepare a memorandum addressing the arguments raised in Endo's letter – including Endo's argument that Ranbaxy "failed to obtain a *valid* tentative approval within 30 months of the date its application was filed" – as well as arguments raised in the May 5, 2014 citizen petition. In connection with this effort, FDA also reviewed documents and information in Ranbaxy's valganciclovir ANDA, including the tentative approval letter and related internal agency documents. After carefully considering this record, along with the arguments regarding tentative approval raised by Endo and in the citizen petition and the comments thereto (including Ranbaxy's comment), FDA determined that it had erroneously issued a tentative approval letter for Ranbaxy's valganciclovir ANDA in 2008.

FDA then reviewed other Ranbaxy ANDAs to determine whether the agency had made the same error elsewhere, and determined that certain other Ranbaxy ANDAs had received tentative approval letters notwithstanding the fact that they referenced manufacturing facilities for which the CGMP compliance status was inadequate to support tentative approval. In the interests of time and appropriate use of agency resources, FDA decided to first rescind only those tentative approval letters for applications for which Ranbaxy was eligible for 180-day exclusivity and for which rescinding the tentative approval letter would eliminate a potential block to approval for subsequent applicants, thus allowing generic competition to reach the market

---

[7] Ranbaxy's protest that it had no notice that FDA's action was possible rings especially hollow in light of the company's detailed, seventeen-page comment responding to the citizen petition's arguments.

sooner.  The only two Ranbaxy ANDAs that fell into this category were valganciclovir and

esomeprazole.  In order to ensure consistency, FDA reviewed a targeted sample of ANDAs from

other sponsors that received tentative approval letters during the same time period.  This review

did not reveal any other ANDAs from any other sponsor that received a tentative approval letter

while referencing a manufacturing facility with an inadequate CGMP compliance status.

Because other applicants' valganciclovir ANDAs were otherwise ready for approval, it

was appropriate for FDA to consider whether Ranbaxy, as the first applicant, was eligible for

180-day exclusivity for valganciclovir.[8]  FDA determined that Ranbaxy had forfeited its

eligibility for 180-day exclusivity for valganciclovir because it failed to obtain tentative approval

of its ANDA within 30 months after the date on which the ANDA was submitted.  *See* 21 U.S.C.

§ 355(j)(5)(D)(i)(IV).  In particular, although the chemistry, bioequivalence, and labeling

sections of Ranbaxy's ANDA were acceptable at the 30-month forfeiture date for that ANDA,

Ranbaxy had not demonstrated compliance with the CGMP requirements at the Dewas and

Paonta Sahib manufacturing facilities, which were referenced in the ANDA.  FDA determined

that, even if there had been a change in or review of the requirements for approval with respect

to the chemistry, bioequivalence, or labeling sections of the ANDA, those would necessarily

have been satisfactorily resolved with respect to this application prior to the 30-month forfeiture

date, or those sections would not have been considered acceptable at that date.  Accordingly,

FDA determined that Ranbaxy's failure to obtain tentative approval within 30 months was not

---

[8] FDA's policy is generally not to decide an applicant's eligibility for 180-day exclusivity until
the first applicant or a subsequent ANDA is ready for approval.  *See, e.g.*, Letter to W. Rakoczy,
Rakoczy, Molino, Mazzochi & Siwik, LLP fr. G. Buehler, Director, FDA Office of Generic
Drugs re. Docket No. FDA-2007-P-0249, at 1, note 1 (May 7, 2008).  Consistent with this
policy, FDA has not made any determination regarding Ranbaxy's eligibility for 180-day
exclusivity for its ANDA for esomeprazole.

caused by a change in or review of the requirements for approval, and thus the exception to the 30-month forfeiture provision did not apply.

On November 4, 2014, FDA sent a letter to Ranbaxy rescinding the erroneously-issued tentative approval letters for Ranbaxy's valganciclovir and esomeprazole ANDAs, and informing Ranbaxy of its determination that Ranbaxy had forfeited its eligibility for 180-day exclusivity for valganciclovir. The same day, FDA separately approved ANDAs 200790 (submitted by Endo) and 203511 (submitted by Dr. Reddy's Laboratories Inc. ("DRL")) for valganciclovir.

## ARGUMENT

Preliminary injunctive relief is an "extraordinary and drastic" remedy that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 129 S. Ct. 365, 375-76 (2008); *Munaf v. Geren*, 553 U.S. 674 (2008); *see also Mpoy v. Fenty*, 674 F. Supp. 2d 163 (D.D.C. 2009) ("Injunctive relief is an extraordinary remedy, and plaintiff bears a substantial burden to obtain it."). To obtain either a temporary restraining order or a preliminary injunction, a party must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction would serve the public interest. *Winter*, 129 S. Ct. at 375; *see also Hall v. Johnson*, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009) (the same standard applies to both temporary restraining orders and preliminary injunctions).

It is "particularly important" for a movant to demonstrate likely success on the merits. *Astellas Pharma US, Inc., v. FDA*, 642 F. Supp. 2d 10, 16 (D.D.C. 2009) (absent "substantial indication" of likely success, there would be no justification for court's intrusion into ordinary processes of administration and judicial review). Moreover, a party seeking preliminary injunctive relief must demonstrate an actual "likelihood" of success on the merits, not merely the

existence of "questions so serious, substantial, difficult and doubtful, as to make them fair ground for litigation . . . ." *Munaf*, 553 U.S. at 690 (citations omitted). Nor is a mere "possibility" of irreparable harm sufficient to justify such relief:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction. . . . Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

*Winter*, 129 S. Ct. at 375-76 (citations omitted, emphasis in original).

In this case, Ranbaxy's burden is even higher, because it seeks not only to preserve the *status quo*, but also to obtain an order that would require FDA to immediately suspend approval of a competitor's product. A court's power to issue such a mandatory injunction "should be sparingly exercised." *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000).

**A. Ranbaxy Is Not Likely To Succeed On The Merits**

**1. Ranbaxy's Claims Regarding Esomeprazole Are Unripe and Lack Final Agency Action**

Under Fed. R. Civ. P. 12(b)(1), the party seeking to invoke the jurisdiction of a federal court bears the burden of establishing that the court has jurisdiction. *U.S. Ecology, Inc. v. DOI*, 231 F.3d 20, 24 (D.C. Cir. 2000). To determine whether an agency decision is ripe for review under Article III of the U.S. Constitution, courts examine "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967). The fitness prong, in turn, depends upon (a) whether the claims raise purely legal questions, and (b) whether the challenge involves final agency action. *Id.* In evaluating the fitness of an issue for judicial review, courts consider whether the issue is "purely legal" and the agency action is final, or, on the other hand, whether

24

"the courts would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998). The APA similarly authorizes judicial review only with respect to "final agency action," 5 U.S.C. § 704, and lack of final agency action is an independent ground for dismissal under Fed. R. Civ. P. 12(b)(6).

Ranbaxy's claims regarding esomeprazole are not fit for judicial resolution because there has been no final agency action. Final agency action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted). Far from consummating the agency's decision-making process and determining Ranbaxy's rights, FDA's tentative approval decisions are, by definition, *tentative*. Unlike with generic valganciclovir, FDA has not determined that Ranbaxy has forfeited any eligibility for exclusivity for esomeprazole, nor has it issued final approval to any competing generic esomeprazole products. Ranbaxy implies that the TA recission for esomeprazole is ripe because FDA's forfeiture decision relating to valganciclovir "controls the analysis" as to esomeprazole. Pls.' TRO Br. at 20. But the esomeprazole-related claims do not become ripe merely because it is now more likely that FDA will eventually find Ranbaxy's generic esomeprazole product ineligible for 180-day exclusivity. *See Pfizer Inc. v. Shalala*, 182 F.3d 975, 980 (D.C. Cir. 1999) ("Although it is now more likely that the FDA will eventually approve Mylan's drug, the agency's tentative approval causes Pfizer no hardship at present or in the near future, nor does it render Pfizer's challenge fit for review."). Only after FDA has taken such final agency action would Ranbaxy's claims regarding esomeprazole potentially be fit for judicial decision.

