## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                               )
RANBAXY LABORATORIES, LTD., et al.,            )
                                               )
            Plaintiffs,                        )        Case No. 14-cv-01923-BAH
                                               )
    v.                                         )
                                               )
SYLVIA MATHEWS BURWELL, et al.                 )
                                               )
            Defendants.                        )
_____      )

## DR. REDDY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO RANBAXY'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND EXPEDITED PRELIMINARY INJUNCTION

### I.   INTRODUCTION

Intervenor-Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") submits this Memorandum in Opposition to Plaintiffs' Motion for a Temporary Restraining Order ("TRO") and Expedited Preliminary Injunction.

At issue in this case is whether the Court will issue a TRO and other injunctive relief that would reverse the U.S. Food and Drug Administration's ("FDA's" or the "Agency's") approval of Dr. Reddy's generic Valcyte® (valganciclovir hydrochloride, or "valganciclovir") products and, further, restrain the Agency from approving Dr. Reddy's pending application for generic Nexium® (esomeprazole magnesium, or "esomeprazole").  Until November 4, 2014, final FDA marketing approval for those generic products was blocked by a generic drug marketing exclusivity period that FDA was reserving for Plaintiffs ("Ranbaxy").  Ranbaxy's exclusivity period effectively blocked FDA approval of any competitor's products while Ranbaxy sought to resolve long-term FDA compliance and cGMP (current good manufacturing practice) issues at Ranbaxy's facilities.  On November 4, 2014, FDA finally corrected the error that created this

stalemate, approved generic Valcyte®, and indicated in its letter decision that Ranbaxy's marketing exclusivity period no longer blocked approval of other generic drug manufacturers' versions of Nexium®.

A TRO should be denied in this case.  In addition to the arguments that FDA is expected to raise in its Opposition, Dr. Reddy's would emphasize the following points:  First, Ranbaxy waited ten days after FDA's November 4, 2014 decision and approval of generic Valcyte® to seek extraordinary judicial relief.  This delay, standing alone, is sufficient to demonstrate that Ranbaxy's request for emergency relief is unjustified and unfounded.  Second, Ranbaxy fails to meet the standard for irreparable injury in this Circuit.  Third, the injury to third parties and the public that would result from the requested injunction – which Ranbaxy glosses over in its supporting memorandum – are so significant as to outweigh any benefit Ranbaxy would gain if its requested relief were granted.  Moreover, Ranbaxy's request for emergency relief should be denied because Ranbaxy's legal theories are simply wrong. FDA was well justified in revisiting the Tentative Approvals ("TAs") granted to Ranbaxy years ago, in light of recent developments demonstrating a sordid history of noncompliance with cGMP, which all pharmaceutical manufacturers are required to follow.  Finally, Ranbaxy does not come to the Court with clean hands, and the "unclean hands" doctrine also bars relief.

Ranbaxy cannot demonstrate any likelihood of success on the merits.  Thus, the Court should deny Ranbaxy's request for a TRO.[1]

---

[1]      Ranbaxy's memorandum in support of its Motion is also styled as a request for an expedited Preliminary Injunction (although Ranbaxy's proposed order does not include a grant of Preliminary Injunction).  In light of Ranbaxy's delay in seeking relief and the complex nature of its factual and legal arguments, however, it would be improvident for the Court to consider granting a Preliminary Injunction at this time, based on briefing submitted today.  It would be inappropriate to require other interested parties to this litigation – some of whom have not yet even had the opportunity to intervene – to fully

## II.   BACKGROUND

### A.  LEGAL BACKGROUND

As noted in Ranbaxy's memorandum, FDA's November 4 Decision, and numerous prior court decisions, approval of generic drugs is governed by the Federal Food, Drug, and Cosmetics Act ("FDC Act" or the "Act"), as modified by the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (the "Hatch-Waxman Amendments"), and the Medicare Prescription Drug, Improvement, and Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) ("MMA").  *See* FDC Act § 505 (21 U.S.C. § 355) *et seq*.   Generic drug manufacturers can obtain FDA approval of their products if those products are bioequivalent to a reference listed drug ("RLD") – here, Valcyte® and Nexium®.  ANDA (abbreviated new drug application) applicants may make one of four certifications with respect to each such listed patent, only one of which is relevant here – the so-called "Paragraph IV certification."  *Id.* §505(j)(2)(A)(vii) (21 U.S.C. § 355(j)(2)(A)(vii)).  A Paragraph IV certification states that a listed patent is invalid, unenforceable, and/or will not be infringed by the generic drug for which the ANDA is submitted.  *See id.* § 505(j)(2)(A)(vii)(IV) (21 U.S.C. § 355(j)(2)(A)(vii)(IV)).  A Paragraph IV certification generally triggers patent infringement litigation.  *See id.* § 505(j)(2)(B) (21 U.S.C. § 355(j)(2)(B)).  Ranbaxy, as the apparent "first filer" of an ANDA with a Paragraph IV certification for the two drugs at issue here, was initially entitled to a 180-day period of marketing exclusivity.  *Id.* § 505(j)(5)(B)(iv)(I)-(II) (21 U.S.C. § 355(j)(5)(B)(iv)(I)-(II)).  However, a "first-filer" (referred to as a "first applicant" in post-MMA vernacular, *id.*§ 505 (j)(5)(B)(IV)(II)(bb)) forfeits any 180-day exclusivity if it

---

brief, within a truncated time period, all of the issues on Preliminary Injunction, so as to be prepared for a likely appeal to the D.C. Circuit.  The Court should set a separate reasonable and deliberate briefing schedule for Ranbaxy's request for a Preliminary Injunction.

fails to obtain tentative approval of the application within 30 months after the date on which the application is filed, unless the failure is caused by a change in or a review of the requirements for approval of the application imposed after the date on which the application is filed.

