# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RANBAXY LABORATORIES, LTD. and | ) |
| | ) |
| RANBAXY, INC. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SYLVIA MATHEWS BURWELL, in her official | ) |
| capacity as Secretary of Health and Human | ) |
| Services; | ) |
| | ) |
| MARGARET HAMBURG, M.D., in her official | ) |
| capacity as Commissioner of Food and Drugs; | ) C.A. No. 1:14-cv-01923-BAH |
| and | ) |
| | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DR. REDDY'S LABORATORIES, INC., and | ) |
| | ) |
| ENDO PHARMACEUTICALS INC., | ) |
| | ) |
| Intervenor-Defendants. | ) |
| | ) |

**ENDO PHARMACEUTICALS INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................................I

INTRODUCTION .........................................................................................................1

     A.   Valganciclovir.............................................................................................3

     B.   Ranbaxy's cGMP Compliance Issues.........................................................3

     C.   Ranbaxy Enters Into the Consent Decree and Settlement Agreement.......4

     D.   Ranbaxy Fails to Bring Generic Valganciclovir to Market. ......................5

     E.   FDA Revokes Ranbaxy's Tentative Approval and Grants Final Approval to Endo. . 6

ARGUMENT ................................................................................................................6

I.      RANBAXY IS NOT LIKELY TO SUCCEED ON THE MERITS...................................7

     A.   The Letter Decision Does Not Impermissibly Conflate Tentative and Final Approval. ................................................................................................ 10

     B.   The Letter Decision Did Not Abrogate Any "Reliance Interests" and Was Not Untimely. ................................................................................................. 12

II.     RANBAXY HAS NOT DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF. ....................................................... 13

     A.   Ranbaxy Has Not Demonstrated Irreparable Harm. ................................ 14

     B.   Any Harm to Ranbaxy Is of its Own Making. ......................................... 15

III.   INJUNCTIVE RELIEF WILL SUBSTANTIALLY HARM ENDO. ............................. 15

IV.   THE PUBLIC INTEREST IN ACCESS TO COST-SAVING GENERIC DRUGS FAVORS DENIAL OF INJUNCTIVE RELIEF. ............................................... 16

V.    RANBAXY SHOULD NOT BE GRANTED INJUNCTIVE RELIEF BECAUSE IT COMES TO THE COURT WITH UNCLEAN HANDS. ................................. 17

CONCLUSION............................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Allina Health Servs. v. Sebelius,
    756 F. Supp. 2d 61 (D.D.C. 2010) ........................................................................16

Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps.,
    899 F. Supp. 646 (D.D.C. 1995) ..........................................................................19

Apotex, Inc. v. Thompson,
    347 F.3d 1335 (Fed. Cir. 2003).............................................................................9

Astellas Pharma US, Inc. v. FDA,
    642 F. Supp. 2d 10 (D.D.C. 2009) ..................................................................13, 17

AstraZeneca Pharm. LP v. FDA,
    2012 WL 1037457 (D.D.C. Mar. 28, 2012).......................................................7, 10

AstraZeneca Pharms. LP v. FDA,
    850 F. Supp. 2d 230 (D.D.C. 2012) .....................................................................11

In re Barr Labs.,
    930 F.2d 72 (D.C. Cir. 1991) ..............................................................................17

Ben Venue Labs., Inc. v. Novartis Pharm. Corp.,
    10 F. Supp. 2d 446 (D.N.J. 1998) ......................................................................2, 14

Biovail Corp. v. FDA,
    519 F. Supp. 2d 39 (D.D.C. 2007) .......................................................................17

Bristol-Myers Squibb Co. v. Shalala,
    923 F. Supp. 212 (D.D.C. 1996) .........................................................................17

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
    467 U.S. 837 (1984) ................................................................................. *passim*

Cmty. Care Found. v. Thompson,
    318 F.3d 219 (D.C. Cir. 2003) ..............................................................................9

Coal. for Common Sense in Gov't Procurement v. United States,
    576 F. Supp. 2d 162 (D.D.C. 2008) .....................................................................13

ConverDyn v. Moniz,
    No. 14-1012, 2014 WL 4477555 (D.D.C. Sept. 12, 2014) .......................................15

Elite Entm't, Inc. v. Reshammiya,
    (No. 08-0641)2008 WL 9356287 (D.D.C. Apr. 18, 2008) .................................................1, 7

Elkem Metals Co. v. United States,
    193 F. Supp. 2d 1314 (Ct. Int'l Trade 2002) ...........................................................................13

Hall v. Johnson,
    599 F. Supp. 2d 1 (D.D.C. 2009) ...............................................................................................7

Household Credit Servs., Inc. v. Pfennig,
    541 U.S. 232 (2004)...............................................................................................................8, 10

Inv. Co. Inst. v. Conover,
    790 F.2d 925 (D.C. Cir. 1986) .................................................................................................8, 9

Keystone Driller Co. v. Gen. Excavator Co.,
    290 U.S. 240 (1933)...................................................................................................................18

Lee v. Christian Coal. of Am., Inc.,
    160 F. Supp. 2d 14 (D.D.C. 2001) ...........................................................................................15

Manpower Inc. v. Mason,
    377 F. Supp. 2d 672 (E.D. Wis. 2005)......................................................................................19

McAllister v. United States,
    3 Cl. Ct. 394 (1983) ..................................................................................................................13

Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,
    463 U.S. 29 (1983).......................................................................................................................8

Mylan Labs., Inc. v. Leavitt,
    484 F. Supp. 2d 109 (D.D.C. 2007) ..........................................................................................14

Mylan Pharm., Inc. v. Shalala,
    81 F. Supp. 2d 30 (D.D.C. 2000)..........................................................................................2, 14

