## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RANBAXY LABORATORIES, LTD. and | ) |
| | ) |
| RANBAXY, INC., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| SYLVIA MATHEWS BURWELL, in her official | ) Case No. 1:14-CV-01923-BAH |
| capacity as Secretary of Health and Human | ) |
| Services; | ) Hon. Beryl A. Howell |
| | ) |
| MARGARET HAMBURG, M.D., in her official | ) |
| capacity as Commissioner of Food and Drugs; and | ) |
| | ) |
| UNITED STATES FOOD AND DRUG | ) |
| ADMINISTRATION, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## REPLY IN SUPPORT OF
## MOTION FOR TEMPORARY RESTRAINING ORDER
## AND EXPEDITED PRELIMINARY INJUNCTION

Michael D. Shumsky (D.C. Bar No. 495078)*
John K. Crisham (D.C. Bar No. 486491)
Stephen S. Schwartz (D.C. Bar No. 477947)
Robert A. Gretch (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
655 15th Street N.W., Suite 1200
Washington, D.C.  20005
(202) 879-5000
(202) 879-5200  fax

*Counsel of Record

*Counsel for Ranbaxy Laboratories, Ltd. and
Ranbaxy, Inc.*

November 18, 2014

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................ 1

    1.    On Lack of Notice or Opportunity to Comment ..................................... 1

    2.    On Jurisdiction ..................................................................................... 3

    3.    On FDA's "Inherent Authority" ......................................................... 6

    4.    On Timeliness....................................................................................... 8

    5.    On The Statutory Standards For TA..................................................... 10

    6.    On What Would Happen If A Criminal Gang Hacked FDA's Computers And Issued A Fake Tentative Approval Letter.................. 16

    7.    On The Defendants' Stone-Throwing ................................................... 17

CONCLUSION................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blue Chip Stamps v. Manor Drug Stores,*
421 U.S. 723 (1975) ........................................................................................ 8

*Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.,*
474 U.S. 361 (1986) ...................................................................................... 14

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,*
511 U.S. 164 (1994) ........................................................................................ 7

*Elkem Metals Co. v. United States,*
193 F. Supp. 2d 1314 (Ct. Int'l Trade 2002) .............................................. 9, 10

*Gonzalez-Servin v. Ford Motor Co.,*
662 F.3d 931 (7th Cir. 2011) ......................................................................... 6

*Gubisch v. Brady,*
No. 88-cv-2031, 1989 WL 44083 (D.D.C. Apr. 20, 1989) .................................. 8

*Hall v. United States,*
132 S. Ct. 1882 (2012) .................................................................................. 14

*Mazaleski v. Treusdell,*
562 F.2d 701 (D.C. Cir. 1977) ........................................................................ 8

*Monument Realty LLC v. Washington Metro. Area Transit Auth.,*
540 F. Supp. 2d 66 (D.D.C. 2008) .................................................................. 18

*Mylan Labs. Ltd. v. FDA,*
910 F. Supp. 2d 299 (D.D.C. 2012) ................................................................ 13

*Nat'l Ass'n of Clean Water Agencies v. EPA,*
734 F.3d 1115 (D.C. Cir. 2013) ..................................................................... 10

*National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,*
440 F.3d 459 (D.C. Cir. 2006) ..................................................................... 5, 6

*New York v. FERC,*
535 U.S. 1 (2002) ........................................................................................... 7

*North Carolina v. EPA,*
531 F.3d 896 (D.C. Cir. 2008) ........................................................................ 7

ii

*Prieto v. United States,*
    655 F. Supp. 1187 (D.D.C. 1987) ....................................................................... 8

*Roberts v. Sea-Land Servs., Inc.,*
    132 S. Ct. 1350 (2012) ................................................................................... 11

*Sanofi-Aventis U.S. LLC v. FDA,*
    842 F. Supp. 2d 195 (D.D.C. 2012) ........................................................... 15, 16

*SEC v. Chenery,*
    318 U.S. 80 (1943) ......................................................................................... 10

*Sosa v. Alvarez–Machain,*
    542 U.S. 692 (2004) ....................................................................................... 11

*Teva Pharms. USA, Inc. v. Sebelius,*
    595 F.3d 1303 (D.C. Cir. 2010) ............................................................. 4, 5, 6

*Texas Indus., Inc. v. Radcliff Materials, Inc.,*
    451 U.S. 630 (1981) ......................................................................................... 7

*Touche Ross & Co. v. Redington,*
    442 U.S. 560 (1979) ......................................................................................... 8