Ranbaxy also will suffer no hardship from the court withholding consideration of its claims regarding esomeprazole. Ranbaxy has not been harmed by FDA's rescission of tentative approval for its esomeprazole ANDA, and it will not suffer any hardship if judicial review (if appropriate) is postponed until such time as FDA makes a final determination regarding exclusivity for generic esomeprazole and issues final approvals for generic esomeprazole products. Indeed, Ranbaxy has not alleged any irreparable harm relating to esomeprazole. *See* Pls.' TRO Br. at 43–47. Moreover, the resolution of Ranbaxy's claims regarding generic valganiciclovir in this lawsuit may lead the agency (either on its own initiative or upon request) to reconsider its decision to rescind tentative approval of Ranbaxy's esomeprazole ANDA, and potentially resolve any controversies administratively and independent of judicial intervention.

Because Ranbaxy's esomeprazole-related claims fail to satisfy the ripeness criteria and fail to satisfy the criteria for reviewability under the APA, and will likely be dismissed for lack of subject matter jurisdiction and for failure to state a claim under Fed. R. Civ. 12(b)(6), Ranbaxy's claims relating to esomeprazole are unlikely to succeed.

## 2. FDA's Actions Pass Muster Under *Chevron* and the APA

FDA's administrative decisions are subject to review under the APA, and may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard is highly deferential to the agency and heightened even further in cases involving scientific and technical decisions. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998). The agency's administrative decision is also entitled to a presumption of validity. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). The reviewing court must determine whether the agency's

26

decision was based upon consideration of the relevant factors and whether there has been a clear error of judgment. *See Overton Park*, 401 U.S. at 416. However, a reviewing court is "not empowered to substitute its judgment for that of the agency," *id.*, and must uphold the agency's action so long as it is "rational, based upon consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Mfrs. Ass'n, Inc., v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983).

In reviewing the FDA's interpretation of the FDCA, the Court is governed by the familiar two-step analysis of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The first question under *Chevron* is "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. If, after this Court "exhaust[s] the 'traditional tools of statutory construction,'" *Natural Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1125 (D.C. Cir. 1995) (quoting *Chevron*, 467 U.S. 837, 843 n. 9), the intent of Congress is clear, "that is the end of the matter." *Chevron*, 467 U.S. at 842. Put another way, the Court must initially decide "whether the statute unambiguously forbids the Agency's interpretation." *Barnhart v. Walton*, 535 U.S. 212, 218 (2002).

If, however, the statute "is silent or ambiguous with respect to the specific issue," the Court proceeds to the second prong of *Chevron*, under which "the question for this court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *Cnty. of L.A. v. Shalala*, 192 F.3d 1005, 1012-13 (D.C. Cir. 1999). The court need not find that the agency construction was the only one it permissibly could have adopted or even the reading the court would have reached; rather, so long as the agency's reading is permissible, it must be sustained. *See Chevron*, 467 U.S. at 843-44 & n. 11; *Cnty. of L.A.*, 192 F.3d at 1012-13. The Supreme Court has "long recognized that considerable weight should be

27

accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *United States v. Mead Corp.*, 533 U.S. 218, 227-28 (2001); *see also Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006) ("We have held on a number of occasions that FDA interpretations of the FDCA receive deference.").

In this case, Ranbaxy challenges FDA's longstanding requirement that an ANDA applicant show CGMP compliance before obtaining tentative approval, FDA's authority to correct an error, and FDA's interpretation of the tentative approval forfeiture trigger. FDA interprets the statutory provision governing tentative approval to require CGMP compliance and its regulations and practice reflect that interpretation; consequently, FDA's interpretation is entitled to *Chevron* deference. FDA's authority to rescind tentative approval goes hand-in-hand with its authority to grant tentative approval, and because the decision to rescind tentative approvals here was rational and based upon consideration of the relevant factors, it should be upheld. And, lastly, FDA's real-world interpretation of the tentative approval forfeiture trigger deserves deference because it fulfills Congress' intent to have FDA tentatively approve applications only where warranted. Because FDA both properly construed and properly applied the tentative approval and forfeiture provisions at issue here, its determination easily passes muster under the APA and thus the United States is likely to succeed on the merits.

### 3. Tentative Approval Requires a Showing of CGMP Compliance

FDA has long interpreted the definition of "tentative approval" to require that an ANDA meet the substantive requirements for approval, including that a sponsor demonstrate that its manufacturing processes and controls are adequate to assure and preserve the drug's identity, strength, quality, and purity. This interpretation is consistent with the statute's plain language under *Chevron* step one.

28

The Act defines tentative approval as

> notification to an applicant by the Secretary that an application
> under this subsection meets the requirements of paragraph (2)(A),
> but cannot receive effective approval *because* the application does
> not meet the requirements of this subparagraph, there is a period of
> exclusivity for the listed drug under subparagraph (F) or section
> 505A, or there is a 7-year period of exclusivity for the listed drug
> under section 527.

21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) (emphasis added).[9] Thus, under a plain reading of the

statute, tentative approval is appropriate when the *only* reason that an application cannot receive

final approval relates to the statutory requirements regarding the timing of approvals, such as an

unexpired exclusivity period or a stay. In contrast, tentative approval is not appropriate where

there are additional reasons unrelated to patents or exclusivity (such as failure to demonstrate

adequate CGMP compliance) that would prevent an application from receiving a final, effective

approval. If Congress had intended that an ANDA could be eligible for tentative approval

without meeting all of the substantive requirements for approval, it could have made that clear by

replacing the phrase "requirements of this subparagraph" with "requirements of paragraph (4)

[setting forth the substantive requirements for ANDA approval] or this subparagraph."

Ranbaxy argues that "the statute could not be more clear" that, in contrast to the

affirmative showing of CGMP compliance required to approve an ANDA, the agency must grant

tentative approval as long as an ANDA contains merely a "full description" of the drug's

proposed manufacturing methods. Pls.' TRO Br. at 38. According to Ranbaxy, two features of

the statute compel this conclusion: *First*, the contrast between the requirement in 21 U.S.C.

§ 355(j)(2)(A) that an ANDA contain "information to show" various facts and language in a

---

[9] The phrase "requirements of this subparagraph" refers to the patent certification requirements,
30-month stay, 180-day exclusivity, and associated requirements related to timing of approvals
described in subparagraph (j)(5)(B) of 21 U.S.C. § 355.

cross-referenced statute requiring only "a full description of" manufacturing methods and controls, *see* 21 U.S.C. § 355(j)(2)(A)(vi) (referring to "items specified in clauses (B) through (F) of subsection (b)(1) of this section") *and* 21 U.S.C. § 355(b)(1)(D) (requiring NDAs to contain "a full description of the methods used in, and the facilities and controls used for, the manufacturing, processing, and packing of such drug"); and *Second*, the contrast between this "full description" language and the statute's requirement in 21 U.S.C. § 355(j)(4)(A) that FDA shall approve an application unless it finds that the sponsor's CGMP compliance is inadequate. Pls.' TRO Br. at 38-39.