FDC Act § 505 (j)(5)(B)(i)(IV), 21 U.S.C.  § 355(j)(5)(D)(i)(IV).

As set forth extensively in FDA's November 4, 2014 letter from Kathleen Uhl, M.D., Acting Director, Office of Generic Drugs, Center for Drug Evaluation and Research, FDA, to Sameer Manan, Director, Regulatory Affairs, U.S. Agent for Ranbaxy Laboratories Limited, Ranbaxy Inc. (the "November 4 Decision"), determination of the drug product manufacturing facility's compliance with FDA's cGMP regulations is integral to FDA's review and approval of generic drug products.  *See* ("November 4 Decision") at 2-6.[2]   In brief, the FDC Act and FDA regulations set out conditions for final (or "effective") approval of a generic drug.  Among these conditions, FDA cannot approve an application for a generic drug if it finds that "the methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug are inadequate to assure and preserve its identity, strength, quality, and purity."  21 U.S.C. §355(j)(4)(A); *see also* 21 C.F.R. § 314.127(a) ("FDA will refuse to approve an [ANDA if] . . . [t]he methods used in, or the facilities and controls used for, the manufacture, processing, and packing of the drug product are inadequate to ensure and preserve its identity, strength, quality, and purity.").   Subject to these provisions, FDA's policy is to *refuse to approve*  an ANDA

---

[2]    FDA's cGMPs "provide for systems that assure proper design, monitoring, and control of manufacturing processes and facilities."  *See* FDA, Facts About Current Good Manufacturing Practices (cGMPs), *available at: http://www.fda.gov/downloads/AboutFDA/Transparency/PublicDisclosure/GlossaryofAcronymsandAbbreviations/UCM211139.pdf,* http://www.fda.gov/Drugs/DevelopmentApprovalProcess/Manufacturing/ucm169105.htm.   "This formal system of controls at a pharmaceutical company, if adequately put into practice, helps to prevent instances of contamination, mix-ups, deviations, failures, and errors."  *Id.*

where the Agency has determined that the relevant facility fails to comply with cGMP, until that such facility can be brought into compliance.

The FDC Act defines "Tentative Approval" as "notification to an applicant by the Secretary that an application under this subsection meets the requirements of paragraph (2)(A), but cannot receive effective approval" due to certain factors including, potentially, another manufacturer's period of 180-day exclusivity.  FDC Act § 505 (j)(5)(B)(iv)(II)(dd); 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd).  FDA's long-standing interpretation of the statute, codified by its regulations, has been that the Agency grants a "Tentative Approval" only upon a determination that "none of the reasons in 314.127 for refusing to approve the [ANDA] . . . applies" (including failure to establish compliance with cGMPs).  *See* 21 C.F.R. § 314.105(d) (stating the conditions for approval, and characterizing a TA as an approval "with a delayed effective date").  This interpretation has been in place since at least 1992.  *See* FDA Final Rule, Abbreviated New Drug Application Regulations, 57 Fed. Reg. 17,950, 17,989 (Apr. 28, 1992) (effective date, Jun. 29, 1992).

## B.  RANBAXY'S GENERIC VALCYTE® AND NEXIUM® ANDAs

Ranbaxy's ANDA for generic Valcyte®, filed on December 22, 2005, stated Ranbaxy's intention to manufacture the drug substance form of generic Valcyte® at the Company's Dewas, India ("Dewas") facility, and the finished dosage form at the Company's Paonta Sahib, India ("Paonta Sahib") facility.  *See* Ranbaxy TRO Brief at 16-17.  FDA granted Tentative Approval to Ranbaxy's generic Valcyte® ANDA on June 20, 2008.  Ranbaxy submitted an ANDA for generic Nexium® on August 5, 2005.  Ranbaxy is a "first-filer" for generic Nexium®.  The Company was granted TA for that ANDA on February 5, 2008.  The ANDA for generic

Nexium® stated Ranbaxy's intention to manufacture generic Nexium® at the Paonta Sahib

facility.  *See* Ranbaxy TRO Brief at 15.

      C.  FDA'S INVESTIGATION OF RANBAXY

      FDA's investigation of Ranbaxy's cGMP noncompliance began *after* the Company

submitted its ANDAs for generic Valcyte® and Nexium®, and was ongoing at the time FDA

granted TA for those ANDAs.  The investigation continues to this day.  An FDA inspection of

Ranbaxy's Paonta Sahib facility in early 2006 ultimately led to an FDA Warning Letter, issued

on June 15, 2006, citing broad cGMP violations at Paonta Sahib and expressing concern over the

Company's "conduct, adequacy and oversight of [its] drug product stability testing and

monitoring program."  *See* FDA, Warning Letter to Ramesh Parekh, Vice President,

Manufacturing, Ranbaxy Laboratories Limited (June 15, 2006), *available at*

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2006/ucm075947.htm.   FDA

inspected the Dewas facility in early 2008, (*see* FDA, Warning Letter to Malvinder Singh, CEO

and Managing Director, Ranbaxy Laboratories Limited (September 16, 2008), *available at*

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2008/ucm1048134.htm), again

resulting in a Warning Letter citing serious cGMP violations.  *Id.*  On the same day it issued a

Warning Letter to the Dewas facility (September 16, 2008), FDA issued a second Warning Letter

to the Paonta Sahib facility.  *See* FDA, Warning Letter to Ranbaxy Laboratories Limited (Sept.

16, 2008), *available at*

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2008/ucm1048133.htm.