Mylan Pharms., Inc. v. Sebelius,
    856 F. Supp. 2d 196 (D.D.C. 2012) ..........................................................................................11

Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy,
    654 F.3d 496 (4th Cir. 2011) ......................................................................................................8

Nostrum Pharm., LLC v. FDA,
    No. 11-3111, 2011 WL 2652147 (D.N.J. July 6, 2011) ...........................................................14

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,
    324 U. S. 806 (1945)..................................................................................................................18

Research Found. of State Univ. of N.Y. v. Mylan Pharms. Inc.,
    723 F. Supp. 2d 638 (D. Del. 2010)..................................................................19

Roche Palo Alto LLC v. Endo Pharmaceuticals Inc.,
    No. 10-261, D.I. 1 (D. Del. filed Mar. 31, 2010).......................................................6

Sandoz, Inc. v. FDA,
    439 F. Supp. 2d 26 (D.D.C. 2006) aff'd sub nom. Sandoz Inc. v. FDA, 2006
    WL 2591087 (D.C. Cir. Aug. 30, 2006) ................................................................16

Sanofi-Synthelabo v. Apotex Inc.,
    488 F. Supp. 2d 317 (S.D.N.Y. 2006)....................................................................19

Serono Labs., Inc. v. Shalala,
    158 F.3d 1313 (D.C. Cir. 1998) ........................................................................9, 17

Udall v. Littell,
    366 F.2d 668 (D.C. Cir. 1966) .............................................................................17

United Distrib. Cos. v. FERC,
    88 F.3d 1105 (D.C. Cir. 1996) ...............................................................................9

United States v. Ranbaxy Labs. Ltd.,
    No. 12-250, D.I. 1 (D. Md. filed Jan. 25, 2012) .................................................4, 5

W.R. Grace v. Local 759, Int'l Union of the United Rubber, Cork, Linoleum &
    Plastic Workers,
    461 U.S. 757 (1983)...........................................................................................19

Winter v. Natural Res. Def. Council, Inc.,
    555 U.S. 7 (2008)................................................................................................7

Young v. Community Nutrition Institute,
    476 U.S. 974 (1986).......................................................................................8, 9

**Statutes**

21 U.S.C. §§ 355 (j)(3)(C)(iv)(II)(dd)(AA), (j)(2)(A)(vi), (b)(1)(D) ...........................11

21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) ...............................................................11

21 U.S.C. § 355(j)(5)(D)(i)(IV) ......................................................................6, 12

FDCA, §501(a)(2)(B) .............................................................................. passim

**Other Authorities**

21 C.F.R. §§ 314.105(d), 314.127(a)(1) ...............................................................11

Fed. R. Civ. P. 65(c) .................................................................................................................19

## **INTRODUCTION**

Plaintiffs Ranbaxy Laboratories Ltd. and Ranbaxy, Inc. ("Ranbaxy") seek relief from a predicament created by its own long-standing compliance issues. The simple truth is that Ranbaxy would have been on the market with its generic product a long time ago but for its own eight-year long failure to bring its manufacturing facilities in India up to the standards of the U.S. Food and Drug Administration ("FDA"). Ranbaxy is now asking the Court to save it from its own failure by imposing a *mandatory injunction* in the form of a temporary restraining order ("TRO") that would undo the grant of final marketing approval by FDA to Endo Pharmaceuticals Inc.'s ("Endo") abbreviated new drug application ("ANDA") for a generic version of Valcyte[®], valganciclovir hydrochloride tablets USP, 450 mg ("valganciclovir").[1] This would not only disproportionality harm Endo but also greatly harm patients by depriving them of the long-overdue opportunity to purchase a low-cost generic version of Valcyte[®].

"A mandatory injunction requires the moving party to meet a higher standard than in the case of an ordinary injunction: the movant must show 'clearly' that she is entitled to relief or that extreme or very serious damage will result." Elite Entm't, Inc. v. Reshammiya, (No. 08-0641), 2008 WL 9356287, at *4 (D.D.C. Apr. 18, 2008) (Urbina, J.). Ranbaxy's request for this extraordinary relief fails because it cannot demonstrate that it will suffer irreparable harm in the absence of that relief. The irreparable harm asserted by Ranbaxy is the loss of the 180-day generic marketing exclusivity. But Ranbaxy's continuing FDA compliance failures (spanning over *eight years*) have prevented and continue to prevent it from bringing a product to market; indeed, Ranbaxy has not even attempted to assert that it expects FDA approval to market its product at a point in time where it will benefit from the 180-day exclusivity period. And the

---

[1] Ranbaxy is also seeking to enjoin FDA from acting to grant final approval to any ANDA relating to esomeprazole (Nexium[®]).

Orange Book-listed patent that is the basis for any generic exclusivity in this matter expires a mere four months from now, taking any exclusivity with it.  The Court's inquiry should end there, and Ranbaxy's TRO motion should be denied. [2]

Ranbaxy's TRO motion should similarly be denied if the Court chooses to consider the likelihood of success prong because Ranbaxy has not cited to any statutory language that compels a result different from the one reached by FDA under the deferential Chevron standard. Ranbaxy's motion thus fails.  Indeed, far from commanding the interpretation asserted by Ranbaxy, the relevant statute and regulations demonstrate that FDA acted appropriately in revoking tentative approval of Ranbaxy's valganciclovir ANDA.  Contrary to Ranbaxy's assertions, the ability to demonstrate compliance with current Good Manufacturing Practices ("cGMPs") is a necessary prerequisite to obtaining tentative approval.  Failure to comply with cGMPs precludes tentative approval, soFDA properly exercised its authority to revoke Ranbaxy's tentative approval status.  Because an agency's interpretation of its own governing statutes and regulations is entitled to substantial deference, this Court should find that FDA acted appropriately and that Ranbaxy is therefore unlikely to succeed on the merits.