**Statutes**

19 U.S.C. § 1675(b) ......................................................................................... 9

21 U.S.C. § 355(b)(1)(D) .......................................................................... 11, 15

21 U.S.C. § 355(j)(2)(A) ................................................................................. 15

21 U.S.C. § 355(j)(2)(A)(ii) ........................................................................... 11

21 U.S.C. § 355(j)(2)(A)(iii) .......................................................................... 11

21 U.S.C. § 355(j)(2)(A)(iv) .......................................................................... 11

21 U.S.C. § 355(j)(2)(A)(v) ............................................................................ 11

21 U.S.C. § 355(j)(2)(A)(vi) ..................................................................... 11, 15

21 U.S.C. § 355(j)(4) ...................................................................................... 12

21 U.S.C. § 355(j)(4)(A) ........................................................................... 15, 16

21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) ............................................ 10, 12, 15, 17

21 U.S.C. § 355(j)(5)(D)(i)(IV) ........................................................................ 12

21 U.S.C. § 501(a)(2)(B) ................................................................................... 17

**Other Authorities**

Department of Justice, *Press Release:*
    *Endo Pharmaceuticals and Endo Health Solutions to Pay $192.7 Million to*
    *Resolve Criminal and Civil Liability Relating to Marketing of Prescription*
    *Drug Lidoderm for Unapproved Uses*, Feb. 21, 2014, *available at*
    http://tinyurl.com/EndoGuiltyPlea
    (last visited Nov. 19, 2014) ......................................................................... 18

Mem. from Martin Shimer,
    Branch Chief, Regulatory Support Branch,
    Office of Generic Drugs, on 180–Day Exclusivity for Valsartan Tablets 1–2
    (Sept. 28, 2012) .......................................................................................... 13

Warning Letter No. 320-11-014 (June 3, 2011)
    *available at* http://tinyurl.com/ReddysGMPWarning
    (last visited Nov. 19, 2014) ......................................................................... 17

## INTRODUCTION

At 5PM yesterday, FDA and the defendant-intervenors filed nearly 100 pages of briefs in opposition to Ranbaxy's motion for a temporary restraining order and expedited preliminary injunction. Ranbaxy is fully prepared to address their arguments at this afternoon's hearing, along with any questions the Court may have about this historically unprecedented case. In advance of that hearing, we wish to offer the following points for the Court's consideration:

### 1.    On Lack of Notice or Opportunity to Comment

Both FDA and defendant-intervenor Dr. Reddy's seek to excuse the government's conduct by insinuating that Ranbaxy in fact received notice that FDA was considering the rescission of its six-year-old TA decisions and therefore that Ranbaxy had an opportunity to comment on that issue. *See, e.g.*, FDA Br. at 21-22 (noting that Dr. Reddy's counsel here had filed a so-called Citizen Petition ("CP") challenging Ranbaxy's eligibility for exclusivity and that Ranbaxy later responded to that CP); Dr. Reddy's Br. at 16 (same). Dr. Reddy's even asserts that "Ranbaxy did not address its inability to ensure product quality through cGMP compliance at the relevant facilities" when it answered the CP. Dr. Reddy's Br. at 16.

Nonsense. Neither the CP nor any other pleading submitted in the CP docket raised any argument regarding Ranbaxy's eligibility for TA six years ago, whether based on the compliance status of the affected facilities or any other ground. *See, e.g.*, Ex. 1 to Dr. Reddy's Br. Instead, the CP was predicated on factually baseless assertions that every single one of Ranbaxy's ANDAs was tainted by fraud and therefore should be stripped of exclusivity—a discredited assertion

that FDA itself has repudiated.  *See* Compl. Exs. 1-2 (concluding that neither of the ANDAs at issue in this case contained an untrue statement of material fact or pattern or practice of data irregularities).  Needless to say, the CP's libelous assertions hardly put Ranbaxy on notice that FDA was considering rescinding the company's TAs, and Ranbaxy of course had no occasion to address the status of its TAs because they weren't at issue in that proceeding.

Instead, as FDA now acknowledges, the actual impetus for its November 4 decision came from secret correspondence to FDA from intervenor Endo in February 2014.  FDA Br. at 20-21.  But FDA ***never*** shared that secret correspondence with Ranbaxy; Endo ***never*** filed that secret correspondence or advanced similar arguments in the public CP docket; and FDA ***never*** informed Ranbaxy that it was considering "Endo's [secret] argument that Ranbaxy 'failed to obtain a ***valid*** tentative approval,'" *id*. at 21 (apparently quoting Endo's secret letter; emphasis in original), whether before ***or*** after FDA "began to prepare a memorandum addressing the arguments raised in Endo's letter … in July 2014."  *Id*.