Unfortunately for Ranbaxy, another court in this district has already determined "that the agency is authorized to interpret the requirement of a 'full description' of the methods and controls called for by section 355(b)(1)(D) to encompass the information it needs to make the findings required by section 355(j)(4)(A)—and indeed, that the words 'full description' *must* be read as a means to accomplish that purpose." *Sanofi-Aventis U.S. LLC v. FDA*, 842 F. Supp. 2d 195, 204 (D.D.C. 2012). As the *Sanofi-Aventis* court noted, "the clauses enumerating what the FDA may review in an ANDA should be construed broadly." *Id.* (citing *Serono Labs. v. Shalala*, 158 F.3d 1313, 1324-25 (D.C. Cir. 1998)). Fundamentally, "the terms 'full description' are sufficiently broad to warrant the same treatment as 'information to show.'" *Sanofi-Aventis*, 842 F. Supp. 2d at 205.

Nothing in section 355(j)(5)(B)(iv)(II)(dd)(BB) alters this conclusion. Rather than "presume further Agency review prior to issuance of a final approval," as Ranbaxy argues, *see* Pls.' TRO Br. at 41, this provision merely allows for the *possibility* that additional review will be necessary: a tentatively approved drug does "not have an effective approval until the Secretary issues an approval after *any necessary additional review* of the application." 21 U.S.C.

30

§ 355(j)(5)(B)(iv)(II)(dd)(BB) (emphasis added). The words "any necessary" convey that, in at least some cases, no additional review will be necessary. For example, an ANDA could receive tentative approval one week before the expiration of any blocking patents; in such a circumstance, additional review might not be necessary before the approval is made effective. On the other hand, when a sponsor has made significant changes to an ANDA since receiving tentative approval and the scientific conclusions underlying the tentative approval no longer support final approval under section 355(j)(4) – for example, if the sponsor has sought to move drug production to a different manufacturing facility – then "additional review of the application" would be necessary for approval. *See Ranbaxy Labs. Ltd v. United States Food and Drug Admin.*, 307 F. Supp. 2d 15, 19 (D.D.C. 2004) ("Approvals do not become effective by operation of law because the FDA has an ongoing health and safety responsibility to perform, and an applicant has no vested right to enter the market until the FDA gives its final formal approval."). This provision implies nothing more.

Also fatal to Ranbaxy's argument is that its proposed interpretation would create an inconsistency in the statute. *See, e.g.*, *United States v. Raynor*, 302 U.S. 540, 547 (1938) ("A construction that creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the act, and will carry out the intention of Congress."). Under the FDCA, a first applicant will forfeit its eligibility for 180-day exclusivity if it fails to obtain tentative approval within 30 months after filing its ANDA, but that failure is excused – and forfeiture is avoided – if "the failure is caused by a change in or a review of *the requirements for approval of the application* imposed after the date on which the application is filed." 21 U.S.C. § 355(j)(5)(D)(i)(IV) (emphasis added). There can be no question that "the requirements for approval" include, among other things, a showing of CGMP

31

compliance.  But if, as Ranbaxy contends, it is not necessary to meet all of the substantive requirements for final approval in order to receive tentative approval, there is no logical reason why Congress would not have tailored this exception to the forfeiture provision narrowly to apply only to the tentative approval requirements.  Ranbaxy's view is inconsistent with Congress's goal in enacting the MMA's forfeiture provisions to eliminate barriers to lower-cost generic alternatives coming to market.

Assuming *arguendo* that Ranbaxy's proposed statutory interpretation suggests that the statute is silent or ambiguous as to the substantive requirements for tentative approval, the agency's interpretation must be upheld so long as it is a permissible construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation.  *Chevron*, 467 U.S. at 843; *id.* n.11; *see also Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).  FDA's interpretation is reflected clearly in its regulations, which provide that FDA will send an approval letter – including a tentative approval letter – to an ANDA sponsor only "if none of the reasons in § 314.127 for refusing to approve the abbreviated new drug application applies."  21 C.F.R. § 314.105(d).  Section 314.127, in turn, provides that FDA will refuse to grant a tentative or final approval for an ANDA for a variety of reasons, including if "[t]he methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug product are inadequate to ensure and preserve its identity, strength, quality, and purity."  21 C.F.R. § 314.127(a)(1).  In the preamble to its proposed rule promulgating the ANDA regulations, FDA observed that "an ANDA . . . may be approved with a delayed effective date, as specified by the agency in its approval letter."  54 Fed. Reg. 28,872, 28,893 (July 10, 1989).  In the preamble to the final rule, the agency explained: "With the exception of editorial matters or other minor deficiencies in an

ANDA, approval letters should not raise new issues for applicants to resolve . . . . FDA has, on its own initiative, clarified that an approval with a delayed effective date is tentative." *Abbreviated New Drug Application Regulations*, 57 Fed. Reg. 17,950, 17,967 (Apr. 28, 1992).

The understanding that tentative approval requires a showing of CGMP compliance is not a novel interpretation of the statute, and it is one that the generic drug industry clearly shares.[10] For example, FDA's Generic Drug User Fee Act ("GDUFA") Commitment Letter reflects the "performance efficiencies, metric goals and procedures" of a generic drug user fee act program "as jointly proposed by FDA and industry." *See* GDUFA Commitment Letter: Generic Drug User Fee Program Performance Goals and Procedures (July 2012), *available at* http://www.fda.gov/downloads/ForIndustry/UserFees/GenericDrugUserFees/UCM282505.pdf. One shared goal is for FDA to "prioritize inspections of establishments associated with ANDAs that are otherwise approvable *or eligible for tentative approval* except for an outstanding inspection." *Id.* at 4, 8 (emphasis added). If tentative approval required only a written "full description" of intended CGMP processes (as Ranbaxy contends), as opposed to an actual showing of CGMP compliance (as FDA has long interpreted the statute), there would be no reason to prioritize these inspections, and it would have been counterproductive for industry to

_____

[10] It also is not news to Ranbaxy. *See, e.g.*, Tentative Approval Letter to Ranbaxy Inc. from G. Buehler, Director, FDA Office of Generic Drugs re. ANDA 077472 for Cetirizine Hydrochloride Syrup, 5 mg/5mL (Nov. 1, 2006) (*available at* http://www.accessdata.fda.gov/ drugsatfda_docs/appletter/2006/077472s000TAltr.pdf) ("We have completed the review of this ANDA, and based upon the information you have presented to date we have concluded that the drug is safe and effective for use as recommended in the submitted labeling. However, we are unable to grant final approval to your ANDA at this time *because of the patent issue* noted below. Therefore, the ANDA is **tentatively approved**. This determination is based on information available to the agency at this time (i.e., information in your ANDA *and the status of current good manufacturing practices (cGMPs) of the facilities used in the manufacturing and testing of the drug product).*") (**bold** emphasis in original, *italicized* emphases added).

agree to (if not insist on) diverting scarce agency resources to inspections that it did not believe were necessary to secure tentative approval.

Finally, even in the context of eligibility for 180-day exclusivity, application of this interpretation of the requirements for tentative approval is not unprecedented. FDA previously has concluded that other applicants have forfeited their eligibility for 180-day exclusivity under the 30-month forfeiture provision as a result of failing to demonstrate CGMP compliance by the 30-month forfeiture date.[11]

### 4. The Rescinded Tentative Approval Letters Were Issued In Error

Ranbaxy has presented no support whatsoever for its inflammatory claim that FDA is seeking to change administrative policy, not correct an error.

There is no serious dispute about the extent of Ranbaxy's CGMP compliance deficiencies at the time the two tentative approval letters were issued, but there also can be no serious dispute that FDA has always interpreted the statute to hold that a tentative approval should not issue unless the *only* bar to approval relates to timing. The relevant substance of the regulations promulgated by FDA in 1992 has not changed; the rationale FDA cited in its letter to Ranbaxy was consistent with this view; and the position that FDA is stating now remains the same. Indeed, Ranbaxy has not identified any departures from this interpretation apart from the Ranbaxy ANDAs at issue in this case.