      Even having issued these serious Warning Letters, FDA's and the U.S. Department of

Justice's ("DOJ's") investigation of Ranbaxy was only beginning.  As the government's

Memorandum in Opposition will likely describe (so details will not be repeated here), the

government continued, and continues, to monitor and investigate Ranbaxy's facilities.  In late

2008, FDA issued an Import Alert barring import of products manufactured at the Paonta Sahib

and Dewas facilities unless Ranbaxy could be affirmatively shown to be in compliance with

cGMP requirements.  *See* FDA Import Alert: Questions and Answers on Drugs Manufactured at

the Dewas and Paonta Sahib Facilities of Ranbaxy Laboratories, Ltd., *available at*

http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesb

yFDA/ucm118442.htm.  The Import Alert remains in effect today.   In 2012, the government

entered into a Consent Decree with Ranbaxy under which the company committed to certain

measures to ensure the integrity of their drug application data and the compliance status of their

facilities.  *See* Consent Decree of Permanent Injunction, *United States v. Ranbaxy Laboratories,*

*Ltd.*, No. 12-cv-250 (D. Md. Jan. 26, 2012).  FDA was subsequently forced to add two more

Ranbaxy facilities to the Consent Decree's provisions based on failure of *those* additional

facilities to meet cGMP requirements.  *See* FDA, Press Release, FDA Prohibits Manufacture of

FDA-Regulated Drugs From Ranbaxy's Mohali, India, Plant and Issues Import Alert (Sept. 16,

2013), *available at*

http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm368445.htm; FDA Press

Release, FDA, Prohibits Ranbaxy's Toansa, India Facility from Producing and Distributing

Drugs for the U.S. Market (Jan. 23, 2014), *available at*

http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm382736.htm.  In 2013,

Ranbaxy pleaded guilty to criminal charges relating to its manufacture and distribution of drugs

for sale in the United States.  Among other things, Ranbaxy admitted to falsifying data it

submitted to FDA from its Paonta Sahib and Dewas facilities.  *See* Attachment A to Criminal

Plea Agreement, *United States v. Ranbaxy USA, Inc.,* No. 13-c-238 (D. Md. May 13, 2013),

Docket No. 7.

### III.   ARGUMENT

Preliminary injunctive relief is an "extraordinary remedy" that should be granted only

sparingly.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted);

*Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996).

To obtain a TRO or preliminary injunction, the moving party must demonstrate that: (1)

it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury in the

absence of preliminary relief; (3) the balance of the equities tips in the movant's favor; and (4)

granting an injunction is in the public interest.  *See Sherley v. Sebelius*, 644 F.3d 388, 392-93

(D.C. Cir. 2011); *Biovail Corp. v. FDA*, 448 F. Supp.2d 154, 158 (D.D.C. 2006); *Mylan Labs.,

Inc. v. Leavitt*, 484 F. Supp.  2d 109, 124 (D.D.C. 2007) (denying preliminary injunction against

FDA's rulings regarding approval of generic drugs).  Plaintiffs seeking emergency injunctive

relief "bear the burden of persuasion, on all four preliminary injunction factors in order to secure

such an extraordinary remedy."  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, No. 14-cv-

820, 2014 WL 2758603, at *2 (D.D.C. June 18, 2014) (J. Howell).  In particular, if the moving

party fails to demonstrate that it is likely to succeed on the merits, injunctive relief must be

denied.  *See Serono Labs, Inc., v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998).  Indeed, when there

is no showing of a likelihood of success, the "court need not proceed to review the other three

preliminary injunction factors . . ."  *Ark. Dairy Coop. Ass'n, Inc.. v.USDA*, 573 F.3d 815, 832

(D.C. Cir. 2009); *see also Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006).

A.  PLAINTIFFS FAIL TO DEMONSTRATE A SUBSTANTIAL LIKELIHOOD
OF SUCCESS ON THE MERITS

Ranbaxy argues that FDA's November 4 Decision is legally flawed because it was issued

"with ***no prior notice*** to Ranbaxy . . . gave Ranbaxy ***no opportunity to comment*** on the issues

raised . . . [a]nd the Agency had ***no power*** to issue its decision..."  Ranbaxy Complaint ¶ 2

(emphasis in original).  In fact, (1) FDA has clear inherent authority to correct an erroneous grant

of TAs based on severe cGMP noncompliance issues, especially where FDA was not aware of all

those issues at the time of TA; and  (2) Ranbaxy had ample actual and constructive notice that

FDA would consider abrogation of the exclusivity periods at issue when it read and responded to

a Citizen Petition submitted to FDA about four months ago that requested such an FDA action –

an action FDA ultimately took by revoking the TAs at issue.  *See* Citizen Petition, Docket No.

FDA-2014-P-0594, 1 (May 5, 2014).

As to Ranbaxy's request for a preliminary injunction, the Court should set a more

reasonable schedule for briefing and consideration of a preliminary injunction in this case.

1.  FDA Has Inherent Authority to Revoke Ranbaxy's TAs Based on cGMP
Compliance Issues

a)  FDA Has Authority to Reconsider and Correct Its Erroneous Grants of TA

This Circuit has long recognized that administrative agencies are assumed "to possess at

least some inherent authority to revisit their prior decisions," which is "premised on the notion

that the power to reconsider is inherent in the power to decide."  *See Ivy Sports Medicine, LLC v.*

*Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (internal quotations omitted) (collecting relevant

authorities).  In the recent *Ivy Sports Medicine* case, this Circuit considered the limits of such

inherent authority.  Specifically, the *Ivy Sports Medicine* court recognized the existence of

agencies' inherent reconsideration authority in the absence of contrary statutory provisions, but

held that "an agency may not rely on inherent reconsideration authority 'when Congress has provided a mechanism capable of rectifying mistaken actions.'" *Id.* (quoting *American Methyl Corp. v. EPA*, 749 F.2d 826 (D.C. Cir. 1984). No such statutory mechanism exists for reconsideration of TAs. Ranbaxy acknowledges, and indeed it argues strenuously, that there is *no statutory provision that governs FDA rescission of TA. See* Ranbaxy TRO Brief at 25-27.[3] Thus, FDA's inherent reconsideration authority with respect to grants of Tentative Approval remains wholly intact.