Finally, the doctrine of unclean hands renders Ranbaxy ineligible for the equitable relief that seeks.  Ranbaxy's hand-wringing over shaken faith in governmental representations cannot obscure the fact that nothing but Ranbaxy's own longstanding, unlawful failure to comply with FDA regulations has prevented it from obtaining final approval and has caused it to forfeit any 180-day exclusivity period.

---

[2] Endo received final approval from FDA for its ANDA on November 4, 2014.  Ranbaxy, however, waited until November 14 to file this motion.  This ten-day delay by itself speaks volumes about Ranbaxy's alleged irreparable harm.  Mylan Pharm., Inc. v. Shalala, 81 F. Supp. 2d 30, 44 (D.D.C. 2000); Ben Venue Labs., Inc. v. Novartis Pharm. Corp., 10 F. Supp. 2d 446, 458 (D.N.J. 1998).

Furthermore, Ranbaxy's requested relief would greatly harm the public and would contravene the central purpose of the Hatch-Waxman Act, as it would delay access to low-cost versions of an important medication in the AIDS and organ transplant communities.  Hatch - Waxman's essential purpose of lowering the costs of prescription products would be thwarted by further delay of generic market competition.

For all of these reasons, the court should deny Ranbaxy's motion for TRO.

## STATEMENT OF FACTS

A.    <u>Valganciclovir</u>

Valganciclovir is an antiviral drug that is prescribed to treat cytomegalovirus retinitis, an eye infection that can cause blindness in people who have AIDS, are receiving chemotherapy, have received an organ or bone marrow transplant or are taking drugs that depress the immune system.  The branded version of the drug, Valcyte®, is sold by Hoffman La Roche.

B.    <u>Ranbaxy's cGMP Compliance Issues</u>.

On December 27, 2005, Ranbaxy filed its ANDA No. 078078 for valganciclovir 450 mg tablets, referencing Valcyte®.  As the first ANDA filer for a generic version of Valcyte®, Ranbaxy was potentially eligible for a 180-day exclusivity period to market its generic product without competition from other generic drug manufacturers.

In early 2006, FDA inspected two of Ranbaxy's manufacturing locations in India – Paonta Sahib and Dewas.  These facilities were listed as manufacturing locations in Ranbaxy's valganciclovir ANDA.  At the conclusion of each of these inspections, FDA noted several violations of current Good Manufacturing Practices ("cGMP").  With regard to the Paonta Sahib facility, FDA issued a formal warning letter finding that the finished drug products at that facility were adulterated under Section 501(a)(2)(B) of the Federal Food, Drug and Cosmetics Act ("the FDCA"), and accordingly determined that approval be withheld for any ANDA listing the

3

facility as a manufacturing location.  With regard to the Dewas facility, FDA issued a Form FDA-483 documenting multiple violations.

In early 2008, FDA conducted a second set of inspections.  Again, each of the inspected facilities was found to be in violation of cGMP on several grounds.  Shortly thereafter, FDA issued warning letters for each of the facilities, finding again that the finished drugs from those facilities were adulterated under Section 501(a)(2)(B) of the FDCA and recommending disapproval of any ANDA listing either of the facilities as a manufacturing location.

Due to the many cGMP violations observed in 2006 and 2008, FDA determined that the compliance status of the Paonta Sahib facility in June 2008 was "Official Action Indicated" ("OAI") and the compliance status of the Dewas facility was "potential OAI."  OAI means that "[o]bjectionable conditions were found and a regulatory action is recommended."  (FDA Decision, dated November 4, 2014, p. 11 (the "FDA Letter Decision") (Ex. C to Complaint, DI. 1).)  As a consequence, the compliance status for Ranbaxy's valganciclovir ANDA in June 2008 was "withhold."

C.      Ranbaxy Enters Into the Consent Decree and Settlement Agreement.

In January 2012, the Department of Justice filed suit against Ranbaxy alleging that Ranbaxy introduced adulterated drugs into interstate commerce, introduced unapproved new drugs into interstate commerce, submitted numerous untrue statements to FDA, violated cGMP regulations, failed to timely submit required reports to FDA concerning distributed batch failures and failed to timely submit required annual reports to FDA.  See United States v. Ranbaxy Labs. Ltd., No. 12-250, D.I. 1 (D. Md. filed Jan. 25, 2012).

Later that month, Ranbaxy entered into a Consent Decree and Permanent Injunction with FDA under which Ranbaxy was required to, among other things, improve quality assurance and quality control at its facilities, retain an independent cGMP auditor to inspect its facilities and

establish an office of data reliability in the United States responsible for conducting pre-submission audits of all of Ranbaxy's NDA and ANDA-related applications to FDA. (Id., D.I. 5.) The Consent Decree also required Ranbaxy to withdraw some of its ANDAs. (Id.) The Consent Decree did not represent or otherwise assure that tentative approval of any existing ANDA could not be reconsidered if FDA realized it was made in error. (Id.)

In May 2013, Ranbaxy settled civil and criminal claims brought by the Department of Justice on behalf of several agencies for a record $500 million, pleading guilty to seven felony charges and admitting among other things to manufacturing and distributing adulterated drugs at the Ponta Sahib and Dewas facilities and making material false statements to FDA (the "Settlement Agreement"). (See Generic Drug Manufacturer Ranbaxy Pleads Guilty and Agrees to Pay $500 Million to Resolve False Claims Allegations, cGMP Violations and False Statements to FDA, THE UNITED STATES DEPARTMENT OF JUSTICE (May 13, 2013), http://www.justice.gov/opa/pr/generic-drug-manufacturer-ranbaxy-pleads-guilty-and-agrees-pay-500-million-resolve-false.)