The fact that FDA acted in cahoots with Endo to prevent Ranbaxy from addressing the arguments the Agency relied upon to strip Ranbaxy's exclusivity lays bare its outrageous conduct.  And it stands in marked contrast to the Agency's contemporaneous actions in connection with other proceedings.  Indeed, less than one month before FDA says it started writing its decision here, the Agency expressly directed another company to re-file a previously "confidential, ex parte submission" in a public Citizen Petition docket for the express purpose of "allow[ing]

2

others the opportunity to comment and participate in the decision-making process" and to "facilitate creation of an administrative record on which the Agency may base future decisions."  Letter from N. Hayes to D. Ahern, June 9, 2014, FDA Docket No. 2014-P-0933-0003 (Exh. 1 to Petition, filed July 2, 2014) (attached here as Reply Exh. 1).  There is no legitimate justification for FDA's failure to have followed the same course of action here, and its disparate treatment of Ranbaxy is beneath the government.

## 2.    On Jurisdiction

FDA briefly asserts that this Court somehow lacks jurisdiction to address Ranbaxy's challenge to the Agency's November 4 decision insofar as it addresses the rescission of Ranbaxy's TA for generic Nexium® products (as opposed to generic Valcyte® products).  FDA Br. at 24-25.  That argument is frivolous.  First, FDA does ***not*** dispute that this Court has jurisdiction to address Ranbaxy's challenge to the Agency's decision to strip the company's statutory right to 180-day exclusivity for generic Valcyte® products.  As a result, there is no question this Court has jurisdiction over this litigation, including Ranbaxy's challenges ***both*** as to FDA's legal authority to correct alleged "mistakes" six years after the fact, without providing notice or an opportunity to comment, after a party has relied on the prior decisions to its detriment, in the absence of any statutory authority for doing so, and at odds with the relevant statutory authority that does exist, ***and*** as to FDA's legal interpretation of the statute's TA provisions—challenges that of course equally are at issue with respect to both of these ANDAs.  The government's jurisdictional objection therefore is puzzling at best.

3

Second, FDA's decision to revoke Ranbaxy's TA for generic Nexium® products unquestionably is final agency action that is ripe for review in its own right. The Agency has rescinded Ranbaxy's generic Nexium® TA; barring the relief sought here, it is gone for all time (and, if the Agency is to be believed, it never even existed). Ranbaxy's challenge to that final action is of course based on the same grounds as its challenge to FDA's rescission of the company's generic Valcyte® TA. The Agency identifies no factual differences between the two cases that warrant deferring review, and there are none. Perhaps most important, the D.C. Circuit definitively rejected the exact same ripeness arguments FDA now raises in a case the Agency surprisingly fails to cite: *Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303 (D.C. Cir. 2010).

*Teva* involved a first ANDA applicant's challenge to FDA's policy of allowing brand manufacturers to "delist" — or remove — patents from the Orange Book following submission of an exclusivity-qualifying Paragraph IV certification. In 2008, the Agency addressed that issue in an administrative proceeding involving first-filer Hi-Tech, holding both that the statute allowed such delistings and that their effect was to divest first-filers like Hi-Tech of 180-day exclusivity. *Id*. at 1307 (citing and discussing the Hi-Tech precedent). One year later, first-filer Teva realized that FDA's Hi-Tech decision meant that it likewise would forfeit exclusivity for a different product on which it held 180-day exclusivity rights. It therefore filed suit challenging the Agency's Hi-Tech rationale—even though FDA had not yet applied the Hi-Tech precedent to Teva's ANDA. *Id*. at 1308 ("[I]n light of the Hi–

4

Tech Letter, Teva saw the writing on the wall [and] went straight to the district court, hoping for a declaratory judgment rejecting the FDA's interpretation and an order that the FDA grant it exclusivity.").

Citing the same authorities it invokes here and using almost identical language, FDA asserted that Teva's pre-enforcement challenge was not ripe because FDA had not formally applied the Hi-Tech ruling to strip Teva's exclusivity. The D.C. Circuit flatly rejected the Agency's argument, explaining that the issues were fit for review because FDA's Hi-Tech decision meant there was "virtually no doubt, as a practical matter, what approach the agency will apply to Teva. And the implication of the FDA's position for any exclusivity that Teva would otherwise merit is equally clear: as discussed above, the unambiguous result of the agency's interpretation is that any such entitlement is already forfeited." *Id.* at 1309.