Ranbaxy claims to have evidence that high-level FDA officials "were involved in establishing a line of precedent under which the Agency granted TAs for both of these ANDAs," and that the agency purposefully granted the TAs despite full knowledge of the firm's

---

[11] FDA's disclosure regulations limit the agency's ability to disclose the details of those decisions. *See* 21 C.F.R. §§ 20.61, 314.430. However, FDA will produce the supporting administrative record with appropriate safeguards in place, *i.e.*, sealing, where appropriate.

compliance status so that it could maintain eligibility for exclusivity. Pls.' TRO Br. at 24. But even if it were true that agency officials more consciously disregarded FDA's longstanding interpretation, as Ranbaxy contends, that fact would not preclude FDA from correcting an erroneous decision. In *Actavis v. FDA*, FDA originally determined that a drug was not eligible for five-year new chemical entity exclusivity, but reversed that decision after Actavis pointed out that the decision was inconsistent with FDA's interpretation of its regulations. 689 F. Supp. 2d 174, 180 (D.D.C.), *aff'd*, 625 F.3d 760 (D.C. Cir. 2010). The district court rejected Actavis's argument that FDA had been inconsistent, and noted with approval that FDA had reversed course:

> Actavis complains that FDA relied on the draft manual provision with respect to another drug application, but any force that argument otherwise might have had is entirely sapped by the fact that FDA recognized its error in that case and reversed itself. Actavis makes too much of the draft manual provision and FDA's alleged flip-flopping. The official policy of the agency is expressed in the formal regulations, not in any draft manual provision that precedes the promulgation of the regulations.

*Id.* Similarly here, FDA may and should reverse a decision that was contrary to FDA's long-standing interpretation of the statute and application of its regulations, even if that erroneous decision was made on a basis more conscious than mere inadvertence.[12]

At the end of the day, promises of evidence without any basis in the record do not establish a likelihood of success on the merits, and Ranbaxy suggests no explanation for why FDA – after taking positions in litigation that paved the way for the company to capitalize on valuable exclusivities for atorvastatin and valsartan, *see* Civ. No. 11-566-JEB (D.D.C. 2011) and Civ. No. 12-1637-JDB (D.D.C. 2012), and after investing countless of its own valuable hours in

---

[12] Nor would any individual statements about the reasons for the erroneous original decision (statements to which Ranbaxy alludes, but does not identify) compel the agency to depart from its longstanding interpretation of the statute and regulations. *See* 21 C.F.R. § 10.85(k).

reviewing the company's Consent Decree submissions for these two drug products – suddenly and "obviously wants to reverse course as a policy matter." Pls.' TRO Br. at 25. The answer, unremarkable as it may be, is that the agency simply wants to do the right thing. "To err is both human and inevitable in a large agency . . . . That the error occurred is regrettable; that the [agency] is now correcting it is laudable." *Howard Sober Inc., v. I.C.C.*, 628 F.2d 36, 42 (1980).

### 5. FDA Is Authorized, and Obligated, To Correct An Error

Ranbaxy appears to argue that, once a federal agency has made an error, it – and all affected stakeholders – are bound by the consequences of that error, unless Congress has contemplated the possibility of that error and provided through statute an express means of correction. But this argument, if it proves anything, proves too much: it cannot be that an action that the agency is unauthorized to take in the first instance somehow becomes permissible when the action is taken in error, and that the agency is then *prohibited* from remedying its own unauthorized action by correcting the error. If an agency has no power to act, then it similarly has no authority to let its own unauthorized action stand, and it must possess some means of correcting its error.

Indeed, the courts have long recognized this common-sense doctrine: "The power to reconsider is inherent in the power to decide." *Albertson v. FCC*, 182 F.2d 397, 399 (D.C. Cir. 1950); *see also United States Gas Improvement Co. v. Callery Properties*, 382 U.S. 223, 229 (1965) ("An agency, like a court, can undo what is wrongfully done by virtue of its order."); *Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) ( "[A]dministrative agencies are assumed to possess at least some inherent authority to revisit their prior decisions."); *Last Best Beef, LLC v. Dudas*, 506 F.3d 333, 340 (4th Cir. 2007) (agencies have "broad authority to

36

correct their prior errors."); *American Therapeutics, Inc. v. Sullivan*, 755 F. Supp. 1, 2 (D.D.C. 1990) ("[A]n agency must be given some leeway to remedy mistakes.").

Courts that have limited an agency's ability to correct its own mistakes have done so only: (1) when there is specific statutory authority to the contrary, or (2) when the agency's correction of its mistake was not timely. *See, e.g.*, *Ivy Sports Medicine*, 767 F.3d at 86. Neither factor limits FDA's authority to correct its mistake here.

### i. Congress Has Not Limited FDA's Authority To Rescind an Erroneously-Issued Tentative Approval Letter

The D.C. Circuit assumes "that Congress intends to displace an administrative agency's inherent reconsideration authority when it provides statutory authority to rectify the agency's mistakes." *Ivy Sports Medicine*, 767 F.3d at 86; *see also American Methyl Corp. v. EPA*, 749 F.2d 826, 835 (D.C. Cir. 1984) ("[W]hen Congress has provided a mechanism capable of rectifying mistaken actions . . . it is not reasonable to infer authority to reconsider agency action."). Simply stated, nothing in the text of the FDCA limits FDA's inherent authority to rescind an erroneously-issued tentative approval letter.

As Ranbaxy acknowledges, Congress *has* spoken directly to the question of when and how FDA shall withdraw *final* approval of a drug, and that provision plainly requires notice to the applicant and an opportunity for a hearing. *See* 21 U.S.C. § 355(e). But Congress also was clear that "tentative approval" does not equate to "approval." *Compare* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(BB) ("A drug that is granted tentative approval . . . is not an approved drug and shall not have an effective approval until the Secretary issues an approval . . .") with 21 U.S.C. § 355(e) ("The Secretary shall, after due notice and opportunity for hearing to the applicant, withdraw approval of an application . . ."); *see also* 21 C.F.R. § 314.107(b)(3)(v) ("Tentative approval of an application does not constitute 'approval'"); *Barr Laboratories, Inc.*

37

*v. Thompson*, 238 F. Supp. 2d 236, 246 (D.D.C. 2002) ("While certain benefits may flow even from ANDA approvals with delayed effective dates, they are in no sense tantamount to the benefits accruing when NDAs or ANDAs are approved with immediate effective dates."). The statute does not limit FDA's authority to rescind an erroneously-issued tentative approval letter.

### ii. FDA Acted In a Timely Fashion In Light Of The Circumstances

In the D.C. Circuit, "an agency has the inherent power to reconsider and change a decision *if it does so within a reasonable period of time*." *Mazaleski v. Truesdell*, 562 F.2d 701, 720 (D.C. Cir. 1977) (emphasis added) (quotation omitted). There is no bright-line rule as to what period of time is reasonable:

> What is a short and reasonable time period will vary with each case, *but absent unusual circumstances*, the time period would be measured in weeks, not years. A correction of an error within a reasonable time period will have retroactive effect, or, in other words, will preclude any cause of action based on the original error. Where reasonable time for reconsideration has expired, there is no longer an opportunity to correct the procedural error retroactively.