In fact, the circumstances of this case closely resemble those in which courts, including the U.S. Supreme Court, have affirmed an agency's exercise of inherent authority to reconsider past decisions. *See, e.g., Boesche v. Udall*, 373 U.S. 472, 476 (1963) (holding that the Department of Interior's ("DOI's") statutory process for cancelling an oil and gas lease based on noncompliance during pendency of the lease did not preclude DOI from exercising its inherent authority to reconsider and cancel the lease based on pre-lease circumstances, *i.e.* "for invalidity at its inception -"); *Am. Trucking Assns, Inc.. v. Frisco Transp. Co.*, 358 U.S. 133, 144-45 (1958) ("[T]he presence of authority in administrative officers and tribunals to correct such errors (due to inadvertence or mistake) has long been recognized."); *Bookman v.United States*, 453 F.2d 1263, 1265 (Ct. Cl. 1972) ("[I]t is the general rule that '[e]very tribunal, judicial or administrative, has some power to correct its own errors or otherwise appropriately modify its judgment, decree, or order.").

---

[3]     Ranbaxy's suggestion that the procedures for revocation of *final* approval could apply to TAs is baseless, considering that the statute very clearly distinguishes between tentative approval and final approval of a drug application. *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd) (stating that a "tentative approval" means that a company "cannot receive effective approval" and a "drug that is granted tentative approval by the Secretary is not an approved drug and shall not have an effective approval . . .").

Ranbaxy tellingly fails to address prior decisions – including those from this Circuit – that suggest that fraudulent misconduct "affecting the integrity of an agency's proceedings" makes it particularly appropriate for an agency to exercise its inherent authority to reconsider a prior decision, *even in spite* of statutory language otherwise limiting that authority (which, as discussed above, does *not* exist here).  *See Am. Methyl Corp. v. EPA*, 749 F.2d 826, 834 n.51 (D.C. Cir. 1984) (finding that EPAs authority to reconsider had been precluded by statute, but refusing to express a view as to "as to EPA's power to revoke a waiver obtained through fraud, ex parte contacts, or other misconduct tainting the original record and thereby affecting the integrity of an agency's proceedings").  While the Court in *Ivy Sports Medicine* noted that the bar for fraud and misconduct is a high one, and one not met by the facts of that case, it also indicated that the bar could be reached by "some clear legal or ethical violation."  *Ivy Sports Medicine, 767 F.3d at 89.*  If there were ever a case that evinced a clear legal and ethical violation, it is this one.

Contrary to Ranbaxy's assertions, FDA's grant of TA to the two Ranbaxy ANDAs at issue here, originating from Ranbaxy's Paonta Sahib and Dewas facilities, was a genuine error based on FDA's failure to discover – at least at that time – the severity of cGMP compliance issues at those facilities.  It is hardly surprising that FDA failed to recognize the true state of Ranbaxy's facilities in 2008, given that it wasn't until May 13, 2013 (five years after FDA granted TA to Ranbaxy's generic Valcyte® and Nexium® ANDAs) that the Company pleaded guilty to four counts of making false statements to FDA and admitted to submitting false data to FDA that specifically related to the 2006 and 2008 inspections of Paonta Sahib and Dewas.  *See* Plea Agreement, *United States v. Ranbaxy USA, Inc.*, No. 13-cr-238 (D. Md. May 13, 2013), Docket No. 7.

Indeed, a facility's state of cGMP compliance is difficult to assess through isolated inspections – even when the company in question does *not* have a practice of making false statements to the Agency.  As noted above, cGMPs are a set of practices and processes that a company's employees must follow in order to ensure the quality and consistency of drug products it produces.  *See* 21 C.F.R. Part 211.  A company's written standard operating procedures may be consistent with FDA regulations, but without a culture of compliance among the company's employees, that company will nevertheless be incapable of achieving and maintaining cGMPs.  Clearly, determining the degree of a company's compliance with cGMPs, including a culture that fosters compliance, is the work of more than weeks or even months.  In the case of Ranbaxy, it has been the work of years.  Ultimately, FDA was faced with several recent developments justifying reconsideration of its 2008 decision to issue the TAs at issue, and, upon reconsideration, FDA properly concluded that it should never have granted TAs to Ranbaxy's ANDAs.

Ranbaxy posits that because FDA was generally aware of compliance issues at the Paonta Sahib and Dewas facilities in 2008, the Agency's reversal of its earlier decision *must* represent a change in policy, rather than the revision of an error.  Ranbaxy TRO Brief, at 23-25.  In fact, the reverse is true.  FDA erred by giving Ranbaxy the benefit of the doubt.  *See*, *e.g,.* FDA, Warning Letter to Ramesh Parekh, Vice President, Manufacturing, Ranbaxy Laboratories Limited (June 15, 2006), *available at* http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2006/ucm075947.htm (stating that the issuing office would recommend that FDA "withhold[] approval of any new applications listing your Paonta Sahib facility as the manufacturer of finished pharmaceutical drug products");  FDA, Warning Letter to Malvinder Singh, CEO and Managing Director, Ranbaxy

Laboratories Ltd. (Sept. 16, 2008), *available at*

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2008/ucm1048134.htm

(recommending again that FDA "disapprov[e] . . . any new applications or supplements listing

your firm as a manufacturing location of finished dosage forms and active pharmaceutical

ingredients); *see also* FDA, Guidance:  Drug Applications and Current Good Manufacturing

Practice (CGMP) Regulations, *available at*

http://www.fda.gov/Drugs/DevelopmentApprovalProcess/Manufacturing/ucm090016.htm

(noting FDA's policy that "[f]ailure to comply [with cGMP regulations] can lead to a decision by

FDA not to approve an application to market a drug").

        Among FDA's more recent bases for reconsidering its original grants of TA are product

quality issues involving Ranbaxy drug products, which have required several recalls over the

past few years.  The most striking example of this relates to Ranbaxy's manufacture of generic

atorvastatin.  Atorvastatin was carved out of the Ranbaxy Consent Decree (Consent Decree of

Permanent Injunction, *United States v. Ranbaxy Laboratories, Ltd.No. 12-cv-250 (D.Md. Jan.