D.    Ranbaxy Fails to Bring Generic Valganciclovir to Market.

The Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") lists a single patent for valganciclovir:  U.S. Patent No. 6,083,953 ("the '953 patent"). The owner of the patent, Roche Palo Alto LLC ("Roche"), sued Ranbaxy for infringement in 2006. Ranbaxy and Roche settled in 2010, pursuant to which Ranbaxy received a license that permitted it to launch its generic valganciclovir product by March 2013. (Ranbaxy's Manufacturing Woes Benefit Big Pharma, GENERICS & BIOSIMILARS INITIATIVE (Aug. 22, 2014), http://www.gabionline.net/Generics/General/Ranbaxy-s-manufacturing-woes-benefit-big-pharma.)

Despite having a license to the '953 patent for more than 20 months, Ranbaxy has been unable to obtain final FDA approval and enter the market. Some eight years after FDA issued its first warning letter against Ranbaxy for cGMP violations, and nearly three years after the entering into the Consent Decree and a year and a half after entering into the Settlement Agreement, Ranbaxy has remained unable to meet FDA's standards.

      E.     <u>FDA Revokes Ranbaxy's Tentative Approval and Grants Final Approval to Endo</u>.

Endo filed its ANDA for generic valganciclovir in early 2010, and Roche sued it for patent infringement on March 31, 2010. (<u>Roche Palo Alto LLC v. Endo Pharmaceuticals Inc.</u>, No. 10-261, D.I. 1 (D. Del. filed Mar. 31, 2010).) Two years later on March 28, 2012, Endo and Roche settled, agreeing that Endo would have a license to sell its generic valganciclovir product.

On November 4, 2014, FDA recognized that it had mistakenly granted tentative approval to Ranbaxy's valganciclovir ANDA in June 2008. FDA corrected its error, revoking Ranbaxy's tentative approval because its manufacturing facilities were not cGMP compliant. Having failed to obtain tentative approval within 30 months, Ranbaxy forfeited its 180-day exclusivity. 21 U.S.C. § 355(j)(5)(D)(i)(IV). Therefore, on November 4, 2014, FDA granted final approval to Endo's ANDA No. 200790 and Dr. Reddy's Labs Ltd.'s ("Dr. Reddy's") ANDA No. 203511, thus permitting Endo to sell generic valganciclovir immediately. Endo is now marketing its product and for the first time providing with a more affordable valganciclovir product.

## ARGUMENT

Ranbaxy cannot use the extraordinary relief of a mandatory injunction to save it from a predicament of its own creation. But for its own failure to make its manufacturing facilities cGMP compliant over the past eight years, it would have been on the market with its generic valganciclovir product since March 2013. The Court should not inflict the disproportionate,

concrete and severe harm on Endo and patients that would result from commanding FDA to rescind its final approval of Endo's valganciclovir ANDA.

Preliminary injunctive relief is an "extraordinary" remedy that "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008).  A party seeking a preliminary injunction or temporary restraining order must satisfy a four-factor test:  "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20.  See also Hall v. Johnson, 599 F. Supp. 2d 1, 3 n.2 (D.D.C. 2009).

The burden on the movant is even higher where, as here, it seeks injunctive relief that changes the status quo.  "A mandatory injunction requires the moving party to meet a higher standard than in the case of an ordinary injunction:  the movant must show 'clearly' that she is entitled to relief or that extreme or very serious damage will result."  Elite Entm't, 2008 WL 9356287, at *4.  Because Ranbaxy seeks a mandatory injunction to change the status quo – i.e., the reversal of FDA's final approval of Endo's valganciclovir ANDA – Ranbaxy must meet this higher burden in order to prevail on its TRO motion.

Ranbaxy fails to carry its burden on all four prongs.

I.      RANBAXY IS NOT LIKELY TO SUCCEED ON THE MERITS.

Although it is the very core of the issue before the Court, Ranbaxy pays only lip service to the highly deferential standard set forth in the Administrative Procedure Act ("APA"), which allows courts to invalidate only those agency decisions that are "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  AstraZeneca Pharm. LP v. FDA, 2012 WL 1037457, at *2 (D.D.C. Mar. 28, 2012) (quoting 5 U.S.C. § 706(2)(A) (Howell, J.)).  Under the highly deferential arbitrary and capricious standard of review, FDA's determination must be

upheld unless a contrary result is "*clearly compelled*" by the statute.  Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 240 (2004) (emphasis added); see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984).

The Chevron two-step framework governs the review of FDA's decision-making in this case.  Chevron, 467 U.S. 837.  Under that approach, "courts are instructed to defer to the reasonable interpretations of expert agencies charged by Congress to fill any gap left, implicitly or explicitly, in the statutes they administer."  Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy, 654 F.3d 496, 504 (4th Cir. 2011) (quoting Am. Online, Inc. v. AT & T Corp., 243 F.3d 812, 817 (4th Cir. 2001)).  Deference is presumptively the rule because "[f]ew phrases in a complex scheme of regulations are so clear as to be beyond the need for interpretation when applied in a real context."  Id. at 505 (quoting Nat'l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 418 (1992)).  Accordingly, a court "is not to substitute its judgment for that of an agency."  Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).  Where Congress "delegate[s] interpretive authority implicitly – by failing to legislate in sufficient detail as to resolve a particular question of interpretation – or explicitly – by expressly leaving a gap for the agency to fill . . . interpretive authority has been delegated to the agency, not to the court."  Inv. Co. Inst. v. Conover, 790 F.2d 925, 935 (D.C. Cir. 1986).