The Court likewise rejected FDA's assertion that Teva would not suffer any hardship from delayed review. It began by noting "that hardship is not a *sine qua non* of ripeness" and that "'where there are no significant agency or judicial interests militating in favor of delay, lack of hardship cannot tip the balance against judicial review.'" *Id.* at 1310 (quoting *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464 (D.C. Cir. 2006)) (original alterations omitted). But the court found no need to "consider the effect of a failure to show hardship, as Teva faces at least one harm from delayed judicial review cognizable in the ripeness analysis: a near-certain loss of the first-mover advantage to which the company

claims entitlement." *Id*. That is precisely what Ranbaxy has shown here, and the D.C. Circuit's rejection of FDA's ripeness claim in this exact context is dispositive.

As in *Teva*, FDA's holding that the rescission of Ranbaxy's generic Valcyte® ANDA caused it to forfeit exclusivity leaves "virtually no doubt, as a practical matter, what approach the agency will apply to" Ranbaxy's generic Nexium® ANDA. *Id*. at 1309. As in *Teva*, Ranbaxy "faces at least one harm from delayed judicial review cognizable in the ripeness analysis: a near-certain loss of the first-mover advantage to which the company claims entitlement." *Id*. at 1310. And if anything, the case for exercising jurisdiction here is even stronger than in *Teva*. After all, the Agency's decision rescinding TA for Ranbaxy's generic Valcyte® and generic Nexium® ANDAs arises from common circumstances, involves a single plaintiff, takes the form of a single decision, and is being defended in this single case—not from two entirely different matters, involving two different plaintiffs, in two different cases, more than a year apart. Every litigant would rather forget the cases it has lost, but the government's failure even to acknowledge *Teva* is unfortunate. *Cf. Gonzalez-Servin v. Ford Motor Co.*, 662 F.3d 931, 934 (7th Cir. 2011) (Posner, J.) (condemning "[t]he 'ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist'").

### 3.     On FDA's "Inherent Authority"

Both FDA and Dr. Reddy's argue that Congress's ***express*** grant of authority to rescind final approval (but not TA) shows that the Agency must have unbounded ***implied*** authority to rescind TA. FDA Br. at 37-38 ("The statute does not limit FDA's authority to rescind an erroneously-issued [TA] letter."); Dr. Reddy's Br. at

10 ("[T]here is no statutory provision that governs FDA rescission of TA.  Thus, FDA's inherent reconsideration authority with respect to grants of [TA] remains wholly intact.") (emphasis omitted).

That *non sequitur* gets it precisely backwards.  As the Supreme Court and D.C. Circuit repeatedly have warned, "an agency literally has no power to act … unless and until Congress confers power upon it."  *New York v. FERC*, 535 U.S. 1, 18 (2002); *see also North Carolina v. EPA*, 531 F.3d 896, 922 (D.C. Cir. 2008) ("Lest EPA forget, it is a creature of statute, and has only those authorities conferred upon it by Congress; if there is no statute conferring authority, a federal agency has none.") (citation and internal quotation omitted).  Neither FDA nor the intervenors identify even a single case in which Congress has provided express statutory authority for an agency to withdraw certain rights but not others, but a court nonetheless has inferred from Congress's silence that the agency must have inherent authority to withdraw the other right as well.  That failure is not surprising, since courts typically draw the exact opposite inference where Congress knows how to do something and chooses not to.  *See, e.g.*, *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 184 (1994) ("The fact that Congress chose to impose some forms of secondary liability, but not others, indicates a deliberate congressional choice with which the courts should not interfere."); *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 & n.11 (1981) (holding "that Congress neither expressly nor implicitly intended to create a right to contribution" because it "knows how to define a right to contribution" and

did not); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 572 (1979) ("[W]hen Congress wished to provide a private damage remedy, it knew how to do so and did so expressly."); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734 (1975) ("When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly."). Defendants' argument not lacks any support in the case law; it contradicts the ordinary rules of statutory interpretation.