*Id.* (emphasis added; quotation omitted). Other circuits have echoed this approach, focusing on reasonableness under the circumstances rather than an inflexible, arbitrary cut-off date. *See, e.g.*, *ConocoPhillips Co. v. EPA*, 612 F.3d 822, 832 (5th Cir. 2010) ("[R]econsideration also must occur within a reasonable time after the decision being reconsidered was made . . . ."); *accord Saqr v. Holder*, 580 F.3d 414, 420 (6th Cir. 2009); *Cooley v. United States*, 324 F.3d 1297, 1305-06 (Fed. Cir. 2003); *AFL-CIO v. Excelsior Foundry Co.*, 56 F.3d 844, 847 (7th Cir. 1995); *Dun & Bradstreet Corp. v. USPS*, 946 F.2d 189, 193 (2d Cir. 1991); *Lewis v. Dep't of Labor*, 368 F. App'x 20, 29 (11th Cir. 2010) (unpublished).

Under the circumstances of this case, FDA acted to correct its error within a reasonable period of time. A valid tentative approval letter in this context is essentially a milestone. If

tentative approval is timely obtained, a first applicant retains its eligibility for 180-day

exclusivity; if a first applicant has obtained a valid tentative approval within 30 months, and has

not forfeited a claim to exclusivity, then subsequent applicants that otherwise are ready for

approval may be blocked.  As noted earlier, FDA's policy is not to decide an applicant's

eligibility for 180-day exclusivity until either the first applicant or a subsequent ANDA is ready

for approval.  Therefore, once FDA had issued the erroneous tentative approval letters, it had no

occasion to revisit them until an approval action was imminent, either for Ranbaxy or for another

applicant.  *See Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314, 1322 (Ct. Int'l Trade

2002) (finding a four and a half year delay not unreasonable where the International Trade

Commission was under no obligation to "monitor subsequent developments as they pertain to a

particular final determination," and "allegations . . . of the kind made here[ ] would necessarily

come to the ITC's attention, if at all, at a time somewhat remote from the original

[proceeding].").[13]

 "'Significant events' occurring prior to the effective date can, and often must, delay the

effective date of ANDA approvals."  *Barr Labs., Inc.*, 238 F. Supp. 2d at 246.  In this case, no

valganciclovir ANDA was ready for approval until 2014, and FDA has not issued a final

approval to any esomeprazole ANDA.  At least some of that delay is attributable entirely to

Ranbaxy:  although it was a first applicant for each of these products, FDA's review of these

applications, which included data from the Paonta Sahib facility, was suspended as a result of its

own unresolved data integrity and CGMP problems at that facility.  In July 2014, as soon as

another applicant – in this case, Endo – was close to approval, FDA promptly reviewed

---

[13] As noted above, FDA had no reason to re-examine the tentative approval letters during the
course of reviewing Ranbaxy's submissions under Paragraphs XIV and XV of the Decree.

Ranbaxy's valganciclovir ANDA file and considered the arguments raised by Endo and other

interested parties (including Ranbaxy). Upon determining that it had erroneously issued a

tentative approval letter to Ranbaxy in 2008, FDA conducted a review to determine whether any

other applications (including applications from other sponsors) were affected. After completing

that review, the agency corrected its error.

Moreover, the passage of time in this case did not preclude a meaningful opportunity to

correct the error. Even if FDA had realized its errors and rescinded the tentative approval letters

in November 2008, there is nothing in the record demonstrating that any other applicant – the

only parties aggrieved by the underlying error, because they would have been blocked from final

approval until 180 days after Ranbaxy triggered its erroneously-acquired exclusivity by going to

market – would have been ready for approval any sooner.

In light of these circumstances, FDA acted to correct its errors within a reasonable time

period. *See Elkem Metals Co.*, 193 F. Supp. 2d at 1322-23 ("[E]ven though the period of time

that elapsed . . . was substantial, it was not unreasonable.").

### iii. Ranbaxy's Alleged "Reliance Interests" Do Not Preclude FDA Action

Ranbaxy's argument that its "reliance interests" are an obstacle to FDA's ability to

correct its errors is completely meritless.

As an initial matter, the cases that Ranbaxy cites in support of the proposition that "it is

particularly inappropriate for agencies to revisit past decisions . . . where reliance interests are at

stake," Pls.' TRO Br. at 30, are wholly inapposite. Two of those cases expressly distinguish

instances where an agency is correcting an error. *See McAllister v. United States*, 3 Cl. Ct. 394,

398 (1983) ("[B]arring a showing of error, an agency may reconsider its final decision only if the

reconsideration is timely and the parties have not adversely changed their positions in reliance on

that decision. . . .  If the parties act on the initial decision, however, and if the agency knows they

will act, then the agency may reverse its initial decision only upon a showing that it was

erroneous."); *Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194, 1202 (D.S.D. 2000) (same,

citing *McAllister*), *rev'd on other grounds sub nom. Rosebud Sioux Tribe v. McDivitt*, 286 F.3d

1031 (8th Cir. 2002).  The other two cases cited also have no bearing on the facts here.  The

language Ranbaxy quotes from *Confederated Tribes of Warm Springs Reservation of Oregon v.*

*United States*, 177 Ct. Cl. 184, 191 (1966) refers to a situation where "a judicial or quasi-judicial

body [reaches] out, after a case has left its jurisdiction, and pull[s] it back in by modifying or

reconsidering its decision," *id.*, which is not what happened in this case.  And the statement from

*Prieto v. United States*, 655 F. Supp. 1187, 1192 (D.D.C. 1987), that "[o]bviously, an agency is

much freer to change a decision when the change will not snatch back vested rights," is not on

point here either:  a tentative approval does not confer a vested right.  *See Ranbaxy*, 307 F. Supp.

2d at 19, 21 (D.D.C. 2004); *Barr*, 238 F. Supp. 2d at 248-50.

Turning to Ranbaxy's alleged "reliance interests," there simply is no basis in the record

for Ranbaxy's claim that FDA's "decisions awarding TA and the company's resulting eligibility

for 180-day exclusivity[ ] was the *very predicate* for the Decree's terms."  Pls.' TRO Br. at 31

(emphasis added).  The parties entered into the Decree to avoid litigating the Complaint; the

Decree is an extremely complex document that resulted from extensive negotiations between the

parties, with Ranbaxy having been advised by experienced and competent food and drug

counsel.  Preserving any claims to exclusivity may well have been Ranbaxy's "principal

objective during those negotiations," *id.*, but the Decree contains no recitals, "whereas" clauses,

or any other language purporting to memorialize that objective, let alone any meeting of the

minds implementing it.

41

"Consent decrees are to be interpreted as contracts," *United States v. Microsoft Corporation*, 147 F.3d 935, 946 (D.C. Cir. 1998), and although "the parties have purposes, generally opposed to each other, [ ] the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *Id.*; *see also United States v. Bank of America*, 922 F. Supp. 2d 1, 6 (D.D.C. 2013) (citing *United States v. W. Elec. Co.*, 894 F.2d 1387, 1390 (D.C. Cir. 1990)) ("The meaning of a consent decree, like a contract, should be determined within its 'four corners.'"). Ranbaxy's argument that it "insisted" it "could maintain its right to exclusivity" for "important first-to-file products," Pls.' TRO Br. at 31, is belied by the fact that nothing in the Decree reflects any agreement by the parties or acknowledgement by FDA that any Excepted Application (or, for that matter, any other Ranbaxy application) possesses or is eligible for exclusivity.