26, 2012),*¶ VII.G, ("For purposes of this Decree, . . . Atorvastatin Calcium is not an Affected

Application.")), but in November 2012 – less than ten months after entry of the decree and

approximately a year after its atorvastatin ANDA received final approval – Ranbaxy was forced

to recall lots of atorvastatin due to particles of glass being found in the product, and stop all

production of atorvastatin while it assessed the problem.  Ranbaxy Inc., Press Release, Ranbaxy

Issues Voluntary Nationwide Recall of 41 Lots of Atorvastatin Calcium Tablets 10 Mg, 20 Mg

and 40 Mg Due to Potential Presence of Foreign Substance (Nov. 28, 2012), *available at*

http://www.fda.gov/Safety/Recalls/ucm329866.htm.  Again, in January 2014, Ranbaxy was

forced to recall over 64,000 bottles of atorvastatin after a pharmacist discovered a 20 mg tablet

mixed into a sealed bottle of atorvastatin 10 mg.  FDA, *Enforcement Report – Week of March 5, 2014* (listing recall event number 67485 from January 16, 2014), *available at*

*http://www.accessdata.fda.gov/scripts/enforcement/enforce_rpt-Product-*

*Tabs.cfm?action=Expand+Index&w=03052014&lang=eng.*  These recalls came on the heels of

other key Ranbaxy recalls, including a recall of the Company's amoxicillin and clavulanate

potassium product.  FDA, *Enforcement Report – Week of April 7, 2010* (listing recall event

number D-383-2010 from March 2, 2010), *available at*

*http://www.fda.gov/Safety/Recalls/EnforcementReports/ucm207761.htm.*  Repeated serious

product quality issues – including recalls of medication manufactured by mainstream

pharmaceutical companies, which are rare – evince undeniably serious GMP issues.

      b)  FDA Properly Exercised Its Authority to Rescind Ranbaxy's TAs

Ranbaxy questions the timeliness of, and basis for, FDA's reconsideration and decision to

rescind its TAs for generic Valcyte® and generic Nexium®.  Ranbaxy's arguments are specious.

As noted above, FDA's decision is timely when placed in context, given the inherent

difficulty in determining what exactly the Ranbaxy facilities' compliance status *was* in 2008.

The Agency has an extremely good reason for lacking full knowledge of the severity of

Ranbaxy's noncompliance in 2008 – and for years thereafter – as Ranbaxy well knows.  "[W]hat

is a short and reasonable time period will vary with each case . . ."  *Mazaleski v. Treusdell*, 562

F.2d 701, 720 (D.C. Cir. 1977).  FDA's decision is timely based on its accumulation of

knowledge about Ranbaxy's stunning and relatively recent history of noncompliance with

cGMPs and the accompanying culture of expedience and profit over compliance.  FDA should

not be penalized into inaction now, because it failed to quickly comprehend the extent of

Ranbaxy's duplicity and, indeed, because it gave Ranbaxy every benefit of the doubt until the Company's severe lack of compliance became unavoidably obvious.

Finally, Ranbaxy's insistence that FDA is not permitted to consider GMP compliance issues when making a decision with respect to a grant of TA is absurd.  As FDA accurately points out, Ranbaxy's position would lead to FDA being required to grant TA to an ANDA for a drug manufactured at a facility that has repeatedly distributed unquestionably dangerous drugs (like Ranbaxy did here), provided the active ingredient was the same as that in the RLD.  *See* FDA November 4 Decision, at 4 ("To interpret this provision otherwise would require FDA to tentatively approve a product even when FDA knew that the product, if fully approved, would be deemed adulterated because it was made in a facility that did not comply with CGMP."). FDA's policy is that an ANDA is not eligible for approval where the Agency has determined that the relevant facility fails to comply with cGMP, until that facility can be brought into compliance.  *See* FDA Compliance Program Guidance Manual, 7346.832, available at http://www.fda.gov/downloads/drugs/developmentapprovalprocess/maufacturing/questionsandan swersoncurrentgoodmanufacturingpracticescgmpfordrugs/ucm07187.pdf (A "withhold recommendation" is issued "[i]f the inspection of the facility finds that the application is unacceptable."  This recommendation to withhold approval is only lifted if "follow-up activities have changed the withhold recommendation (*i.e.*, FDA-483 response is found to be adequate, or satisfactory follow-up inspection)").  Moreover, under FDA's Application Integrity Policy ("AIP"), which was imposed on Ranbaxy's Paonta Sahib facility on February 25, 2009, scientific review of Ranbaxy's pending drug applications was required to be delayed "until [FDA] is satisfied that the data or information in the application is reliable."  *See* FDA Application Integrity Policy Procedures (March 5, 1998), 1-1-3, *available at*

http://www.fda.gov/downloads/icEcI/EnforcementActions/ApplicationintegrityPolicy/UCM0726
31.pdf; see also letter from Janet Woodcock, Director, Center for Drug Evaluation and Research
to Mr. Malvinder Mohan Singh, CEO & Managing Director, Ranbaxy Laboratories Ltd. (Feb.
25, 2009) (imposing FDA's AIP on the Paonta Sahib facility based on "a pattern and practice of
submitting untrue statements of material fact and other wrongful conduct.").

Pursuant to these policies, FDA should not have granted the TAs to Ranbaxy's ANDAs, in light
of problems observed at the plants.

> 2.  Ranbaxy Had Actual and Constructive Notice of the Possibility that FDA
>     Could Revoke Its TAs for Generic Valcyte®, and Nexium®.