Time and again, the courts have upheld an agency's statutory interpretation even while acknowledging that an alternative interpretation was permissible, or even "the more natural interpretation."  For example, in Young v. Community Nutrition Institute, 476 U.S. 974, 980 (1986), the Supreme Court reversed the appellate court and upheld FDA's interpretation of the FDCA where "[t]he Court of Appeals' reading of the statute may be the more natural

interpretation, but the phrasing of [the statutory section] admits of either respondents' or petitioner's reading of the statute."  Similarly, the D.C. Circuit has stated:

> The petitioners' proffered interpretation is also a reasonable, indeed, perhaps a more natural interpretation of the statutory language.  That, however, is not the standard. . . .  The only question is whether the agency's interpretation is reasonable and consistent with the statutory purpose.

United Distrib. Cos. v. FERC, 88 F.3d 1105, 1166 (D.C. Cir. 1996).  "[An] agency interpretation may be reasonable even if it is one which the court would not have rendered had it been interpreting the statute in the first instance."  Inv. Co. Inst., 790 F.2d at 935.

Deference to FDA is especially warranted here for two reasons.  First, where, as here, the agency is interpreting its own governing statute, particular deference is appropriate.  Chevron, 467 U.S. at 844.  Accordingly, courts have often deferred to FDA's reading of the FDCA.  See, e.g., Young, 476 U.S. at 980; Serono Labs., Inc. v. Shalala, 158 F.3d 1313, 1319 (D.C. Cir. 1998).

Second, deference is "'even more warranted' when [the agency's] interpretation concerns . . . a 'complex and highly technical regulatory program.'"  Cmty. Care Found. v. Thompson, 318 F.3d 219, 225 (D.C. Cir. 2003) (citation omitted).  The generic drug approval regime embodied in the Hatch-Waxman Act is exactly the kind of complex regulatory regime over which, in the absence of clear statutory language, a federal agency should be given the maximum amount of discretion to interpret and administer.  In such circumstances, the courts have often afforded FDA particular deference:

> Deference is due to an administrative agency's regulations particularly when the subject matter of the regulatory authority is a highly detailed regulatory program to which the agency has brought its specialized expertise . . . , a characterization that aptly describes FDA's role in the context of the regulatory scheme created pursuant to the Hatch-Waxman Act.

Apotex, Inc. v. Thompson, 347 F.3d 1335, 1352 (Fed. Cir. 2003) (citation omitted).

Application of these bedrock administrative law principles here compels denial of Ranbaxy's motion.

As this Court has recognized, finding that a portion of the FDCA is unambiguous and compels the reversal of an FDA action on a TRO motion is a heavy burden:

> Further, the Court declines to decide at this procedural juncture, without the benefit of fully briefing on the issues, whether the statutory provision [of the FDCA] at issue is unambiguous but rather assumes for purposes of this TRO that it is unclear, particularly given the parties dispute over its proper construction. Consequently, the Court must give appropriate deference to the agency's interpretation.

AstraZeneca, 2012 WL 1037457, at *3.

Ranbaxy has not come close to offering a sufficient basis to set aside the deference due to FDA's determination that it has the authority to correct its own mistaken tentative approval of Ranbaxy's valganciclovir ANDA.  In fact, Ranbaxy has not pointed to any statutory or regulatory provision that clearly compels the extraordinary reversal of FDA's decision here. Under the deference required by Chevron, FDA's determination should thus be upheld.  See Household Credit Servs., 541 U.S. at 240; Chevron, 467 U.S. at 842-43.  Although FDA is fully capable of defending its own authority, Endo will briefly address a few of the arguments Ranbaxy has advanced.

A.     The Letter Decision Does Not
       Impermissibly Conflate Tentative and Final Approval.

Ranbaxy asserts that that FDA conflated the requirements for tentative and final approval.  Specifically, Ranbaxy argues that final approval requires that an applicant actually prove cGMP compliance, whereas a bare disclosure of capability of compliance suffices for tentative approval.  The FDCA and FDA's own regulations, however, provide that the substantive bases for obtaining tentative and final approval are the same, the *only* difference

being that tentative approval is granted when a blocking patent or marketing exclusivity would make final approval impossible.  <u>See</u> 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA).

Courts have consistently echoed this interpretation.  <u>See, e.g.</u>, <u>AstraZeneca Pharms. LP v. FDA</u>, 850 F. Supp. 2d 230, 235 (D.D.C. 2012) ("[I]f the FDA finds that the generic drug satisfies the requirements for approval at the time of review, but final approval is blocked by a stay, a marketing exclusivity period, or some other barrier, the FDA will give the drug 'tentative approval.' 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA)."); <u>Mylan Pharms., Inc. v. Sebelius</u>, 856 F. Supp. 2d 196, 201 n.3 (D.D.C. 2012) (same).  Moreover, the FDCA and FDA regulations provide that to receive tentative approval, an applicant must not only submit in its ANDA information describing manufacturing methods, facilities, and controls, but must also be able to demonstrate the manufacturing methods, facilities, and controls described in the ANDA will adequately assure and preserve the drug's identity, strength, quality, and purity.  21 U.S.C. §§ 355 (j)(3)(C)(iv)(II)(dd)(AA), (j)(2)(A)(vi), (b)(1)(D); 21 C.F.R. §§ 314.105(d), 314.127(a)(1).

The statutory language and implementing regulations are thus clear that tentative approval, just like final approval, requires the applicant to be capable of demonstrating present compliance with cGMP.  To interpret the tentative approval provisions otherwise would be absurd, as it would require FDA to grant tentative approval even if the agency knew that the product could be manufactured in a noncompliant facility or in a dangerous manner.  Nevertheless, this is precisely the position that Ranbaxy advocates in its TRO motion.  Such an interpretation has grave public health consequences, as it places patients at risk of treatment with adulterated drugs.  This cannot be correct, yet is the most plausible argument that Ranbaxy can

proffer given that its loss of tentative approval is self-inflicted, owing to its long history of noncompliance.