### 4.    On Timeliness

Nor have the defendants identified even a single case in which a court has sanctioned a federal agency's delay in rectifying a supposed "mistake" that it made six years earlier, much less after the agency self-consciously deprived the affected party of notice that it intended to reconsider the decision and an opportunity to comment.   Again, that is not surprising, since the courts—including the D.C. Circuit—repeatedly have warned that the permissible time period for correcting errors must be "measured in weeks, not years."   *Mazaleski v. Treusdell*, 562 F.2d 701, 720 (D.C. Cir. 1977); *see also Prieto v. United States*, 655 F. Supp. 1187, 1191-92 (D.D.C. 1987) (holding it "completely clear that the Secretary exceeded his authority" by reconsidering decision nine months later); *Gubisch v. Brady*, No. 88-cv-2031, 1989 WL 44083, at *10 (D.D.C. Apr. 20, 1989) (holding that the government's "contention that there is no time limit on its ability to reopen its decisions is meritless" and rejecting reconsideration after sixteen months).

The closest they come is a decision from the Court of International Trade that allowed the International Trade Commission ("ITC") to reconsider decisions it had

issued approximately four years later.  *See Elkem Metals Co. v. United States*, 193 F. Supp. 2d 1314 (Ct. Int'l Trade 2002).   But *Elkem Metals* is totally distinguishable, since it rested on the discovery of new evidence not known to the ITC when it issued the relevant decisions and since the affected parties were provided a full opportunity to comment on the issues.  That case arose after the ITC found in 1993-94 that foreign ferrosilicon producers from several countries were selling their products in the United States below fair value ("dumping") and that the Venezuelan government was improperly subsidizing such sales, all to the detriment of the U.S. ferrosilicon industry.  *Id*. at 1317.  That factual finding in turn led the Department of Commerce to issue antidumping orders against the foreign producers and impose duties on the Venezuelan products.  *Id*.

In 1998, however, the foreign producers publicly petitioned the ITC for review of the original findings on the ground that a "recently disclosed price-fixing conspiracy among some domestic manufacturers, and its consequent distortion of the price data presented to the ITC during its original material injury investigations, constituted 'changed circumstances' sufficient to warrant review pursuant to 19 U.S.C. § 1675(b)."  *Id*.  In response to that petition, the ITC issued a formal notice in the *Federal Register* announcing its intention to reconsider the prior decisions, and expressly invited the domestic ferrosilicon producers who had benefited from antidumping orders and duties to "submit comments, including new factual information … relating to the original periods of investigation."  *Id*. at 1318 (internal quotation omitted).

The ITC later reversed and vacated its prior decision, *id.*, and the domestic beneficiaries of the original decision thereafter challenged the timeliness of the ITC's reconsideration.  The Court of International Trade later held that the ITC had acted in a timely fashion because it "took action soon after it possessed information it believed substantiated the allegations concerning the price-fixing conspiracy." *Id.* at 1322.  That holding is obviously inapplicable here, where FDA has had full knowledge of all the relevant facts all along, came to regret how it originally handled them, and seeks to backtrack.[1]

### 5.    On The Statutory Standards For TA

Neither FDA nor the intervenors even attempt to address the clear textual distinctions ***within*** the statute's TA provisions or ***between*** the TA provisions and the final approval provisions.  Those distinctions are fatal to the government's case.  TA depends on an ANDA "meet[ing] the requirements of paragraph (2)(A)," 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA), and as Ranbaxy previously explained, Congress established two different kinds of requirements in that subsection.  ***Nine separate***

---

[1]   In an effort to bolster FDA's position, Dr. Reddy's attempts to argue that FDA's decision indeed rested on new facts because the Agency allegedly "fail[ed] to discover—at least at that time—the severity of cGMP compliance issues at [the affected] facilities."  Dr. Reddy's Br. at 11.  But even the government doesn't make that argument, because it is both false and irrelevant: As the operative decision and FDA's brief make clear, the relevant facilities were subject to Warning Letters at the time of the TAs, and under FDA's decision, even a single GMP violation (no matter how severe) is sufficient to foreclose TA.  In any event, it is well-settled that agency decisions can only be defended only on the grounds advanced by the agency itself.  *See, e.g.*, *SEC v. Chenery*, 318 U.S. 80, 95 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."); *Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1138 (D.C. Cir. 2013) ("EPA did not state this rationale in the rulemaking, and we cannot accept counsel's post hoc rationalizations for agency action.") (quotation and alteration omitted).

*times*, Congress required the ANDA applicant to provide substantive proof that its proposed generic product met applicable criteria: "information to show" sameness of the product's active ingredient; "information to show" sameness of the product's route of administration, dosage form, and strength; "information to show" bioequivalence; "information to show" labeling sameness; and so on.  *Id*. § 355(j)(2)(A)(ii)-(v).   When it came to the applicant's facilities and controls, however, Congress shifted gears: It required only "a full description" and provided no substantive standard except unadorned disclosure.  *See id*. § 355(j)(2)(A)(vi) (cross-referencing *id*. § 355(b)(1)(D)).