Instead, the Decree identifies circumstances where a given application may be deemed conclusively *ineligible* for exclusivity, *see* Decree ¶ XIV.A.2, and where Ranbaxy will be deemed to have relinquished *any claim* to exclusivity, *see* Decree ¶¶ XII, XIII, XL. In this sense, the Decree's language reflects FDA's long-held and consistent policy of not deciding whether an applicant is eligible for 180-day exclusivity until either the first applicant or a subsequent ANDA is ready for approval. *See supra* at 42. Nothing within the four corners of the Decree permits an inference that FDA departed from its longstanding policy and made any determinations regarding the accuracy of Ranbaxy's beliefs that it might be eligible for exclusivity for any application.[14]

---

[14] Ranbaxy could reasonably have anticipated the possibility of this action and insisted that the Decree clearly reflect and preserve its beliefs as to the exclusivity status of its applications. At least one other generic drug manufacturer believed as early as 2010 that Ranbaxy's compliance problems put some or all of its tentative approvals at risk of revocation. *See Apotex, Inc. v. Eisai Inc.*, No. 1:09CV477, 2010 U.S. Dist. LEXIS 89153, at *11 (M.D.N.C. Aug. 27, 2010) ("Apotex

Finally, Ranbaxy's own conduct since entry of the Decree raises questions about its suggestion that its "important first-to-file products" represent some sacrosanct pool of "valuable assets." *See* Pls.' TRO Br. at 31-32.  It bears mention that the term "first-to-file" appears nowhere in the Decree.  But if one assumes that Ranbaxy is referring here to the five ANDAs defined as Excepted Applications, it is noteworthy that Ranbaxy affirmatively chose not to take advantage of the Decree's accelerated pathway for ANDA 3.  Only Ranbaxy knows for sure whether it made this decision for commercial reasons or because it did not expect the application to pass the Decree-mandated scrutiny for untrue statements and patterns of practices of data irregularities.  Either way, Ranbaxy's claim that "FDA has unilaterally upended the parties' self-evident expectations," Pls.' TRO Br. at 31, does not hold water, and it certainly does not interfere with the agency's authority to correct a mistake.

### 6.  FDA's Interpretation of the Forfeiture Trigger is Reasonable

FDA's determination that Ranbaxy has forfeited its eligibility for 180-day exclusivity for its valganciclovir ANDA is entirely consistent with the statute.  The alternative interpretation advanced by Ranbaxy, in contrast, would frustrate the purpose of the MMA.

In the Hatch-Waxman Amendments, "Congress sought to strike a balance between incentives, on the one hand, for innovation, and on the other, for quickly getting lower-cost generic drugs to market."  *Teva Pharm. Indus. Ltd. v. Crawford*, 410 F.3d 51, 54 (D.C. Cir. 2005).  When it passed the MMA, Congress underscored the importance of the latter goal:  it "enacted the forfeiture provisions to ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic

---

maintains that the FDA will reject Ranbaxy's ANDA on account of these [CGMP] deficiencies, and that Ranbaxy's tentative approval . . . will also be revoked.").

competition." *Hi-Tech Pharmacal Co., Inc. v. U.S. Food and Drug Admin.*, 587 F. Supp. 2d 1, 4

(D.D.C. 2008) (citing 149 Cong. Rec. S15746 (daily ed. Nov. 24, 2003) (statement of Sen.

Schumer)).

As explained above, FDA determined that it had erroneously issued a tentative approval

letter for Ranbaxy's valganciclovir ANDA, and corrected its error by rescinding the tentative

approval letter. Under the MMA's provisions, a first applicant forfeits its eligibility for 180-day

exclusivity if it fails to obtain tentative approval of an ANDA within 30 months after the date on

which the application is filed. 21 U.S.C. § 355(j)(5)(D)(i)(IV). Ranbaxy's ANDA for

valganciclovir was received by the agency for filing on December 27, 2005; thirty months after

that date was June 27, 2008. With the rescission of the erroneously-issued tentative approval

letter, Ranbaxy failed to obtain tentative approval by June 27, 2008, and FDA determined that

Ranbaxy forfeited its eligibility for 180-day exclusivity for valganciclovir.

Ranbaxy challenges this determination, pointing to language in the statute defining

tentative approval as "notification to an applicant." 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA).

Tentative approval, Ranbaxy asserts, "requires no more than an act of notice by FDA." Pls.'

TRO Br. at 33-34. But this interpretation ignores reality. Tentative approval requires a

notification grounded in a legitimate basis, and forfeiture of eligibility for 180-day exclusivity

cannot be avoided on the basis of an invalid tentative approval. There is no reason to believe

that Congress intended for an invalid tentative approval to provide shelter from forfeiture. "Part

of a fair reading of statutory text is recognizing that 'Congress legislates against the backdrop' of

certain unexpressed presumptions. . . . The notion that some things 'go without saying' applies

to legislation just as it does to everyday life." *Bond v. United States*, 134 S. Ct. 2077, 2088

(2014) (citation omitted). It goes without saying that Congress should not have to expressly

44

preface every predicate act or condition in a statute by saying that it must be "valid" or "legitimate."

If Ranbaxy's interpretation were correct, then any communication purporting to be an act of notice from FDA would qualify as a tentative approval irrespective of the propriety of that action, protecting a first applicant from possible forfeiture and potentially blocking other generic entrants from the market, thus frustrating Congressional intent. Consider a hypothetical: sophisticated criminals hack into FDA's computer system, and generate a tentative approval letter (complete with electronic signature) for an actual application that, by any standard, does not meet the requirements for approval. Under Ranbaxy's interpretation, there has been a "notification to the applicant" within the meaning of section 355(j)(5)(B)(iv)(II)(dd)(AA).

This is an extreme scenario, and it is possible to imagine other similarly extreme scenarios, but if Ranbaxy's position is correct, then forfeiture is avoided and other generic entrants are blocked from entering the market. Ranbaxy's interpretation clearly leads to absurd results that are inconsistent with Congressional intent, in passing the Hatch-Waxman Amendments and the MMA, to bring lower-cost generic alternatives to the market. Fortunately, "[e]very statute must be interpreted in the light of reason and common understanding to reach the results intended by the legislature." *Rathbun v. United States*, 355 U.S. 107, 109 (1957); *see also Haggar Co. v. Helvering*, 308 U.S. 389, 394 (1940) ("All statutes must be construed in the light of their purpose. A literal reading of them which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose."); *cf. Deal v. United States*, 508 U.S. 129, 132 (1993) (citing the "fundamental principle of statutory construction . . . that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.").

45

The D.C. Circuit addressed a somewhat analogous situation in *Teva Pharms. v. Leavitt*, 548 F.3d 103 (D.C. Cir. 2008). There, Teva submitted an ANDA containing a paragraph IV patent certification to a patent that had previously been delisted, but had not yet been removed from the printed Orange Book. Under the FDCA, a paragraph IV certification is a requirement for 180-day exclusivity. Teva argued that it was eligible for exclusivity, but the Court agreed with FDA that "reality matters," 548 F.3d at 105, explaining:

> [A]n applicant's right to a period of marketing exclusivity does not vest merely because a paragraph IV certification is filed. Only compliance with paragraph IV triggers exclusivity, and *compliance presupposes the existence of a claiming patent. . . . Inadvertent failure by the agency to meet its separate publication requirement cannot defeat facts. . . .* Teva's argument goes beyond punishing Agency inadvertence; it would reward willful blindness on the part of manufacturers—a position clearly at odds with Hatch-Waxman's focus on fostering competition and lowering drug prices.

*Id.* at 107 (emphasis added). Likewise in this case, only a valid tentative approval can avoid forfeiture. Ranbaxy cannot elevate the agency's error over the fact that it was never entitled to receive tentative approval for its applications.

Ranbaxy's argument regarding the withdrawal provisions, Pls.' TRO Br. at 34-35, is unavailing. Congress saw fit to provide an express statutory means to withdraw an approved drug product precisely because of the "inalterable vested legal right to go to market" that accompanies a final approval, *Barr Labs.*, 238 F. Supp. 2d at 247, as well as the interests of patients and health care practitioners who take or prescribe an approved drug. Rescinding an erroneously-issued tentative approval letter implicates no similar interests.