Ranbaxy had actual notice that FDA might take further action with respect to the
company's TAs.  In fact, the very letters that FDA sent to Ranbaxy regarding generic Valcyte®
and Nexium® pursuant to Paragraph XV of the company's Consent Decree and that Ranbaxy
cites prominently in its papers (Ranbaxy Compl. Att. 1, 2), explicitly contemplate FDA's
ongoing evaluation of Ranbaxy's applications (*i.e.* "nothing in paragraph XV restricts FDA's
ability to raise additional data integrity concerns regarding the review process").  Moreover, as
discussed further below, Ranbaxy had actual notice of a pending Citizen Petition submitted to
FDA on May 5, 2014, which explicitly requested that FDA determine Ranbaxy was ineligible or
had forfeited 180-day exclusivity for its ANDAs for valganciclovir and esomeprazole – the very
action FDA took on November 4, 2014, and that is at issue in this case.  *See* Citizen Petition,
Docket No. FDA 2014-P-0594 (Attached as Exhibit 1 to this Memorandum).  Ranbaxy's actual
notice of this pending Citizen Petition is evinced by the fact that it submitted a comment to the
Citizen Petition docket on July 10, 2014, well in advance of FDA's November 4 decision.  *See*
Docket Entries, attached as Exhibit 2 to this memorandum.  Ranbaxy was certainly on notice that
FDA could potentially grant the Citizen Petition, and thus that its eligibility for 180-day

exclusivity for generic Valcyte® and Esomeprazole was under active consideration by the Agency.

In its July 10, 2014 comment to FDA, Ranbaxy raised, arguments similar to the arguments it raises in its Memorandum in Support of a TRO in this case.  *See* Comments of Ranbaxy, Inc., FDA Docket No. 2014-P-0594 at (8 July 10, 2014).  However, in its comments, Ranbaxy did not address its inability to ensure product quality through cGMP compliance at the relevant facilities, although it was aware of the severity of cGMP issues at the Dewas and Paonta Sahib facilities at the time its ANDAs were granted TA.   Thus, the fact that Ranbaxy did not *choose* to address issues that it alone had sufficient knowledge to raise before the Agency does not equate to a lack of *opportunity* to do so.  As soon as Ranbaxy was on notice that the eligibility of its generic Valcyte® and Nexium® ANDAs for 180-day exclusivity was under active consideration by FDA pursuant to the Citizen Petition, it had the option of raising any and all legal and factual arguments that it believed relevant to that consideration.

For additional reasons, Ranbaxy had constructive notice of the possibility that FDA could revoke its TAs for generic Valcyte® and Nexium® based on GMP noncompliance.  As a company operating in the heavily regulated pharmaceutical industry, Ranbaxy is presumed to have constructive notice of all statutory and regulatory requirements.  This includes FDA's long-standing policy of withholding TA where it determines that the manufacturing facility for the drug product subject of the ANDA fails to meet cGMPs, which is codified in the Agency's regulations.  *See* 21 C.F.R. 314.105(d).  As much as Ranbaxy may regret the fact, the Consent Decree that the company entered into with the government simply *does not address or limit* FDA's inherent authority to reconsider and potentially rescind TA of Ranbaxy's ANDAs.  If Ranbaxy was under a mistaken belief that the Consent Decree limited FDA's regulatory

authorities other than what was expressly committed in the language of the Decree, it was not the government's burden to disabuse Ranbaxy of that unfounded notion.

3.   The Court Should Deny Ranbaxy Equitable Relief Pursuant to the Doctrine of "Unclean Hands"

As discussed above, and likely also at length in the Federal Defendant's Memorandum in Opposition, Ranbaxy has pleaded guilty to multiple criminal charges, including making false statements to FDA, and has admitted to submitting falsified data to FDA, regarding the very facilities at issue in this lawsuit – the facilities where Ranbaxy plans to manufacture generic Valcyte® and Nexium®.  Ranbaxy now has the gall to suggest to this Court that equity requires a TRO enjoining FDA's action to redress a problem that Ranbaxy's bad acts themselves created.

This Court should refuse Ranbaxy the relief it seeks pursuant to the "equitable maxim that he who comes into equity must come with clean hands," (*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co*., 324 U.S. 806, 814 (1945)), otherwise known as the "unclean hands" doctrine.  *See also Cochran v. Burdick*, 89 F.2d 831, 834 (D.C. Cir. 1937) ("Equity will refuse relief to a suitor who approaches with unclean hands, whether it is due to conduct which technically constitutes fraud, or which is unconscionable.")  As the Supreme Court noted in *Precision Instrument*, this doctrine "is far more than a mere banality," but rather it "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . ."  324 U.S. at 814.  Application of the doctrine is particularly appropriate where the interests of the public are also at stake, and "an equity court properly uses the maxim to withhold its assistance . . . [to] prevent[] a wrongdoer from enjoying the fruits of his transgression [and] avert[] an injury to the public."  *Id*. at 815.

Ranbaxy has acted both fraudulently and unconscionably with respect to the very matter at issue before this Court, and thus should be denied any equitable relief.

## B.  PLAINTIFFS FAIL TO DEMONSTRATE IRREPARABLE INJURY

Ranbaxy's claims to irreparable injury are belied by the fact that it took the company fully ten days to come before this Court seeking extraordinary emergency relief.  Moreover, Ranbaxy's allegations of potential economic harm – at some indefinite point in the future – through loss of its 180-day exclusivity period, fail to even approach the standard for irreparable injury in this Circuit.