Ranbaxy has thus failed to demonstrate that the statute or regulations compel a result contrary to the one reached by FDA. The reason for this is simple – the statute and regulations actually make it clear that tentative approval, like final approval, requires present  cGMP compliance. Because there is no doubt as to Ranbaxy's chronic noncompliance – as determined by FDA – <u>Chevron</u> deference requires that the FDA decision be upheld.[3]

> B. The Letter Decision Did Not Abrogate
> Any "Reliance Interests" and Was Not Untimely.

Ranbaxy argues that FDA lacked authority to issue the Letter Decision because it abrogated Ranbaxy's "reliance interests" in the tentative approval of its ANDA. (Pls.' Br. at 30-33.) This argument cannot be reconciled with the fact that, some six years after the tentative approval, Ranbaxy is still unable to satisfy FDA's cGMP standards to obtain final approval. This failure to act by Ranbaxy demonstrates that Ranbaxy has no "reliance interest" in the tentative approval.

Instead, Ranbaxy merely asserts that it agreed to the Consent Decree and Settlement Agreement based on some supposed reliance on the tentative approvals. (<u>Id.</u> at 30-31.) Given the severity and multitude of Ranbaxy's own compliance failures, however, it surely takes chutzpah to assert that the inviolability of the tentative approval for its valganciclovir ANDA was the linchpin of its acceptance of these resolutions of the government's civil and criminal actions against it. In any case, the Consent Decree and Settlement Agreement nowhere represent

---

[3] Because Ranbaxy failed to obtain tentative approval of its valganciclovir ANDA within 30 months of submitting the ANDA to FDA, Ranbaxy forfeited its eligibility for the 180-day generic marketing exclusivity. <u>See</u> 21 U.S.C. § 355 (j)(5)(D)(i)(IV).

or otherwise assure that the tentative approval could not be reconsidered if FDA realized it was made in error.  Ranbaxy's argument should therefore be rejected.

Ranbaxy's argument that FDA lacked authority to issue the Letter Decision because too much time has passed since the tentative approval is similarly unavailing.  (Id. at 27-30.)  There is no fixed rule as to how much time is too much for an agency to correct its own error.  Rather, courts look at the factual circumstances of each case.  In Elkem Metals Co. v. United States, 193 F. Supp. 2d 1314, 1322–23 (Ct. Int'l Trade 2002), for example, a period of four-and-a-half years was acceptable, while in McAllister v. United States, 3 Cl. Ct. 394, 396, 398 (1983), one of the cases cited by Plaintiffs, a period of 32 days was not acceptable.

As a general matter, the more significant, immediate and far-reaching effect an agency decision has, the shorter the time the agency should take to reverse that decision.  In this case, FDA's decision to grant tentative approval to Ranbaxy's valganciclovir ANDA had neither far-reaching nor immediate effects.  On the contrary, Ranbaxy's failure to satisfy FDA's cGMP standards six years later demonstrates that FDA's tentative approval of Ranbaxy's ANDA had virtually no effects.

## II.    RANBAXY HAS NOT DEMONSTRATED THAT IT WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Even apart from Ranbaxy's failure to demonstrate a likelihood of success on the merits, Ranbaxy's motion should be denied because it has not and cannot demonstrate that it will suffer irreparable harm absent injunctive relief.  See e.g., Astellas Pharma US, Inc. v. FDA, 642 F. Supp. 2d 10, 16 (D.D.C. 2009) ("[I]f a party fails to make a sufficient showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors.").  Commensurate with the extraordinary relief requested, the "irreparable injury requirement erects a very high bar for a movant."  Coal. for Common Sense in Gov't

13

Procurement v. United States, 576 F. Supp. 2d 162, 168 (D.D.C. 2008).  Ranbaxy's ten-day

delay in filing its TRO motion following Endo's final approval from FDA for its ANDA on

November 4, 2014 speaks volumes about Ranbaxy's alleged irreparable harm.  Mylan Pharm.,

81 F. Supp. 2d at 44; Ben Venue Labs., 10 F. Supp. 2d at 458.

     A.     Ranbaxy Has Not Demonstrated Irreparable Harm.

     Ranbaxy's alleged irreparable harm in the absence of an injunction is the loss of the 180-

day generic marketing exclusivity.  (Pls.' Br. at 44-46.)  Ranbaxy, however, has not and cannot

establish that it would receive final FDA approval to market its ANDA product in time to

exercise its asserted exclusivity right in light of its continuing compliance issues.  In fact, the

180-day exclusivity period is only awarded if the first applicant receives final approval before

the expiration of the Orange Book-listed patent.  Mylan Labs., Inc. v. Leavitt, 484 F. Supp. 2d

109, 122-23 (D.D.C. 2007); Nostrum Pharm., LLC v. FDA, No. 11-3111, 2011 WL 2652147, at

*10 (D.N.J. July 6, 2011).  Here, the '953 patent expires just four months from now – on March

29, 2015 – and Ranbaxy has not shown or even asserted that it will receive final approval by

then.

     Such an assertion by Ranbaxy would hardly be credible.  Ranbaxy settled its Hatch-

Waxman patent litigation with Roche in September 2010.  Under the terms of the settlement,

Ranbaxy received a license to the '953 patent that permitted it to launch its generic version of

Valcyte® no later than March 15, 2013.  More than 20 months have passed since, without

Ranbaxy obtaining FDA approval or launching its product.  The only reason is that Ranbaxy has

not rectified the FDA compliance issues with its manufacturing facilities as required by the 2012

Consent Decree.  Having failed to do so in the past three-plus years, despite having the right to

market generic Valcyte® under a license since March 15, 2013, there is no reason to think that

Ranbaxy will be able to do so in the next four months.  And Ranbaxy does not make any representation to the contrary.