That distinction is significant: Having required ANDA applicants to provide "information to show" on ***nine separate occasions*** within this provision—in each instance immediately linking that requirement to a substantive standard—it defies the most basic canons of statutory interpretation to suggest that Congress's requirement that applicants provide only "a full description" of their facilities and controls (untethered to a substantive standard of proof) is immaterial.  Precisely the opposite is true: "'[T]he usual rule [is] that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended.'"  *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 n.5 (2012) (quoting *Sosa v. Alvarez–Machain*, 542 U.S. 692, 711, n.9 (2004)).   Indeed, that "usual rule" has even greater force here, because the statute goes on to specify that Final Approval does indeed require a substantive determination that the applicant's facilities are not "inadequate," 21 U.S.C.

11

§ 355(j)(4), thereby tying the prior disclosure requirement to a standard of proof at the Final Approval stage **alone**.

The defendants make three basic responses, but none is sufficient to overcome the obvious textual and structural differences manifesting Congress's intent to impose different burdens at the different stages of approval. The government initially argues that the statute's definition of TA shows that the TA and Final Approval requirements are co-extensive because TA "is appropriate when the **only** reason that an application cannot receive final approval relates to the statutory requirements regarding the timing of approvals, such as an unexpired exclusivity period or a stay." FDA Br. at 29. Not so. FDA bases that argument entirely on the TA definition's use of the word "**because**," *id.* (quoting 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) with emphasis), which it says "plain[ly]" requires that one of the subsequently enumerated conditions—which indisputably applied here— must be the exclusive, but-for cause of the applicant's inability to "receive final approval" within the statutory deadline. *Id.*

But FDA has taken—and prevailed in court on—precisely the opposite position with respect to the statute's other causation requirement, which arises in this same context. Like the causation requirement at issue here, the very failure-to-obtain TA forfeiture trigger that FDA invokes in this case includes an exception where the first applicant's "failure [to obtain TA within 30 months] **is caused by** a change in or a review of the requirements." 21 U.S.C. § 355(j)(5)(D)(i)(IV) (emphasis added). And interpreting the materially indistinguishable causation requirement in

12

that provision of the statute, FDA repeatedly has made clear—and the courts have agreed—that the exception applies even if the applicant would have failed to obtain TA within the deadline for reasons wholly apart from the Agency's change or review in the applicable requirements:

> But-for causation is not required to meet this exception.  That is, "[i]f *one of the causes* of failure to get tentative approval by the 30–month forfeiture date was a change in or review of the requirements for approval imposed after the application was filed, an applicant will not forfeit eligibility *even if there were other causes for failure to obtain tentative approval by the 30–month forfeiture date that were not caused by a change in or review of the requirements for approval*."  Hence, "an applicant need only show that acceptability of one aspect of the ANDA (e.g., chemistry) was delayed due to a change in or review of the requirements for approval, *irrespective of what other elements may also have been outstanding at the 30–month date*."

*Mylan Labs. Ltd. v. FDA*, 910 F. Supp. 2d 299, 302 (D.D.C. 2012) (quoting Mem. from Martin Shimer, Branch Chief, Regulatory Support Branch, Office of Generic Drugs, on 180–Day Exclusivity for Valsartan Tablets 1–2 (Sept. 28, 2012); alteration in original; internal citations omitted; emphasis added here).  There is no reason to treat the causation requirements in these closely-related provisions differently, not least of which because they relate the very same thing—TA.  The Agency cannot have it both ways.

FDA's next argument runs even further afield.  It contends that this Court should ignore the obvious textual and structural distinctions both *within* the TA provisions and *between* the TA and Final Approval provisions because the above-noted forfeiture exception applies only when FDA has changed the Final Approval requirements and not when it has changed the TA requirements.  According to the

Agency, that must mean that the TA and Final Approval requirements are co-extensive; otherwise there would be "an inconsistency in the statute." FDA Br. at 31. But relying on an exception to the forfeiture trigger is a thin basis for ignoring the obvious textual and structural distinctions both ***within*** and ***between*** the substantive provisions that establish the actual TA and Final Approval requirements, and FDA's argument misunderstands the nature of statutory exceptions in any event.