Ranbaxy's final contention, that it is exempt from forfeiture because of a "change in or a review of" the relevant approval requirements, also is dispensed with easily. The relevant approval requirements here never changed; as explained above, FDA has long interpreted the statute to require a showing of CGMP compliance before granting tentative approval. Unlike in

46

*Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 307 (D.D.C. 2012), where a new USP

monograph for the drug substance (changing both the specifications and the test methods for the

drug substance) became official approximately two months before the 30-month forfeiture date*,*

nothing has changed about the CGMP requirements.  All that happened was that FDA made an

error and issued two tentative approval letters when the facilities referenced in the underlying

ANDAs were not in compliance with CGMP.

      FDA has now identified and acted to correct that error, by rescinding the wrongly-issued

tentative approval letters, determining that Ranbaxy has forfeited any eligibility for 180-day

exclusivity for its valganciclovir ANDA, and approving two generic valganciclovir products.

This result is correct under the statute and consistent with Congressional intent, the law does not

require this Court to undo FDA's efforts and compound the error, and Ranbaxy has no likelihood

of success on the merits.

## B.  Ranbaxy Has Not Shown That It Will Suffer Irreparable Injury In The Absence Of Immediate Injunctive Relief

      Ranbaxy not only is unlikely to prevail on the merits, it also fails to establish that it will

suffer irreparable harm absent preliminary relief.  Only *irreparable* harm that is *likely* justifies

the issuance of a preliminary injunction.  *Winter v. NRDC*, 555 U.S. 7, 20-22 (2008).  Indeed, "if

a party fails to make a sufficient showing of irreparable injury, the court may deny the motion for

injunctive relief without considering the other factors."  *Astellas Pharma US, Inc., v. FDA*, 642

F. Supp. 2d 10, 16 (D.D.C. 2009).  The *Winter* Court "rejected the idea that a strong likelihood

of success could make up for showing only a possibility (rather than a likelihood) of irreparable

harm.  In other words, the Court ruled that the movant always must show a likelihood of

irreparable harm."  *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009)

(Kavanaugh, J., joined by Henderson, J., concurring).  The injury must "be both certain and

great; it must be actual and not theoretical." *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). Ranbaxy must show that "the injury complained of [is] of such imminence that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C. 1976)).

### 1. Ranbaxy Cannot Show Current or Imminent Financial Losses

Ranbaxy projects financial harm to the company based on the potential launch of generic competition; obviously, no launch has yet occurred, and therefore there is no harm. *See, e.g.*, Amended Decl. of Dan Schober ("Schober Decl.") (Dkt. No. 11). Despite Ranbaxy's efforts to convince the Court that the alleged harm is imminent, it offers no actual evidence in support.

### 2. Ranbaxy's Projected Financial Losses Do Not Constitute Irreparable Harm

Ranbaxy claims the harms in this case are "extraordinary" and that it "stands to suffer hundreds of millions of dollars in lost sales" during the first year of sales.[15] Pls.' TRO Br. at 45; Schober Decl. at ¶ 12. In this circuit, mere economic loss ordinarily does not constitute irreparable harm. *See, e.g.*, *Wis. Gas*, 758 F.2d at 674; *Astellas*, 642 F. Supp. 2d at 22 ("[I]t is well-settled that economic loss alone will rarely constitute irreparable harm"); *Mylan v. Shalala*, 81 F. Supp. 2d 30, 42-43 (D.D.C. 2000) ("Courts within the Circuit have generally been hesitant to award injunctive relief based on assertions about lost opportunities and market share"); *Bristol-Myers*, 923 F. Supp. 212, 220 (D.D.C. 1996). Instead, economic loss may constitute irreparable harm "only where the loss threatens the very existence of the movant's business." *Wis. Gas.*, 758 F.2d at 674; *Astellas*, 642 F. Supp 2d at 22; *Coal. for Common Sense in Gov't*

---

[15] It is unclear how the first year sales figure provided by Ranbaxy accounts for the expiration of exclusivity after 180 days in that first year of sales, at which point competition would ensue.

*Procurement v. United States*, 576 F. Supp. 2d 162, 168- 69 (D.D.C. 2008) ("degree of harm" must be so severe as to cause extreme hardship to the business or threaten the very existence of Coalition members); *Biovail Corp. v. U.S. Food and Drug Admin.*, 448 F. Supp. 2d 154, 160 (D.D.C. 2006); *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) (noting that "[t]o successfully shoehorn potential economic loss into the irreparable harm requirement, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence." (citations omitted)); *Sociedad Anonima Viña Santa Rita v. Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business"). Ranbaxy does not come close to satisfying this standard.

### a. Any Financial Losses Are Calculated Pending a Decision and Not For the Entire Sales Year

In a motion for temporary or preliminary injunctive relief, Ranbaxy must establish that it would suffer irreparable harm during the pendency of the litigation, that is, before its claims can be heard on the merits. *Mylan v. Shalala*, 81 F. Supp. 2d at 43; *see also Apotex, Inc. v. FDA*, No. 06-0627, 2006 WL 1030151 at *17 (D.D.C. Apr. 19, 2006) ("[T]he actual relevant period for assessing harms is probably only a few months" – from the time of generic launch to the time the case is resolved on the merits.); *Bristol-Myers*, 923 F. Supp. at 221 ("If it ultimately prevails on the merits, Bristol's total sales will be insignificantly affected over the duration of the litigation."). Even if Ranbaxy could potentially lose "hundreds of millions of dollars" over the first sales year without exclusivity for the products here at issue, it will not lose anywhere close to that amount during the brief amount of time it will take the parties to litigate the merits of this case. Indeed, Ranbaxy could not market a product now even if FDA had not taken the actions of which Ranbaxy complains, nor has any other generic manufacturer launched a competing

49

product.  Under these circumstances, assuming the Court proceeds to hear the merits of this case in relatively short order, Ranbaxy faces no imminent harm whatsoever – much less irreparable harm so substantial as to seriously threaten Ranbaxy's business and warrant the extraordinary remedy of a TRO.

### b. Ranbaxy's Projected Financial Losses for the Relevant Time Period Are Only a Small Percentage of Its Overall Profits

Further, in evaluating the financial information, "[m]onetary figures are relative, and depend for their ultimate quantum, on a comparison with the overall financial wherewithal of the corporation involved." *Mylan Labs., Inc. v. Leavitt*, 484 F. Supp.2d 109, 123 (D.D.C. 2007); *Sandoz, Inc. v. Food & Drug Admin.*, 439 F. Supp. 2d 26, 32 (D.D.C. 2006) *aff'd sub nom. Sandoz Inc. v. FDA*, No. 06-5204, 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006).  *Compare Sandoz, Inc. v. FDA*, 439 F. Supp. 2d at 32 (for subsidiary of large pharmaceutical company, $31 million loss representing less than one percent of its sales was "not irreparable harm . . . nor would it threaten the company's very existence.") (internal quotations and citation omitted), *with Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (recognizing injury to a small company with one product).

Ranbaxy does not even attempt to argue that its projected losses pose an existential threat to its business.  This is because it is one of the world's largest developers and manufacturers of generic, branded generic, over-the-counter products, and active pharmaceutical ingredients with a product portfolio of over 500 molecules, more than 14,600 employees, and twenty-one manufacturing facilities spread across eight countries.  *See* Ranbaxy: About Us.  (available at http://www.ranbaxy.com/about-us/overview/) (last accessed November 18, 2014).  Ranbaxy has ground operations in 43 countries, sells products in over 150 countries and earned revenues of $2.3 billion in 2012.  *Id.*  In order to justify the extraordinary remedy of a temporary restraining

order, Ranbaxy must demonstrate that, in the absence of such relief, it would suffer virtually catastrophic harm *before* its claims would otherwise be heard. Decreased sales for a single product due to foreseeable generic competition will not cause "extreme hardship" to Ranbaxy, much less threaten its existence.