The D.C. Circuit applies a high standard for showing irreparable injury, which requires a demonstration that the alleged industry be "both certain and great," and "beyond remediation." *ConverDyn v. Moniz*, ___ F.Supp. 3d ___ (No. 14-cv-1012) (D.D.C. Sept. 12, 2014), slip op. at 13 -14 (*citing Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).  Thus, "economic loss does not, in and of itself, compel a finding of irreparable harm" except that "[m]onetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business."  *Id.*; *see also Mylan Labs, Inc. v. Leavitt*, 484 F. Supp .2d 109, 123 (D.D.C. 2007) (holding that movant's failure to allege that projected losses in the absence of an injunction would threaten the continued existence of their business was dispositive of the issue of irreparable injury).  This is true even where the projected loss cannot be recovered from the government.  *See LG Electronics U.S.A., Inc. v. U.S. Dep't of Energy*, 679 F. Supp. 2d 18, 36 (D.D.C. 2010) ("Even assuming LG will not be able to recover monetary damages from DOE, however, the financial impact LG claims it will suffer does not rise to the level of irreparable harm."); *Mylan Labs.*, 484 F. Supp. 2d at 123 (finding no irreparable injury despite lack of "legal recourse in recouping the financial losses caused by the FDA's decision").

Flouting this Circuit's standards, Ranbaxy does not even attempt to provide specific

numbers for losses caused by abrogation of its 180-day exclusivity for generic Valcyte® and

Nexium®, or to explain why the speculative loss – loosely identified as "hundreds of millions of

dollars" – would jeopardize Ranbaxy, especially upon completion of its merger with Sun

Pharmaceuticals, Inc.  The worldwide annual revenues of the combined companies are expected

to exceed $4 billion.  Ranbaxy Inc., Annual Report 2013-2014, 13 (2014), *available at*

http://www.ranbaxy.com/wp-

content/uploads/2014/07/ranbaxy_annual_report_2013_14_updated.pdf ._____.

Most importantly, Ranbaxy fails to discuss the likelihood that *it will **not be able to obtain***

***final approval** to market generic Valcyte® or Nexium®, and thus will never be in a position to*

*take advantage of any 180-day exclusivity.*  Ranbaxy, after all, is still the subject of an ongoing

FDA Import Alert restricting the import of products originating at its Dewas and Paonta Sahib

facilities, among others.  FDA, Press Release, FDA Issues Warning Letters to Ranbaxy

Laboratories, Ltd., and an Import Alert for Drugs from Two Ranbaxy Plants in India (Sept. 16,

2013), *available at*

http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/2008/ucm116949.htm.

Indeed, it is public information that Ranbaxy – if it had received FDA Final Approval – could

have begun marketing valganciclovir more than 20 months ago, in March 2013.  *See* Law 360,

Roche, Ranbaxy Settlement Ends Valcyte Patent Battle, Sept. 3, 2010, *available at*

www.law.360.com/articles/191236/roche-ranbaxy-settlement-ends-valcyte-patent-battle.  If

Ranbaxy's serious cGMP issues had not prevented it from receiving FDA Final Approval in

March 2013, it would have launched its valganciclovir product, and its 180 day exclusivity

period would have expired more than a year ago.  Likewise, published reports show that

Ranbaxy's patent litigation settlement agreement with AstraZeneca removed any obstacles to Ranbaxy's launch of esomeprazole as of May 27, 2014.  If Ranbaxy had been able to clear its cGMP violations and launch at that point, its 180-day exclusivity period would be drawing to a close now.

Ranbaxy's cGMP compliance issues are by no means at an end, and FDA will not grant final approval to a product where the facilities manufacturing that product fail to reliably comply with cGMPs.  Meanwhile, the only remaining patent exclusivity for Valcyte®, for example, expires on March 29, 2015.  It is highly unlikely that Ranbaxy will be able to resolve its compliance issues prior to that date.  Thus, Ranbaxy's supposed "loss" stemming from FDA's revocation of TA, and consequently of 180-day exclusivity, could very well be no loss at all – it is by no means of sufficient imminence and certainty to justify a finding of irreparable harm in this Circuit.  *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Injury . . . must be actual and not theoretical.  Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time . . . ; the party seeking injunctive relief must show that the injury complained of is of such *imminence* that there is a clear and resent need for equitable relief…") (internal quotations omitted).

### C.  PLAINTIFFS FAIL TO DEMONSTRATE THAT THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF A TRO

Ranbaxy briefly notes that if its request for relief is granted, other ANDA applicants who seek to market their versions of generic Nexium® and/or Valcyte® will be temporarily blocked by Ranbaxy's exclusivity.  Ranbaxy argues that its competitors stand to be "one of just a few generics in the … market"  and  "rewarding runners-up was not Congress's object."  Ranbaxy TRO Brief, at 47 (citations omitted).  However, it was also clearly *not* Congress's object to reward fraud on FDA and repeated violation of basic manufacturing standards with an inherently

protectable "exclusivity right."  Thus, Congress' intent is arguably most frustrated by Ranbaxy's

maintaining – indefinitely, as to esomeprazole  – a purported "exclusivity right" while other

compliant ANDA applicants are barred from the market.

Moreover, the losses to "other ANDA applicants" such as Dr. Reddy's, are significant.

And these losses, unlike those cited by Ranbaxy, are both certain and imminent if Ranbaxy

obtains the TRO it seeks.  Dr. Reddy's has made extensive preparations to launch generic

Valcyte® pursuant to its final FDA approval for that product, and expects to launch within a

matter of weeks – not months.[4]  *See* Declaration of Jinping McCormick, at ¶ 5 (hereinafter

"McCormick Decl."), attached as Exhibit 3.  Dr. Reddy's estimates that it stands to lose tens of

millions of dollars in U.S. revenue during the time it would be forced to keep its generic

Valcyte® product off the market if this Court grants Ranbaxy's requested relief.  *Id.* at ¶ 7.

 Further, Dr. Reddy's will lose much more if its final approval of generic Nexium® is

delayed by a Ranbaxy exclusivity period, once FDA deems Dr. Reddy's ANDA for generic

Nexium® to be otherwise ready for approval.  *See* McCormick Decl., at ¶ 8-9.  The numbers at

issue are extremely significant to a relatively small company, with annual net revenues of less

than $1 billion.  *Id.* at ¶ 9.