"In this Circuit, a litigant seeking a preliminary injunction must satisfy 'a high standard' for irreparable injury."  <u>ConverDyn v. Moniz</u>, No. 14-1012, 2014 WL 4477555, at *8 (D.D.C. Sept. 12, 2014) (quoting <u>Wis. Gas Co. v. FERC</u>, 758 F.2d 669, 674 (D.C.Cir.1985) (alterations in original)).  The asserted injury "must be both certain and great; it must be actual and not theoretical," and the movant must show that "[t]he injury complained of [is] of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."  <u>Id.</u> Because Ranbaxy has failed to even assert, let alone demonstrate, that it will receive final approval prior to the expiration of the '953 patent, it has failed to demonstrate that it will be the beneficiary of the 180-day generic marketing exclusivity, and hence that it can suffer any harm incurred by losing that exclusivity.  For this reason alone, Ranbaxy's motion should be denied.

      B.     <u>Any Harm to Ranbaxy Is of its Own Making</u>.

Even if Ranbaxy could have demonstrated any actual harm in the absence of an injunction, any such harm would be entirely of its own doing.  But for Ranbaxy's own failure to keep its manufacturing facilities in compliance with FDA regulations, it would have been on the market at least by March 2013.  "The case law is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." <u>Lee v. Christian Coal. of Am., Inc.</u>, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) (internal quotation omitted).  Ranbaxy cannot point to harm caused by its own actions to justify the extraordinary remedy of injunctive relief.

III.    <u>INJUNCTIVE RELIEF WILL SUBSTANTIALLY HARM ENDO</u>.

The balance of hardships in this case weighs strongly in Endo's favor because Endo, unlike Ranbaxy, would be subject to concrete and substantial harm that is not of its own making.

Endo has spent years in diligent pursuit of FDA approval to market its generic valganciclovir product in the United States.  In contrast to Ranbaxy, Endo has received final approval by FDA and begun marketing its product.  (Declaration of Don DeGoyler ("DeGoyler Decl.") at ¶ 20.)  If FDA is compelled to rescind its final approval of Endo's ANDA, Endo will be prohibited from receiving the significant revenue that it expects from its continued sales of this product and will lose millions of dollars from the increase in the number of competitors it will face later.  (Id. at ¶¶ 21-22.)  At this time, Endo is one of only a small number of generic market entrants.  (Id. at ¶ 20.)  As time passes, other generic companies with pending ANDAs for generic valganciclovir will undoubtedly receive approval and enter the market.  (Id. at ¶¶ 19, 22.)  If Ranbaxy's motion were granted, these applicants may receive final approval while the injunction is pending.  (Id. at ¶ 22.)  Endo would irretrievably lose the significant market share and higher margin that it would have earned by virtue of having been ahead of those competitors.  (Id.)

In addition to losing millions of dollars, Endo's reputation and goodwill with purchasers who are expecting to continue to receive Endo's product will be harmed if Endo's ability to sell valganciclovir were suddenly revoked.  (Id. at ¶ 23.).  See, e.g.,  Sandoz, Inc. v. FDA, 439 F. Supp. 2d 26, 33 (D.D.C. 2006) aff'd sub nom. Sandoz Inc. v. FDA, (No. 06-5204), 2006 WL 2591087 (D.C. Cir. Aug. 30, 2006) (finding that enjoining defendant-intervenor from marketing its approved generic drug product would destroy its goodwill and impair future access to major customers).  This loss of reputation and goodwill is impossible to quantify and will be irretrievably lost if the TRO is granted.  (DeGoyler Decl. ¶ 22.)

IV. THE PUBLIC INTEREST IN ACCESS TO COST-SAVING
    GENERIC DRUGS FAVORS DENIAL OF INJUNCTIVE RELIEF.

As a general matter, disruption of the status quo weighs against the public interest.  See Allina Health Servs. v. Sebelius, 756 F. Supp. 2d 61, 69-70 (D.D.C. 2010).  Here, the mandatory

injunction Ranbaxy requests would not only disproportionately harm Endo but also the public. Most immediately, compelling FDA to rescind their final approvals of Endo's (and Dr. Reddy's) valganciclovir ANDA would deprive patients of a combined savings of about $1 million per day by forcing them to continue to purchase the higher-cost branded version, Valcyte®.  (DeGoyler Decl. at ¶ 24.)

Second, beyond the specific costs an injunction would impose, it would also contravene the public interest generally in increased access to cheaper, safe generic drugs – a benefit Ranbaxy's papers completely ignore.  The purpose of the Hatch-Waxman Act is to allow lower-cost generic drugs to reach more patients.  See Serono, 158 F.3d at 1326 (the purpose of the Hatch-Waxman Act was "to increase competition in the drug industry by facilitating the approval of generic copies of drugs"); Bristol-Myers Squibb Co. v. Shalala, 923 F. Supp. 212, 221-22 (D.D.C. 1996) (the Hatch-Waxman Act "aimed to increase competition in the drug industry" by facilitating approval of generic drugs); In re Barr Labs., 930 F.2d 72, 76 (D.C. Cir. 1991) ("Congress sought to get generic drugs into the hands of patients at reasonable prices – fast.").  Courts have consistently recognized the public interest in allowing generic entry.  See Biovail Corp. v. FDA, 519 F. Supp. 2d 39, 50 (D.D.C. 2007); Astellas, 642 F. Supp. 2d at 23-24. Allowing FDA's final approval of Endo's generic product to remain in place therefore benefits the public and satisfies the intent of the Hatch-Waxman Act.