In simple terms, exceptions to statutory requirements are a matter of legislative grace, and Congress has plenary power to define their scope however it chooses. *See, e.g.*, *Hall v. United States*, 132 S. Ct. 1882, 1983 (2012) ("[T]here may be compelling policy reasons for treating postpetition income tax liabilities as dischargeable. But if Congress intended that result, it did not so provide in the statute. Given the statute's plain language, context, and structure, it is not for us to rewrite the statute, particularly in this complex terrain of interconnected provisions and exceptions enacted over nearly three decades."). It thus is irrelevant whether FDA would have written the exceptions to forfeiture more broadly than Congress did, or would prefer that the exceptions be narrower than they are. The Agency may not simply rewrite the statute because it thinks Congress should have written the exceptions differently, particularly when Congress has carefully chosen the words used to establish the applicable statutory structure. *See, e.g.*, *Board of Governors of Fed. Reserve Sys. v. Dimension Fin. Corp.*, 474 U.S. 361, 374 (1986) ("The statute may be imperfect, but the Board has no power to correct flaws that it

14

perceives in the statute."). And in the end, any "inconsistency" is illusory, since changes in the substantive standards for Final Approval almost always will affect the disclosure standard for TA as well: As relevant here, for example, a substantive change in GMP will change not only the proof required for Final Approval, but the nature of the description required for TA.

Finally, FDA argues that the courts previously rejected the argument that the TA requirements and Final Approval requirements are distinct. FDA Br. at 30 ("[A]nother court in this district has already determined 'that the agency is authorized to interpret the requirement of a 'full description' of the methods and controls called for by section 355(b)(1)(D) to encompass the information it needs to make the findings required by section 355(j)(4)(A)—and indeed, that the words 'full description' must be read as a means to accomplish that purpose.') (quoting *Sanofi-Aventis U.S. LLC v. FDA*, 842 F. Supp. 2d 195, 204 (D.D.C. 2012)).

The language FDA quotes provides no support for its position here. Instead, it undermines it. Ranbaxy agrees that the "full description" required by § 355(j)(2)(A)(vi)'s cross-reference to § 355(b)(1)(D) is broad enough to require applicants to provide a description sufficient to enable FDA ***to determine whether or not the applicant's ANDA meets the Final Approval standards*** set forth in § 355(j)(4)(A). But that does not remotely mean that the applicant ***must actually satisfy the substantive standards set forth in § 355(j)(4)(A)*** in order to fulfill its disclosure obligations under § 355(j)(2)(A) and thereby qualify for TA under § 355(j)(5)(B)(iv)(II)(dd)(AA). Instead, as FDA's description confirms, the point of

the disclosure requirements is to enable FDA *to make a determination of compliance or non-compliance* with the Final Approval requirements, and that determination is of course relevant only at the Final Approval stage. *Sanofi*, 842 F. Supp. 2d at 204 ("Congress gave FDA the authority to utilize its expertise to determine what information it needs *to make the assessment it is required to make under section 355(j)(4)(A)*.") (emphasis added).

In any case, *Sanofi* had absolutely nothing to do with the question at issue here. The case instead involved a challenge to FDA's consideration of immunogenicity studies in connection with its issuance *of Final Approval* to a generic applicant, *see id.* at 196-97, 203, and never even uses the words "tentative approval." As a result, it simply has no relevance here—where the question is whether the TA and Final Approval requirements are coextensive despite their differing language, and where it is beyond dispute that Ranbaxy provided all the information it was required to provide at the time it sought and was granted the TAs at issue here.

### 6. On What Would Happen If A Criminal Gang Hacked FDA's Computers And Issued A Fake Tentative Approval Letter

Faced with all of this, FDA ultimately posits a convoluted hypothetical involving a criminal gang that — perhaps thwarted in its attempt to hack Kim Kardashian's mobile phone? — opts to infiltrate FDA's computer systems and issue a fraudulent TA letter ("complete with electronic signature") for a proposed generic drug product instead. FDA Br. at 45. At this point, you know the government's argument must be in real trouble. And it is. The gang's plan not only would be

16

silly, but legally ineffective: The resulting missive would not constitute "a notification to an [ANDA] applicant *by the Secretary*," 21 U.S.C. § 355(j)(5)(B)(iv)(II)(dd)(AA) (emphasis added), and so would have no legal effect. Apart from its sheer amusement value, the Agency's hypothetical contributes nothing to this case—and it bears no resemblance to the facts here, where FDA issued genuine TA notices to Ranbaxy after the then-Director of the Office of Generic Drugs, the then-head of the Agency's Office of Compliance, the then-current Chief Counsel of FDA and FDA's current Chief Counsel were aware of the issues Ranbaxy was facing and personally participated in discussions concerning the Agency's legal authority to issue these TAs despite Ranbaxy's well-known compliance problems.