### 3. Loss of Exclusivity Does Not Obviate the Need for Ranbaxy to Show Serious Injury

Instead of demonstrating catastrophic harm, Ranbaxy suggests that the loss of a first applicant's 180-day exclusivity should alone suffice to meet the high bar for irreparable harm. But nowhere in the cases cited by Ranbaxy does this Court or the Court of Appeals for the District of Columbia Circuit state or intimate that such a loss "is a quintessential irreparable harm" as Ranbaxy suggests. *See* Pls.' TRO Br. at 44. For instance, in *Mova Pharm. Corp. v. Shalala* cited by Ranbaxy, the Court's discussion of a loss of exclusivity was not divorced from the comparison between the harm and the overall financial wherewithal of Mova, as Ranbaxy would have this Court do here. 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998) (noting, in addition to the harm from "the loss of its officially sanctioned head start," that "Mova's small size put it at a particular disadvantage. This suffices to show a severe economic impact to Mova.").[16] Ranbaxy also cites to langauge in *Teva Pharms. USA, Inc. v. Sebelius*, a case examining ripeness, not irreparable harm. *See* 595 F.3d 1303, 1311 (D.C. Cir. 2010). The *Teva* court's discussion of a loss of exclusivity stemmed from the potential hardship to Teva if the court withheld review of FDA's policy until FDA actually made its first to file exclusivity decision. *Id.* Here, FDA has

---

[16] Ranbaxy also cites to *Apotex, Inc. v. FDA*, which explicitly relies on *Mova*. *See* No. 06-627, 2006 WL 1030151, at *17 (D.D.C. Apr. 19, 2006). The *Apotex* court, in the context of a pre-*Winter* sliding-scale standard, examined the magnitude of harms to each of the parties in denying Apotex emergency injunctive relief. *Id.* at *17. Ranbaxy also cites to *Sandoz, Inc. v. FDA*, 439 F. Supp. 2d at 32, another pre-*Winter* case, which in turn relies on *Apotex*.

already made its decision, at least with respect to valganciclovir and FDA is not asking the court

to withhold review until FDA can take some additional action in the future.  Review is underway

and FDA simply requests a reasonable schedule for doing so.

### 4.  Sovereign Immunity Does Not Obviate the Need for Ranbaxy to Show Serious Injury

Nor is there any merit to Ranbaxy's suggestion that economic losses are irreparable *per

se* where sovereign immunity renders damages unrecoverable from a government defendant.  *See*

Pls.' TRO Br. at 45.  If that were true, prospective injunctive relief would cease to be an

extraordinary remedy in cases against the federal government.  *See N. Air Cargo v. U.S. Postal

Serv.*, 756 F. Supp. 2d 116, 125 n.6 (D.D.C. 2010), *vacated on other grounds*, 674 F.3d 852

(2012).  Courts have concluded that even if the harm is irrecoverable because the government is

immune from suits seeking monetary damages, "it remains incumbent on plaintiffs to

demonstrate . . . that they are threatened with serious injury."  *ViroPharma, Inc. v. Hamburg*, 898

F. Supp. 2d 1, 25 (D.D.C. 2012).  Ranbaxy's reliance on *Smoking Everywhere* is misplaced, as

the *Smoking Everywhere* court's "irreparable injury determination was based in large part on the

fact that the potential economic loss and loss of good will are substantial, especially for a

fledgling company like [plaintiff, founded just one year prior,] that has only one product line."

*See ViroPharma, Inc.*, 898 F. Supp. 2d at 26 n.31.  Another court in this district has recently

criticized the characterization in *Feinerman*, and adopted by Ranbaxy, of "economic damages

that are unrecoverable due to sovereign immunity as "irreparable per se," and has instead

suggested that "the inability to recover economic losses can more accurately be considered as a

factor in determining whether the movant has shown irreparable harm."  *Converdyn v. Moniz*,

2014 U.S. Dist. LEXIS 127838 at *32 (Sept. 12, 2014) (citing *Feinerman v. Bernardi* 558 F.

Supp. 2d 36, 51 (D.D.C. 2008)).

### C. The Balance Of Harms And The Public Interest Weigh Against The Entry Of Immediate Injunctive Relief

Ranbaxy has also failed to show that any harm it may suffer in the absence of injunctive relief outweighs the potential harm to FDA and the public. Although FDA has no commercial stake in the outcome of this litigation, FDA's interest and the public's interest in drug approvals are the same. *See Serono*, 158 F.3d at 1326 (determining that the public interest is "inextricably linked" to Congress's purpose in passing the Hatch-Waxman Amendments). FDA must implement the statutory scheme governing the approval of drugs in the manner outlined by Congress in the FDCA.

In addition, any financial harm that Ranbaxy would incur in the absence of a preliminary injunction will be matched, if not exceeded, by the financial harm that Intervenor-Defendants will suffer by being deprived of its right to market its product during the period that injunctive relief is in effect. The D.C. Circuit has found in similar circumstances that the balance of harms "results roughly in a draw." *Serono*, 158 F.3d at 1326; *see also Bristol-Myers*, 923 F. Supp. at 221 (noting that generic company had "endured a seven year process to obtain FDA approval" and that "the effect of an injunction [on the generic company] . . . would be dramatically greater" than the harm to plaintiff); *cf. Ark. Dairy Coop.*, 576 F. Supp. 2d at 161 (noting that any harm plaintiffs would suffer absent preliminary injunctive relief would be offset by substantial harm to defendant-intervenors if injunction were granted).

## CONCLUSION

For the foregoing reasons, Ranbaxy's motion for a temporary restraining order and/or preliminary injunction should be denied.

Dated:  November 18, 2014

Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

JONATHAN F. OLIN
Deputy Assistant Attorney General

MICHAEL S. BLUME, Director

ANDREW CLARK, Assistant Director

Of Counsel:                                          /s/ Roger Gural
WILLIAM B. SCHULTZ                   ROGER GURAL
Acting General Counsel                   Trial Attorney
                                                           Consumer Protection Branch
ELIZABETH H. DICKINSON          Civil Division
Chief Counsel                                    United States Department of Justice
Food and Drug Division                   P.O. Box 386
                                                           Washington, DC 20044
PERHAM GORJI                              202-307-0174
Deputy Chief Counsel, Litigation      Roger.Gural@usdoj.gov

STEVEN TAVE
Associate Chief Counsel
U.S. Dept. of Health & Human Services
Office of the General Counsel
Food and Drug Administration
Building 31 Room 4304
10903 New Hampshire Avenue
Silver Spring, MD 20993

# CERTIFICATE OF SERVICE

The undersigned certifies that on this 18th day of November, 2014, he caused the foregoing DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER to be served upon the following individuals via CM/ECF:

John Kevin Dolan Crisham
Michael D. Shumsky
Stephen S. Schwartz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022

Douglas B. Farquhar
Jennifer McVey Thomas
HYMAN, PHELPS & MCNAMARA, P.C.
Suite 1200
700 13th Street, N.W.
Washington, DC 20005

Chad A Landmon
David K. Ludwig
Thomas K. Hedemann
AXINN, VELTROP & HARKRIDER LLP
90 State House Square
9th Floor
Hartford, CT 06103

/s/ Roger Gural
ROGER GURAL
United States Department of Justice