Presumably, losses to other affected ANDA applicants, such as Endo Pharmaceuticals

Inc., are similar to those Dr. Reddy's will experience.  These combined losses, imminent and

certain as they are to result from grant of the relief Ranbaxy seeks, outweigh any speculative

future loss Ranbaxy *may* some day experience by loss of its exclusivity.

---

[4]     The exact launch date for Dr. Reddy's generic Valcyte® product is subject to a
confidentiality agreement.

### D.  THE PUBLIC INTEREST WOULD BE DAMAGED BY A TRO

Ranbaxy helpfully points out that brand manufacturer Astrazeneca sold $3.8 billion worth of Nexium® in a single year, 2013.  It fails to note that a large percentage of that $3.8 billion was paid by government payors and through private insurance premiums – in other words, Astrazeneca's net profits are the public's net costs.  Nexium® is widely used to treat gastroesophageal reflux disease, or GERD (manifesting in severe heartburn).  And FDA's final approval of an ANDA for generic Nexium® (which Ranbaxy's claimed 180-day exclusivity has already *blocked* for years) could save the public and government payors millions of dollars.  *See* U.S. Dep't of Health & Human Services, *Expanding the Use of Generic Drugs*, ASPE Issue Brief 5-6 (Dec. 2010), *available at* http://aspe.hhs.gov/sp/reports/2010/genericdrugs/ib.pdf; *Greater Access to Generic Drugs*, FDA (Jan. 2006, last updated Aug. 12, 2011), *available at* http://www.fda.gov/Drugs/ResourcesForYou/Consumers/ucm143545.htm.  For example, it is estimated that generic availability of esomeprazole could save the State of New York's Medicaid program, alone, approximately $83 million annually.  *See* Excellus BCBS, Opportunities for Generic Savings in 2013 and 2014, 3, (Winter 2013) (hereinafter "Excellus"), 3, *available at* https://www.excellusbcbs.com/wps/wcm/connect/3b077339-3270-41fc-90cb-1d781c5af698/Generic+Savings+2013-2014+FS-EX+FINAL+1.pdf?MOD=AJPERES&CACHEID=3b077339-3270-41fc-90cb-1d781c5af698.  The availability of multiple generic competitors for Nexium® could save the public exponentially more.  *See* FTC, Working Paper No. 317: The Effect of Generic Drug Competition on Generic Drug Prices During the Hatch-Waxman 180-Day Exclusivity Period (April, 2013), *available at* http://www.ftc.gov/sites/default/files/documents/reports/estimating-effect-entry-generic-drug-prices-using-hatch-waxman-exclusivity/wp317.pdf (analyzing the

significant marginal impacts on drug price caused by greater numbers of generic competitors both during and outside of 180-day exclusivity periods).

Generic Valcyte®, or valgancilovir, will have a smaller market but is very important from a public health perspective.  Valcyte® is an anti-viral drug used to treat or prevent serious eye infections in immunocompromised patients, such as those with AIDS or those who have received an organ transplant.  It is also an expensive drug, with an Average Wholesale Price of up to $4,636.73 per package, or approximately $77.28 per tablet.  Availability of generic Valcyte® could save the State of New York's Medicaid program, alone, approximately $3.5 million a year, below the costs of the brand drug.  *See* Excellus at 2.  Again, availability of multiple generic competitors for Valcyte® could save the public exponentially more.  *See supra*, FTC Working Paper No. 317.   Costs would be driven much lower if multiple generic companies reach the market. Ranbaxy is the only company attempting to keep its competitors from marketing these drugs.

Beyond the public cost savings with respect to the drug products at issue here, there is a strong public interest in this Court affirming FDA's inherent authority to revisit and rescind a past erroneous decision to grantTA.  As discussed above, Ranbaxy's asserted claim to 180-day exclusivity based on its erroneously granted TAs for generic Valcyte® and Nexium®, combined with the company's outright inability to comply with FDA requirements so as to achieve *final* approval of those products, has resulted in a long-term blockade of generic products.  This blockade frustrates the intent of the Hatch-Waxman Amendments.

## IV.   CONCLUSION

For the foregoing reasons, and incorporating the arguments and issues raised in both the Federal Defendant's and Intervenor-Defendant Endo Pharmaceuticals Inc.'s Memoranda in

Opposition,  Dr. Reddy's respectfully requests that this Court *deny* Ranbaxy's Motion for a TRO

and schedule further briefing on its request for an Expedited Preliminary Injunction.


Dated: November 18, 2014                              Respectfully submitted,

                                                      /s/ Douglas B. Farquhar
                                                      Douglas B. Farquhar (D.C. Bar No. 386573)
                                                      James P. Ellison (D.C. Bar No. 477931)
                                                      Kurt R. Karst (D.C. Bar No. 482615)
                                                      Jennifer M. Thomas (D.C. Bar No. 987518)
                                                      Hyman, Phelps & McNamara, P.C.
                                                      700 13th Street, N.W., Suite 1200
                                                      Washington, D.C. 20005
                                                      Phone:  (202) 737-5600
                                                      Fax:  (202) 737-9329
                                                      Email: dfarquhar@hpm.com

                                                      *Attorneys for Dr. Reddy's Laboratories, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of November, 2014, the foregoing Memorandum of

Points and Authorities in Opposition to Ranbaxy's Motion for a Temporary Restraining Order

and Expedited Preliminary Injunction, attached Exhibits, and Proposed Order were filed via the

Court's CM/ECF system and served upon ECF-registered counsel for all parties to this

proceeding.

By: /s/ Douglas B. Farquhar
Hyman, Phelps & McNamara, P.C.
700 13th Street, N.W., Suite 1200
Washington, D.C. 20005
Phone:  (202) 737-5600
Fax:  (202) 737-9329
Email: dfarquhar@hpm.com

*Attorneys for Dr. Reddy's Laboratories, Inc.*