V.      RANBAXY SHOULD NOT BE GRANTED INJUNCTIVE RELIEF
        BECAUSE IT COMES TO THE COURT WITH UNCLEAN HANDS.

In addition to failing to satisfy the standard for injunctive relief, Ranbaxy's motion should also be denied because it has unclean hands.  It is a fundamental principle that "one seeking equity must do equity and must show 'clean hands' at the threshold."  Udall v. Littell, 366 F.2d 668, 675 (D.C. Cir. 1966).  Thus, the doctrine of unclean hands "closes the door of a

court of equity to one tainted with inequitableness or bad faith relative to the matter in which he

seeks relief . . . ." Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U. S. 806, 814

(1945) (denying relief due to perjury).

In order to apply the doctrine of unclean hands, the act of bad faith in question must have

an "immediate and necessary relation to the equity that he seeks in respect of the matter in

litigation." Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933).  Here,

Ranbaxy's bad conduct is directly and inseparably tied to the relief it seeks in this matter.

Ranbaxy has plead guilty to criminal violations of the FDCA by manufacturing drugs deemed

adulterated at its Ponta Sahib and Dewas facilities because these facilities did not comply with

cGMP.  Eight years after FDA issued its first warning letter, nearly three years after the entering

into the Consent Decree and a year and a half after entering into the Settlement Agreement,

Ranbaxy has not improved the condition of its manufacturing facilities sufficiently to meet

cGMP and obtain final approval for its generic valganciclovir ANDA.  If it had done so, it would

have been able to launch at least by March 2013.  Thus, Ranbaxy's own misconduct is the cause

of its complaint in this matter.

Granting Ranbaxy's request for injunctive relief would be tantamount to rewarding its

failure to comply with the very FDA regulations that have prevented it from obtaining final

approval and forfeiting its 180-day exclusivity.  The doctrine of unclean hands therefore renders

Ranbaxy ineligible for the equitable relief that it is seeking.

18

## CONCLUSION

For all the foregoing reasons, the Court should deny Ranbaxy's motion for a temporary restraining order and preliminary injunction.[4]

Date:  November 18, 2014

Respectfully submitted,

**AXINN, VELTROP & HARKRIDER LLP**

/s/ Chad A. Landmon
Chad A. Landmon (DC Bar No. 990347)
950 F Street, N.W.
Washington, DC 20004
(202) 912-4700 (telephone)
(202) 912-4701 (facsimile)

Thomas K. Hedemann (*pro hac vice*)
David K. Ludwig (*pro hac vice*)
90 State House Square
Hartford, CT 06103
(860) 275-8100 (telephone)
(860) 275-8101 (facsimile)

*Attorneys for Endo Pharmaceuticals Inc.*

---

[4] If the Court nonetheless issues a temporary restraining order, the Court should require Ranbaxy to post a sizeable bond.  Fed. R. Civ. P. 65(c).  Although a party injured by the issuance of injunctive relief later determined to be erroneous has no action for damages stemming from the injunction, see W.R. Grace v. Local 759, Int'l Union of the United Rubber, Cork, Linoleum & Plastic Workers, 461 U.S. 757, 770 n.14 (1983), an improvidently enjoined party may collect damages up to the value of the bond in the discretion of the district court.  See Alton & S. Ry. Co. v. Bhd. of Maint. of Way Emps., 899 F. Supp. 646, 650 (D.D.C. 1995); Research Found. of State Univ. of N.Y. v. Mylan Pharms. Inc., 723 F. Supp. 2d 638, 664 (D. Del. 2010).  Here, a large bond would be necessary to adequately protect Endo.  See, e.g., Sanofi-Synthelabo v. Apotex Inc., 488 F. Supp. 2d 317, 349 (S.D.N.Y. 2006); Manpower Inc. v. Mason, 377 F. Supp. 2d 672, 681 (E.D. Wis. 2005) ("Because the damages caused by an erroneous preliminary injunction cannot exceed the amount of the bond posted as security, and because an error in setting the bond too high is not serious, district courts should err on the high side when setting bond.").

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of November, 2014, true and correct copies of ENDO PHARMACEUTICALS INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER and DECLARATION OF DON DeGOYLER were served on the attorneys of record listed below via the Court's CM/ECF system.

COUNSEL FOR PLAINTIFFS:

John Kevin Dolan Crisham
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(202) 879-5000

Michael D. Shumsky
KIRKLAND & ELLIS, LLP
655 15th Street, NW
Suite 1200
Washington, DC 20005
(202) 879-5228

Stephen S. Schwartz
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(202) 879-5153

COUNSEL FOR FEDERAL DEFENDANTS:

Roger Joseph Gural
U.S. DEPARTMENT OF JUSTICE
Enivornment & Natural Resources Division
Wildlife & Marine Resources Section
1000 SW Third Avenue
Suite 600
Portland, OR 97204
(202) 307-0174

COUNSEL FOR INTERVENOR-DEFENDANTS:

      Douglas B. Farquhar
      James P. Ellison
      Kurt R. Karst
      Jennifer M. Thomas
      HYMAN, PHELPS & McNAMARA, P.C.
      700 13th Street, N.W., Suite 1200
      Washington, D.C. 20005
      (202) 737-5600

      /s/ Chad A. Landmon
      Chad A. Landmon (DC Bar No. 990347)
      AXINN, VELTROP & HARKRIDER LLP
      950 F. Street, N.W.
      Washington, D.C. 20004
      (202) 912-4700 (telephone)
      (202) 912-4701 (facsimile)

      *Attorney for Endo Pharmaceuticals, Inc.*