### 7.    On The Defendants' Stone-Throwing

Without credible legal and factual arguments, the defendants ultimately attempt to justify FDA's punitive actions in this case by repeatedly smearing Ranbaxy.  The attacks lodged by Dr. Reddy's and Endo come with particular ill-grace; both have their own well-documented histories of serious misconduct during the past three years.  *See, e.g.*, Warning Letter No. 320-11-014 (June 3, 2011) (citing "significant deviations from Current Good Manufacturing Practice (CGMP) for the manufacture of APIs" at Dr. Reddy's that "cause your APIs to be adulterated within the meaning of section 501(a)(2)(B) of the [FDCA]."), *available at* http://tinyurl.com/ReddysGMPWarning (last visited Nov. 19, 2014); Department of Justice, *Press Release: Endo Pharmaceuticals and Endo Health Solutions to Pay $192.7 Million to Resolve Criminal and Civil Liability Relating to Marketing of*

17

*Prescription Drug Lidoderm for Unapproved Uses*, Feb. 21, 2014, *available at* http://tinyurl.com/EndoGuiltyPlea (last visited Nov. 19, 2014).

To the extent they invoke the doctrine of "unclean hands," Dr. Reddy's Br. at 18; Endo Br. at 17-18, their claims are baseless.  Contrary to their assertions, that doctrine does not forever close the courthouse doors to companies that have committed wrongs in the past (if it did, Endo and Reddy's would be in big trouble). Rather, both common sense and precedent dictate that the party asserting "unclean hands" as a defense to equitable relief must demonstrate "a direct link between plaintiffs' unethical behavior and the underlying obligation that formed the basis of the lawsuit." *Monument Realty LLC v. Washington Metro. Area Transit Auth.*, 540 F. Supp. 2d 66, 82 (D.D.C. 2008). As a result, "[e]quity does not require blamelessness with respect to other matters, but [merely] that one seeking relief must have acted fairly and without fraud or deceit ***as to the controversy at issue***." *Id*. (emphasis added).  The doctrine thus has no application here, where FDA affirmatively has determined that there was ***no fraud***, ***no untrue statement of material fact***, and ***no pattern or practice of data irregularities*** with respect to the two ANDAs at issue in this litigation.

As for the government, it should know better.  Ranbaxy has been open about its past compliance issues; accepted full responsibility for its misconduct and pleaded guilty to federal charges; and paid a very heavy price from which it will take years to recover.  But the fact that Ranbaxy engaged in certain bad acts does not taint everything the company has ever done, or justify the government's

unbridled assertion of power and outright contortion of the statute's plain language to impose literally hundreds of millions of dollars in additional punitive sanctions.

## CONCLUSION

For the foregoing reasons, Ranbaxy respectfully requests that this Court grant its motion for a temporary restraining order and expedited preliminary injunction.

Dated: November 19, 2014                 Respectfully submitted,

                                         By: /s/ Michael D. Shumsky
                                         Michael D. Shumsky (D.C. Bar No. 495078)*
                                         John K. Crisham (D.C. Bar No. 486491)
                                         Stephen S. Schwartz (D.C. Bar No. 477947)
                                         Robert A. Gretch (*pro hac vice* forthcoming)
                                         KIRKLAND & ELLIS LLP
                                         655 15th Street N.W., Suite 1200
                                         Washington, D.C.  20005
                                         (202) 879-5000
                                         (202) 879-5200  fax

                                         *Counsel of Record

                                         *Counsel for Ranbaxy Laboratories, Ltd. and
                                         Ranbaxy, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 14th day of November, 2014, he caused the foregoing REPLY to be served upon the following via the Court's CM/ECF system:

Roger Joseph Gural
U.S. Department of Justice
1000 SW Third Avenue, Suite 600
Portland, OR 97204
(202) 307-0174

*Counsel for the Federal Defendants*

Douglas B. Farquhar
Hyman, Phelps & McNamara, P.C.
700 13th Street, NW, Suite 1200
Washington, DC 20005-5929
(202) 737-9624

*Counsel for Dr. Reddy's Laboratories, Inc.*

Chad A Landmon
Axinn, Veltrop & Harkrider LLP
950 F Street, NW, 7th Floor
Washington, DC 20004
(202) 721-5415

*Counsel for Endo Pharmaceuticals Inc.*

/s/ Michael D. Shumsky
Michael D. Shumsky

*Counsel for Ranbaxy Laboratories, Ltd.*
*and Ranbaxy, Inc.*